1  Randolph Gaw (S.B. #223718)
   rgaw@gawpoe.com
2  Mark Poe (S.B. #223714)
   mpoe@gawpoe.com
3  GAW | POE LLP
   4 Embarcadero, Suite 1400
4  San Francisco, CA 94111
   Telephone: (415) 766-7451
5  Facsimile: (415) 737-0642

6  Attorneys for Plaintiff Donald Okada

7

8

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11

12  DONALD OKADA                    Case No. 2:15-CV-7006

13            Plaintiff,            **COMPLAINT**

14      v.

15  MARK WHITEHEAD

16            Defendant.

17

18

19      Plaintiff Donald Okada ("Okada") hereby makes the following allegations

20  against defendant Mark Whitehead ("Whitehead"):

21                    **JURISDICTIONAL STATEMENT**

22      1.    The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332

23  because the parties are citizens of different states and the amount in controversy

24  exceeds $75,000.

25      2.    Venue is proper in this district pursuant to a forum selection clause in

26  the contract between the parties from which this dispute arises.

27

28

## PARTIES

3.     Plaintiff Donald Okada is an individual domiciled in Orange County, California.

4.     Defendant Mark Whitehead is an individual domiciled in Miami-Dade County, Florida.

## FACTUAL ALLEGATIONS

### *Background*

5.     Okada and Whitehead were longtime business partners who participated in numerous joint ventures together.  This relationship eventually soured due to Whitehead's persistent refusal to equitably share the profits and costs of those ventures with his partner.

6.     One such joint venture was their acquisition of a luxury house at 9 Ocean Ridge Drive in Newport Beach ("Ocean Ridge").  Each person had a 50% interest in that property.  The original plan was for Okada and Whitehead to remodel Ocean Ridge and then re-sell it for a profit.

7.     Following the acquisition, however, Whitehead claimed that he wanted to live at Ocean Ridge instead, and moved his family into it.  Okada acquiesced to this change of plans, but remained a 50% owner of the property.  Whitehead, however, agreed to be responsible for paying all of the homeowners' association fees as he was living in the property.

8.     Another joint venture between the two was memorialized in the formation of a California limited liability company called Beverly Hillbillys LLC ("BH LLC").  Okada and Whitehead each had a 50% interest in BH LLC.  Okada was the sole managing member of that enterprise.

9.     BH LLC acquired a 10.724 acre residential property on Drake Lane, Beverly Hills, California 90210 (the "BH Property").  Okada and Whitehead planned to obtain certain easements for the BH Property and then re-sell it for a profit.

COMPLAINT
CASE NO. 2:15-CV-7006

*Outside Interest in the BH Property*

10.    Beginning in late 2013, Whitehead was approached by a foreign investment group looking to acquire the BH Property (the "Investors").

11.    The Investors owned a Belize holding corporation called Rockford Investment, Inc. ("Rockford"), which in turn owned or controlled all of the shares in five different Dominican Republic corporations called, respectively, SHR SOLAR 24, S.A.; SHR SOLAR 134, S.A.; SHR SOLAR 135, S.A.; SHR SOLAR 136, S.A.; and SHR SOLAR 137, S.A. (collectively, the "SHR SOLAR Entities").

12.    In turn, the SHR SOLAR Entities owned complete title to a luxury mansion and several acres of surrounding real property in the Dominican Republic known as the Lionsgate Mansion (collectively, "Lionsgate").

13.    The Investors proposed to Mr. Whitehead that they would acquire the BH Property in exchange for some cash consideration and a swap of Lionsgate (accomplished through a transfer of Rockford and its subsidiaries, the SHR SOLAR Entities).

14.    Okada was not interested in the terms of that deal and proposed a counteroffer.  On November 26, 2013, Whitehead sent an e-mail to Dann Rogers ("Rogers"), a person acting at that time as some kind of go-between for Whitehead and the Investors, setting forth that counteroffer.  In that e-mail, Whitehead also wrote, "I have a lawyer in (sic) Dominican Republic who can handle the transaction for us there.  And I have spoken with agents there as well on opinions and what needs to be done on the home currently.  We still have to pay some transfer taxes and legal fees."

15.    Rogers responded on November 27, 2013 stating that the Investors had declined Whitehead's counteroffer and had no interest in countering that offer.  Any deal for the BH Property appeared to be dead.

*Negotiations for the Settlement Agreement*

16.     Whitehead was furious that Okada would not agree to the terms offered by the Investors, as he had severe cash flow problems and needed liquidity. In January 2014, he sent repeated e-mails to Okada trying to persuade him to change his mind.

17.     In a January 9, 2014 e-mail to Okada, Whitehead wrote that he had been talking to real estate agents in the Dominican Republic to get their opinion as to how quickly they could sell Lionsgate and for how much.

18.     Throughout February and March 2014, Whitehead continued his attempts to persuade Okada to agree to the general terms proposed by the Investors. He was not successful.

19.     By this time, however, the relationship between Okada and Whitehead was rapidly deteriorating.  For example, Whitehead had borrowed $510,000 from Okada back in 2007 and was refusing to pay back the principal or interest on that loan.  Okada eventually filed an action against Whitehead for breach of a promissory note on March 27, 2014.

20.     Also around spring 2014, Okada brought a separate action against Whitehead for breach of his fiduciary duties in relation to actions taken by Whitehead as a member of another joint venture between the two – a California limited liability company called Cheap As Chips LLC.

21.     Even after Okada filed his lawsuits, Whitehead kept trying to convince him to accept the terms offered by the Investors.  A major sticking point for Okada, however, was that BH LLC had not performed any due diligence on Lionsgate – an important consideration for anyone looking to acquire a property located in an unfamiliar country.

22.     Whitehead steadfastly refused to contribute his 50% share of any expenses relating to having a neutral third party perform due diligence on

COMPLAINT
CASE NO. 2:15-CV-7006

Lionsgate.  Instead, Whitehead kept assuring Okada that he had already performed his own due diligence and was satisfied with what he had learned.

23.     For example, on April 15, 2014, Whitehead sent an e-mail to Okada stating that he had "[d]one a lot of due diligence on this with many lawyers."

24.     For added emphasis, on April 25, 2014, Whitehead sent another e-mail to Okada stating "Like you said you don't like the due diligence I do but believe me I have done a lot on this.  That's why I have the lawyer I have here."

25.     Okada still was reluctant to do a deal, however.  Among other reasons, he had learned that Whitehead was falsely representing to the Investors that he had full authority to enter into agreements on behalf of BH LLC.

26.     Some breakthroughs in negotiations between Whitehead and Okada starting taking place, however, after Whitehead engaged a new attorney to represent him named James Bryant ("Bryant").

27.     As a concession to Whitehead, Okada agreed that any settlement agreement between them would include finalizing a deal with the Investors, where the parties would essentially trade properties with the Investors so that the Investors obtained BH LLC and, in turn, Okada and Whitehead would receive all the shares of Rockford (and thereby receive ownership of Lionsgate).

28.     But, wary of Whitehead's intentions and distrustful of his character, Okada wanted to ensure that any deal he reached with Whitehead would strongly protect his interests and, more importantly, allow him to quickly act to secure those interests if Whitehead again refused to honor his contractual commitments to Okada or engaged in any further misrepresentations.

29.     On May 19, 2014, the parties agreed to one of the major points of a potential settlement agreement.  The parties agreed that Okada would receive a non-voting ownership interest in Rockford worth $950,000 (with Whitehead holding all the remaining interests) and Whitehead would cause Rockford to enter into a

1   promissory note with Okada for the amount of $950,000, secured by a lien upon

2   Lionsgate.

3       30.    That same day, Whitehead sent an e-mail to Guido Perdomo

4   ("Perdomo"), a local attorney in the Dominican Republic whom the Investors were

5   using to handle any issues related to the SHR SOLAR Entities and Lionsgate.

6   Whitehead informed Perdomo that he needed to have a lien or promissory note

7   placed on Lionsgate for $950,000 in favor of Okada. Whitehead then asked

8   Perdomo if he could arrange those details. Okada was not copied on this e-mail.

9       31.    Perdomo replied by e-mail on May 19, 2014, stating that a lien could

10  indeed be placed on Lionsgate, but the SHR SOLAR Entities needed to be updated

11  first, by transforming them into a different corporate entity called a SRL (Sociedad

12  de Responsabilidad Limitada), the Dominican equivalent of a limited liability

13  company. Perdomo cautioned that "no liens could be placed at titles office till this

14  update is completed." Okada was not copied on this e-mail.

15      32.    Whitehead replied that same day to Perdomo's e-mail and clarified

16  "Just a lien on title or loan will do that [sic] correct. Like any other lien." Okada

17  was not copied on this e-mail.

18      33.    Perdomo then replied that same day by e-mail and stated, "Correct but

19  for that we need updated companies." Okada was not copied on this e-mail.

20      34.    Thus, Whitehead was clearly informed – twice on May 19, 2014 by

21  Perdomo – that the SHR SOLAR Entities needed to be transformed into SRLs

22  before any liens could be placed on them. And at the same time, Okada lacked

23  such knowledge.

24      35.    Okada's lack of knowledge did not prevent him from remaining wary

25  of Whitehead, however. Thus, he negotiated an additional condition for the

26  settlement agreement. The parties had to agree that Rockford would be managed

27  by a third party administrator pursuant to written instructions provided by Okada

28  and Whitehead until the $950,000 obligation was paid off. It was imperative to

COMPLAINT
CASE NO. 2:15-CV-7006

Okada that Whitehead would not have control over Rockford or Lionsgate while the $950,000 obligation was still pending.

36.     Whitehead agreed to Okada's additional condition but required that Perdomo be the third party administrator for Rockford.  Okada agreed.

37.     Within a day or two, Whitehead informed Perdomo of the parties' intention to use his services for the SHR SOLAR Entities and Lionsgate.  Perdomo agreed and on May 23, 2014, sent a confirming letter by e-mail to Whitehead.  In that letter, Perdomo wrote "I remind you that all companies must be updated according to the new Corporate Law of the Dominican Republic."  Okada was not copied on this e-mail or the letter.

38.     The parties continued their negotiations, but Whitehead pressured Okada to reach a deal quickly because the Investors were supposedly growing impatient and were preparing to walk away entirely.

39.     On or around July 8, 2014, Whitehead asked Perdomo to send copies of the titles and certificates of registration for the SHR SOLAR Entities.  Perdomo did, and Whitehead forwarded Perdomo's e-mail and its attached documents to Randolph Gaw ("Gaw"), Okada's attorney, on July 8, 2014.

40.     For each certificate of registration for the SHR SOLAR Entities, the listed President for each of the individual corporations was a man named Jose Lantigua ("Lantigua").

41.     Okada's due diligence on the SHR SOLAR Entities revealed that they may not have been in good standing at that time.  Accordingly, Gaw e-mailed Bryant and a man named JP Martins ("Martins"), the lead representative of the Investors, drawing attention to this issue and stating that the SHR SOLAR Entities needed to be reinstated so Okada could receive the appropriate security agreements on them.

42.     Martins replied by e-mail on July 8, 2014 to Gaw and Bryant, explaining that the titles for Lionsgate "are in 100% good standing," and that the

1   SHR SOLAR Entities only needed to be updated to the SRL format "which process

2   is simple (sic) routine and we have informed Mr. Whitehead about this issue over

3   six months ago."  Martins also stated that Perdomo was prepared to do this work,

4   that the work would cost $10,000 in total and would take about 30 days to finish.

5   Martins further said there would be no problems in providing collateral against the

6   titles to Lionsgate.

7        43.   Martins was not a Dominican Republic attorney, however, and so

8   failed to explain some nuances to one of his points.  Under Dominican Republic

9   law, no liens could be placed on Lionsgate **_until_** the SHR SOLAR Entities had been

10   transformed to the SRL format even though the titles for Lionsgate were in good

11   standing.  Okada was not aware of this fact.

12        44.   Whitehead **_was aware of that fact_**, however.  In addition to the two e-

13   mails he had received on May 19, 2014, he had separately e-mailed Perdomo on

14   July 8, 2014 asking him to explain to Gaw "what's [sic] needs to happen and that it

15   does not affect the ability to lien the prpoety [sic]."  Perdomo replied by e-mail that

16   same day with a correction:  "Companies must be updated according to the

17   Corporate Law."  Neither Gaw nor Okada were copied on or forwarded any of these

18   communications.

19        45.   The parties continued finalizing their negotiations.  Whitehead,

20   however, was getting anxious due to his perception that the Investors were getting

21   impatient over a deal not having been agreed upon.  On July 29, 2014, he sent a

22   series of text messages to Okada regarding his queries regarding the SRL

23   conversion.  In one message, Whitehead wrote, "They're Pissed Again Cause This

24   Is And [sic] Issue That should HAVE Been dealt With And One Which Was

25   Explained Months [sic] And Perdramo Could Easily Explain And has no bearing on

26   note or ability to lien property"

27        46.   Worried that the Investors might walk away from the deal if there was

28   further delay (in light of Martins' increasingly impatient e-mails) and, in reliance on

Whitehead's representation that the status of the SHR SOLAR Entities had no bearing on his ability to receive a lien on Lionsgate, Okada entered into the Settlement Agreement with Whitehead on July 31, 2014.  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit A.

### The Terms of the Settlement Agreement

47.     Under the Settlement Agreement, Okada agreed to dismiss his lawsuit regarding Whitehead's breach of fiduciary duties with respect to the Cheap as Chips venture with prejudice.  Okada also accepted a stipulated judgment on his lawsuit against Whitehead over the promissory note, but agreed he could not enforce that judgment except under certain circumstances.

48.     Also under the Settlement Agreement, Okada transferred to Whitehead all title and interest in the Ocean Ridge property.

49.     This transfer was done pursuant to Whitehead's prior representations that he and his family were living at Ocean Ridge.  In truth, however, had been renting out Ocean Ridge for at least several months by that time, but intentionally failed to disclose that fact to Okada.

50.     In fact, Whitehead had previously refused to consider the idea of renting out Ocean Ridge.  For example, in a July 27, 2013 e-mail to Okada, Whitehead expressly rejected a suggestion by Okada that Whitehead move to a different house and rent out Ocean Ridge.  Similarly, in a December 2, 2013 Seller's Affidavit of Nonforeign Status that had been contemporaneously provided by Whitehead to Okada, Whitehead attested under penalty of perjury that Ocean Ridge was his primary residence.

51.     Under the Settlement Agreement, Whitehead agreed to indemnify Okada as to any claims made against Okada by Rogers – the aforementioned go-between in Whitehead's negotiations with the Investors.  This provision was specifically negotiated for, because Rogers had contacted Okada and claimed that Whitehead had made an oral agreement with Rogers regarding the disposition of

BH LLC and had expressed his intention to sue both Okada and Whitehead if it was not honored.  When Gaw questioned Bryant about the validity of Rogers' allegations, Bryant replied that Whitehead had informed him the claims were completely meritless and Whitehead would accordingly agree to indemnify Okada as part of the Settlement Agreement.

52.    Under the Settlement Agreement, Whitehead promised that within 24 hours of closing of the transaction between BH LLC and the Investors, he would secure a first priority lien against Lionsgate in the amount of $950,000 in favor of Okada.

53.    Under the Settlement Agreement, Whitehead agreed that Okada would receive a $950,000 non-voting ownership interest in Rockford upon closing of the transaction between BH LLC and the Investors.

54.    To protect Okada's interests, the parties also agreed under the Settlement Agreement that they would hire Perdomo to manage Rockford as a third party administrator pursuant to Administrator Instructions appended to the Settlement Agreement.  The parties agreed that Perdomo could not deviate from these Administrator Instructions absent written consent from the parties.

55.    The Settlement Agreement also defined events that would constitute a default by Whitehead.  The failure to comply with and perform any of the terms of the Settlement Agreement, or any other agreements between Okada and Whitehead, would result in a default.

56.    Also defined as a default would be Whitehead's failure to comply with or perform any obligations under the laws of the Dominican Republic that might have any impact on Okada's interest in Lionsgate.  Similarly, any acts or omissions by Rockford or Whitehead that may have any negative impact on Okada's interests in Lionsgate would also be a default.

57.     Also defined as a default would be any false or misleading representation made by Whitehead with respect to any of the executed agreements between him and Okada.

58.     The Settlement Agreement also defined what remedies Okada would be entitled to in the event of a default by Whitehead.  That section specifically stated that Okada would be entitled to any remedies under Dominican Republic law, including the option of having legal and equitable title of Lionsgate transferred to himself.

59.     The Administrator Instructions, which were even more explicit as to Okada's remedies, stated that the parties gave Power of Attorney to the Administrator (i.e., Perdomo) over Rockford and the SHR SOLAR Entities so that the Administrator could undertake certain actions in favor of Okada in the event of Whitehead's default.

60.     Under the Administrator Instructions, the Administrator would hold in escrow 100% of all present and future shares of Rockford and its subsidiaries until Whitehead had fully performed under his agreements with Okada.

61.     The Administrator Instructions also stated that, in the event of Whitehead's default and upon the Administrator's receipt of a notice of such default, the Administrator would promptly transfer all shares of Rockford and its subsidiaries to Okada upon his election.

62.     Okada, Whitehead and Perdomo all executed the Administrator Instructions.  A true and correct copy of the executed Administrator Instructions is attached hereto as Exhibit B.

63.     The above-referenced measures were specifically and deliberately bargained for by Okada after months of negotiation.  Okada knew that Whitehead had avoided all opportunities to pay back his debts to Okada in the past, so Okada requested and received such measures to ensure he would receive all of Rockford and Lionsgate, at his option, if Whitehead again tried to welch on his obligations.

64.     Furthermore, Okada gave substantial consideration to receive this deal, including but not limited to, freely surrendering his 50% interest in Ocean Ridge, which is currently worth in excess of $4.5 million.  Okada paid $604,461.51 of the down payment, compared to $105,000 from Whitehead, when the parties acquired the property for $3.5 million back in 2005.

### Whitehead Immediately Attempts to Cheat Okada

65.     After the parties executed the Settlement Agreement, they proceeded to finish up the remaining tasks needed to close the transaction between BH LLC and the Investors.

66.     During a routine exchange of correspondence, Gaw e-mailed Martins on August 6, 2014 requesting that he be copied on any exchanges with Whitehead regarding the Investors' transfer of Rockford shares.  Gaw explained that this was because Okada was supposed to receive some non-voting equity interests in Rockford as part of the transaction.

67.     Martins replied back that same day with surprise, stating in his e-mail "[t]his is the first time I hear, that Okada would have an interest also in the equity of Rockford?!"  Martins also stated that the current plan was to hand over ownership of Rockford's shares to Whitehead's family trust.

68.     Okada found this development to be very surprising and disconcerting. The parties had been negotiating for months that Okada would receive an equity interest in Rockford.  Yet Whitehead had made no attempt to disclose this fact to the Investors and was apparently planning to quietly have those interests transferred instead to his family trust.

69.     Okada's fortuitous discovery nearly unraveled the entire deal between BH LLC and the Investors, because apparently under Belize corporate law, there had to be some kind of vetting process of Okada before Rockford's shares could be transferred to him.  This process would take long enough that BH LLC would miss the closing date of its anticipated transaction with the Investors.

COMPLAINT
CASE NO. 2:15-CV-7006

70.     Accordingly, on August 13, 2014, Okada and Whitehead executed the First Amendment to Settlement Agreement.  A true and correct copy of the First Amendment to Settlement Agreement is attached hereto as Exhibit C.

71.     In that amended agreement, the parties agreed that if Okada could not receive his ownership interest in Rockford upon the closing of the transaction between BH LLC and the Investors, the entire ownership interest in Rockford would instead be conveyed to Perdomo.

72.     The amended agreement did not change any other terms in the Settlement Agreement or the Administrator Instructions.

### The Deal Finally Closes

73.     On August 15, 2014, BH LLC and the Investors closed their transaction.  Per the terms of that deal, the Investors delivered all shares in Rockford over to Perdomo.

74.     On that same day, Okada delivered a fully executed and notarized Grant Deed transferring his entire interest in Ocean Ridge to Whitehead and Whitehead's wife.

### Whitehead Repeatedly Defaults Under the Settlement Agreement

75.     After the deal closed, Okada waited for Whitehead to begin the process of inscribing a lien on Lionsgate in favor of Okada.  This did not happen.

76.     Despite a 24-hour deadline for him to secure Okada's lien on Lionsgate, Whitehead did nothing to fulfill his contractual obligations.  On August 28, 2014 – two weeks after the transaction close – Whitehead paid a visit to Perdomo in the Dominican Republic.  Not once did Whitehead mention anything about putting the lien on Lionsgate.  Perdomo, however, reminded Whitehead that he needed to transfer the SHR SOLAR Entities to SRLs, as Perdomo was aware of Whitehead's obligations under the Settlement Agreement and Administrator Instructions.

77.     Still, nothing continued to happen and Okada heard nothing about Whitehead making progress on inscribing the required lien.  Concerned, Okada arranged for a conference call between himself, Gaw, Bryant and Perdomo to discuss the lien issue.

78.     This conference call took place on September 15, 2014.  During the call, Perdomo explained (for the first time to Okada and Gaw) that no liens could be placed on Lionsgate until the SHR SOLAR Entities were transformed to SRLs and the cost of this action would be $10,000.  Perdomo also stated to Bryant that he had personally informed Whitehead about this issue a month or two earlier.  Perdomo further explained it would take approximately one month for the Dominican authorities to transform the SHR SOLAR Entities into SRLs.

79.     To Okada, Bryant sounded concerned over the phone, as it appeared he had not been told by Whitehead as to the need to first transform the SHR SOLAR Entities to SRLs.  Bryant stated at the conclusion of this call that he would have Whitehead immediately begin the process of transforming the SHR SOLAR Entities.

80.     On October 6, 2014, Perdomo sent an e-mail to Okada and Whitehead informing them that Whitehead had decided to terminate the services of Lantigua.  As such, under Dominican Republic law, Lantigua was entitled to an immediate severance payment of $20,000 due to his ten years of employment with the SHR SOLAR Entities.  Perdomo also stated that if the payment was not made within a few days, then Lantigua would be entitled to place a lien on Lionsgate.

81.     Whitehead's actions were taken unilaterally and without consultation with anyone.  There was an immediate uproar.  Whitehead included Martins on the resulting e-mail chain and, on October 6, 2014, Martins replied by e-mail to Okada and Whitehead washing his hands of everything.  Martins stated that he had already explained to Whitehead that there "has been no need to liquidate any of the local employees after this deal… in a case of replacing a staff member a liquidation

1   payment might be due…. Guido [Perdomo] knows better than I do what would be

2   the right amount due and how it is calculated."

3          82.   Perdomo then reiterated that a severance payment was indeed owed to

4   Lantigua. But on October 6, 2014, Whitehead sent an e-mail to Perdomo and

5   Okada expressing defiance and proclaiming that no payment was owed to Lantigua

6   under Dominican Republic Law. He then further declared that "[Lantigua] is of

7   course welcome to file a lawsuit and we are welcome to defend it if needed. As

8   you all know law suits dont [sic] scare me."

9          83.   Also on October 6, 2014, Whitehead sent an e-mail to Perdomo with a

10  blind carbon-copy to Gaw asking Perdomo to advise him on the process and costs

11  of updating the SHR SOLAR Entities to SRLs. Amazingly, Whitehead had

12  apparently done nothing since the September 15, 2014 phone call despite Bryant's

13  representation that he would promptly take the necessary steps to inscribe Okada's

14  lien on Lionsgate.

15         84.   Infuriated by all these events, Okada consulted with local counsel in

16  the Dominican Republic. Those attorneys confirmed that it would take 30 days and

17  around $10,000 to transform the SHR SOLAR Entities to SRLs in order to have

18  Okada's lien placed on Lionsgate. Those attorneys also told Okada, however, that

19  it would take an additional 1-2 months to have the lien inscribed because certain

20  fees were outstanding on Lionsgate and needed to be paid off first. Those fees

21  amounted to around $20,000. In addition, a land survey would be needed for the

22  Lionsgate holdings.

23         85.   Okada's local counsel also confirmed that Lantigua was owed $20,000

24  and would place a lien on Lionsgate under Dominican Republic law if that

25  severance payment was not made. Moreover, Lantigua would be entitled to a

26  multiple of $20,000 (as a penalty to Rockford for not having made a timely

27  severance payment) and that his lien would have priority over any lien belonging to

28  Okada.

86.     It became clear to Okada that Whitehead knew all along that he could not place a lien on Lionsgate promptly after the closing of the BH LLC transaction with the Investors, let alone within 24 hours.  Whitehead just said whatever he needed to say to get Okada to agree to the deal, and had hoped to evade the consequences of his misrepresentation by having Rockford's shares secretly issued to his family trust.

87.     On October 7, 2014, Perdomo e-mailed Okada and Whitehead to inform them that Whitehead had apparently fired the maid that took care of Lionsgate (again, unilaterally).  Perdomo informed everyone that she was entitled to a severance payment of $1,500 under Dominican Republic law.

88.     On October 8, 2014, Whitehead privately e-mailed Perdomo claiming that he was not aware that liens could be placed on Lionsgate until the SHR SOLAR Entities had been transformed.  He then said he would provide money to Perdomo that day to start the process.

89.     Incredulous, Perdomo e-mailed Whitehead back on October 8, 2014 stating "It is strange you did not know that to file the liens companies had to be updated, I am almost sure that information is written in one of several emails we shared."

90.     In that same e-mail, Perdomo also informed Whitehead that the SHR SOLAR entities could not be transformed unless Lantigua signed off on his resignation as President of those entities but Lantigua would not do so until he had received his severance payment.

91.     Later on October 8, 2014, Gaw sent to Perdomo, Bryant and Whitehead a formal Notice of Default of Mark Whitehead on behalf of Okada.  The notice listed all the different ways Whitehead had breached the Settlement Agreement (within Okada's knowledge at the time).  In the Notice of Default, Okada requested Perdomo to transfer the shares of Rockford to him in accordance with the Settlement Agreement and the Administrator Instructions.

92.     Whitehead responded by an e-mail later that day to Perdomo, stating that he had wired the funds to Perdomo to begin the process of updating the SHR SOLAR Entities.  Whitehead also absolved himself of any responsibility, claiming that "Had i [sic] have known it was critical to registering the liens for Okada i [sic] would have done it sooner."  Whitehead also wrote "had i [sic] known that [Lantigua] was the manager of record for the companies i [would] have dealt with that differently as well."

93.     The next day, Perdomo sent an e-mail to Whitehead to notify him that there was an additional $19,000 that needed to be paid in fees in order to inscribe a lien on Lionsgate for Okada.

94.     Martins also sent an e-mail to Okada and Whitehead on October 9, 2014 offering his side of the story.  Martins wrote that he had asked Whitehead multiple times to make an on-site inspection of Lionsgate to check both the property and the staff, but Whitehead declined.  Martins also stated that he had "asked what the buyer wanted to do with the existing staff and manager of the local entities.  The answer was clear: nothing should be changed, and the new owners would continue with everything as is."

95.     On October 10, 2014, Perdomo e-mailed Whitehead and Okada stating that Lantigua's severance payment had been successfully negotiated down to $8,500.  Thus, Whitehead needed to pay only $10,000 to extinguish all potential liability to Lantigua and the maid.

96.     Whitehead, however, continued to make no effort to pay either of the employees he had unilaterally terminated.

97.     On October 13, 2014, Perdomo announced to everyone that in compliance with his obligations, he had transferred all shares of Rockford over to Okada.  He also said that he still had not been able to update the SHR SOLAR Entities because Lantigua was still refusing to sign the necessary papers due to him not having received his severance payment.

COMPLAINT
CASE NO. 2:15-CV-7006

98.     On October 14, 2014, Whitehead sent an e-mail to Perdomo requesting that the $10,000 that Whitehead had provided him be returned.  Perdomo complied. As such, this ended any possible way for Perdomo to update the SHR SOLAR Entities.

99.     Whitehead also steadfastly refused to pay Lantigua's severance payment, thereby allowing the threat of litigation and a priority lien to hang over Lionsgate.  Finally, on November 21, 2014, Okada paid the $8,500 directly to Lantigua.  At Okada's request, Lantigua also executed a release of all of his claims against the SHR SOLAR Entities and Lionsgate.

### *Whitehead Unlawfully Occupies and Rents out Lionsgate*

100.    Okada assumed control over Rockford and the SHR SOLAR Entities. At great expense to him – amounting in the tens of thousands of dollars – he had the SHR SOLAR Entities transformed and cleared up all the back property taxes owed on the property.

101.    Whitehead, however, began telling various real estate agents that handle sales of international, luxury homes that he was the sole owner of Lionsgate and had complete authority to sell or trade it.  Okada discovered this because he has many contacts within that community and they passed this information on to him.

102.    Gaw sent a cease and desist letter to Bryant on November 25, 2014, but Whitehead continued making such misrepresentations in an effort to cloud Okada's title over Lionsgate and preclude his ability to sell or otherwise dispose of that property.

103.    Whitehead also moved into Lionsgate and began enjoying the life of living in one of the most luxurious mansions in the Dominican Republic, with attendant servants.

104.    Whitehead also periodically rented out Lionsgate to vacationers. Whitehead would charge and collect approximately $22,000 for a weeklong rental and had those funds transferred to bank accounts held by him in the United States.

*Whitehead Engages In Other Wrongful Conduct*

105.   Despite Okada having provided him with a Grant Deed for Ocean Ridge, Whitehead has not had this deed recorded.

106.   This was deliberate, as Whitehead was delinquent on his homeowners' association fees for Ocean Ridge and was sued for this delinquency.  The Homeowners Association obtained a stipulated judgment against Whitehead, on which he promptly defaulted.  Now, that Homeowners Association is attempting to collect those funds from Okada because he is still listed on title for Ocean Ridge and because Whitehead has left California for good.

107.   Also, around May 2015, Okada learned for the first time through conversations with local realtors that around April 2014, Whitehead had actually moved his family out of Ocean Ridge and had turned it into a rental property.  Whitehead had been renting Ocean Ridge for at least $10,000 per month since then.

108.   At no point did Whitehead ever disclose to Okada that he had, or had plans to, turn Ocean Ridge into rental property,  Instead, repeatedly throughout 2013 and early 2014, Whitehead maintained that he wanted Ocean Ridge to be the home for him and his family.

109.   Okada agreed to give up his share of Ocean Ridge in the Settlement Agreement because he thought Whitehead wanted to live there.  Had he known that Whitehead was using it instead as rental property, he would have demanded a perpetual share of all income generated by Ocean Ridge for Whitehead in exchange for providing him the Grant Deed.

110.   On or around December 2, 2014, Okada was named in a lawsuit filed by Rogers.  The action was captioned *Rogers v. Whitehead*, No. 2014-00759167 and filed in the Orange County Superior Court (the "Rogers Lawsuit").  This lawsuit by Rogers alleged that Whitehead and Okada had breached an oral agreement with him regarding the disposition of BH LLC.  Rogers also accused Whitehead of fraud, but did not make such allegations against Okada.

COMPLAINT
CASE NO. 2:15-CV-7006

111.   On January 6, 2015, Okada made a demand for indemnification to Whitehead pursuant to the terms of the Settlement Agreement.  Whitehead has ignored this demand.

## FIRST CAUSE OF ACTION
### (Declaratory Relief)

112.   Okada hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

113.   Okada and Whitehead entered into the Settlement Agreement, the material and relevant terms of which have been set forth herein.

114.   Okada has fully performed under that contract, including executing and providing a Grant Deed to Whitehead for Ocean Ridge.

115.   Okada seeks a declaration that Whitehead defaulted under the Settlement Agreement by failing to even begin the process of securing a $950,000 lien for Okada on Lionsgate, let alone securing that lien as he was contractually obligated to do so, within four months after the close of the transaction between BH LLC and the Investors.

116.   Okada seeks a declaration that Whitehead defaulted under the Settlement Agreement for having made numerous misrepresentations to Okada in connection with the negotiations of the Settlement Agreements.

117.   Okada seeks a declaration that Whitehead defaulted under the Settlement Agreement by having himself and Rockford fail to comply with the laws and regulations of the Dominican Republic resulting in a negative impact on Okada's interest in Lionsgate.

118.   Okada seeks a declaration that Whitehead defaulted under the Settlement Agreement by having himself and Rockford engage in acts or omissions resulting in a negative impact on Okada's interests in Lionsgate.

119.   Okada seeks a declaration that Whitehead defaulted under the Settlement Agreement by refusing to indemnify Okada for the Rogers Lawsuit.

COMPLAINT
CASE NO. 2:15-CV-7006

120.   Okada seeks a declaration that he validly exercised his contractual remedies under the Settlement Agreement and the Administrator Instructions by having legal and equitable title of Lionsgate transferred to him and by having all shares of Rockford transferred to him.

### SECOND CAUSE OF ACTION
**(Breach of Contract)**

121.   Okada hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

122.   This cause of action for breach of contract is plead in the alternative should the Court decline to declare that Okada validly exercised his contractual remedies under the Settlement Agreement and the Administrator Instructions by having legal and equitable title of Lionsgate transferred to him and by having all shares of Rockford transferred to him.

123.   Okada and Whitehead entered into the Settlement Agreement, the material and relevant terms of which have been set forth herein.

124.   Okada has fully performed under that contract, including executing and providing a Grant Deed to Whitehead for Ocean Ridge.

125.   Whitehead was provided adequate and just consideration under the Settlement Agreement, as he was provided several million dollars of value through the Grant Deed for Ocean Ridge as well as a release for hundreds of thousands of dollars in obligations owed by him to Okada.

126.   Whitehead has breached the Settlement Agreement for all the reasons stated herein.

127.   Okada seeks specific performance because his remedy at law is inadequate, given that real property is recognized as a unique asset under the law and not adequately compensable by monetary damages.

128.   In the alternative, Okada has been damaged by Whitehead's breach of contract should the remedy of specific performance be unavailable to him.  Okada

has had to expend large sums of money to keep Rockford and its subsidiaries in good standing.

129.   Okada has also been damaged by Whitehead's refusal to indemnify him in the Rogers Lawsuit, and has had to expend attorney's fees to defend himself in that action.

**THIRD CAUSE OF ACTION**
**(Fraud – Cal. Civ. Code § 1709)**

130.   Okada hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

131.   Okada and Whitehead were business partners in the Ocean Ridge joint venture.

132.   Throughout late 2013, Whitehead represented to Okada, both orally and in writing, that he and his family were using Ocean Ridge as their domicile, as evidenced by the examples already provided herein.

133.   At no point did Whitehead inform Okada that he was going to turn Ocean Ridge into a rental property.  Okada was not otherwise aware until May 2015 that Ocean Ridge had been turned into a rental property.

134.   Whitehead intentionally failed to disclose such information to Okada, because he did not want to share any rental income from Ocean Ridge with Okada, as he would be obligated to do under their joint venture.

135.   Okada reasonably relied upon Whitehead's deception as to his family's residency in Ocean Ridge.

136.   Okada has been damaged by Whitehead's fraudulent omission, because he has been deprived of 50% of the rental income generated by Ocean Ridge through July 31, 2014.

137.   Okada has also been damaged by Whitehead's fraudulent omission because, had he known the truth, he would have negotiated different terms in the Settlement Agreement regarding the disposition of Ocean Ridge.  Specifically, he

would have asked for a perpetual share of all rental income generated by Ocean Ridge so long as Whitehead continued to own Ocean Ridge.

138.   Whitehead's deception was the sole factor causing Okada's harm, as Okada had no reason to believe Whitehead would use Ocean Ridge as anything but his family home, given his repeated representations to Okada over the years.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

139.   Okada hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

140.   Okada and Whitehead were joint venturers in Ocean Ridge.

141.   As equal participants in a joint venture, Whitehead owed a fiduciary duty of loyalty to Okada regarding all financial opportunities involving Ocean Ridge.

142.   Similarly, Whitehead owed a fiduciary duty to disclose all material facts that might affect Okada's decisions regarding Ocean Ridge.

143.   Whitehead failed to disclose to Okada that he was renting out Ocean Ridge while the joint venture was still in existence.

144.   Whitehead's breach of his fiduciary duties damaged Okada, as Okada was not aware that Ocean Ridge was earning rental income and thus Whitehead appropriated the entirety of this rental income.

145.   Whitehead's breach of his fiduciary duties damaged Okada as he disposed of his interest in Ocean Ridge without knowing that it was earning substantial rental income, which would have affected his decision to dispose of that interest.

146.   Okada has been damaged in the amount of 50% of the rents received for Ocean Ridge up to July 31, 2014 and has been damaged because he is not receiving a share of the ongoing rental income received for Ocean Ridge.

## FIFTH CAUSE OF ACTION
### (Trespass to Land – Cal. Civ. Code § 3334)

147.   Okada hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

148.   Okada is the lawful owner of Lionsgate.

149.   Whitehead is wrongfully occupying Lionsgate even though Perdomo has transferred all ownership of Rockford and Lionsgate over to Okada in accordance with the terms of the Settlement Agreement and the Administrator Instructions.

150.   When Whitehead is not occupying Lionsgate, he is instead renting out that property for substantial sums of money and keeping all of those funds for himself.

151.   Whitehead fully intended to occupy Lionsgate and also to rent it out to third parties.  Whitehead has ignored Okada's declaration of default and attempts to force him to vacate the property.

152.   Whitehead's occupation and letting of Lionsgate has harmed Okada, because it means Okada cannot occupy his own property nor rent it out himself.

153.   Okada has been damaged by Whitehead's wrongful possession of Lionsgate in an amount of no less than $22,000 per week since Perdomo transferred ownership of Lionsgate to Okada.

## SIXTH CAUSE OF ACTION
### (Equitable Indemnity)

154.   Okada hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

155.   Okada has been subjected to various lawsuits or debt collection claims relating to Ocean Ridge, all of them stemming from Whitehead's failure to make required payments under contract.

156.   One such example is the judgment against Whitehead for his unpaid homeowners' association fees relating to Ocean Ridge.

COMPLAINT
CASE NO. 2:15-CV-7006

157.   All of those third parties have chosen to sue or collect from Okada, and not Whitehead, because Whitehead has purposefully not recorded the Grant Deed so that Okada continues to show up on title as a current owner.  Meanwhile, Whitehead hides in Florida or the Dominican Republic away from these Southern California-based creditors while Okada is an easy target as he still resides in that area.

158.   And in many of these cases, all of the benefits of the services performed by these third parties went entirely to Whitehead.

159.   Under principles of equitable indemnity, Whitehead is at least 50% responsible, if not 100% responsible, for any amounts paid by, or damages suffered by, Okada relating to these third parties.

## PRAYER

**WHEREFORE**, Plaintiff Donald Okada prays for judgment as follows:

1.     For judgment against defendant Mark Whitehead;

2.     For a judicial declaration that Whitehead defaulted under the Settlement Agreement and Administrator Instructions and the Okada properly exercised his contractual remedies under those agreements;

3.     For specific performance compelling Whitehead to convey all legal and equitable title of Rockford to Okada, should Okada not receive declaratory relief;

4.     For compensatory damages according to proof;

5.     For punitive damages;

6.     For restitution and disgorgement of Whitehead's profits under principles of unjust enrichment;

7.     For prejudgment interest;

8.     For attorney's fees;

9.     For costs; and

COMPLAINT
CASE NO. 2:15-CV-7006

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10.    For such other and further relief as the Court deems just and proper.


Dated:  September 3, 2015          GAW | POE LLP


                                   By: _____
                                       Randolph Gaw
                                       Attorneys for Plaintiff Donald
                                       Okada

# EXHIBIT A

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release (the "Agreement") is made as of July 31, 2014 (the "Effective Date"), by and between Donald Okada ("Okada"), on the one hand, and Mark Whitehead ("Whitehead"), on the other hand, with respect to the following the facts and circumstances set forth below.  Okada and Whitehead are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on or around February 26, 2004, Whitehead and Okada formed the entity Beverly Hillbillys, LLC, a California limited liability company ("BH LLC"), for the purpose of acquiring real property assets, including a 10.7024 acre residential property on Drake Lane, Beverly Hills, California 90210 (the "BH Property"), and selling ownership interest in BH LLC or its real property assets.

WHEREAS, on or around January 14, 2014, Timo Lindberg, on behalf of Premium Invest Ltd. and Kamprad Venture Capital LP (collectively the "Buyers"), submitted to the Parties an offer to purchase 100% ownership interest in BH LLC, in exchange Three Million Eight Hundred and Fifty Thousand USD ($3,850,000) and an in-kind exchange for 100% ownership interest in Rockford Investment, Inc., a Belize corporation ("Rockford"), including Rockford's real property assets located at Seahorse Ranch, Puerto Plata, Dominican Republic and currently held by the Dominican Republic entities called SHR SOLAR 24 (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), S.A., SHR SOLAR 134 (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), S.A., SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata), (collectively, all of these real property assets are referred to as "Lions Gate") (the "BH LLC Acquisition").

WHEREAS, on or about March 27, 2014, Okada filed a lawsuit against Whitehead, among others, entitled Donald Okada v. Mark Whitehead et al., in the Orange County Superior Court Case No. 30-2014-00713110-CU-CL-CJC (the "Whitehead Dispute").

WHEREAS, on or about April 16, 2014, Okada filed a lawsuit against Whitehead, among others, entitled Donald Okada v. Cheap As Chips, LLC et al., in the Orange County Superior Court Case No. 30-2014-00717179-CU-FR-CJC (the "CAC Dispute").

WHEREAS, in addition to the Disputes, the Parties have encountered a number of partnership related challenges, and collectively with the Whitehead Dispute and CAC Dispute shall be referred hereinafter as the "Disputes."

WHEREAS, the Parties have now reached a compromise and settlement of the Disputes and all related claims and causes of action thereto, and wish to memorialize their compromise and settlement by entering into this Agreement, doing so freely and voluntarily, after having received the benefit of independent counsel and with full knowledge of the binding and conclusive nature thereof.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including the mutual promises contained in this Agreement, IT IS AGREED BETWEEN OKADA and WHITEHEAD that:

## <u>TERMS AND CONDITIONS</u>

1.      **Consideration.**  In addition to the consideration of the release of claims set forth below, the Parties agree as follows:

1.1      Okada shall approve the terms of the BH LLC purchase agreement and the BH Note, that is to be negotiated in good faith between Okada, Whitehead and the Buyers.

1.2      Upon closing of the BH LLC Acquisition Okada is to receive monies in the amount of One Million One Hundred Thousand USD ($1,100,000), less any amounts withheld pursuant to section 1.13 of this Agreement.  Okada is to receive these funds upon the closing of the BH LLC Acquisition regardless of any concurrent or subsequent developments regarding the BH LLC Acquisition or any of the other transactions and events contemplated in this Agreement.

1.3      Further upon closing, Whitehead is to receive monies in the amount of One Hundred Thousand USD ($100,000), less any amounts withheld pursuant to section 1.13 of this Agreement.  Whitehead is to receive these funds upon the closing of the BH LLC Acquisition regardless of any concurrent or subsequent developments regarding the BH LLC Acquisition or any of the other transactions and events contemplated in this Agreement.

1.4      Further upon closing, the Buyers shall issue to Okada a promissory note in the amount of Two Million Three Hundred Nineteen Thousand One Hundred and Ten USD and 40/100 ($2,319,110.40) to be secured against the BH Property (the "BH Note").  Okada is to receive the BH Note upon the closing of the BH LLC Acquisition regardless of any concurrent or subsequent developments regarding the BH LLC Acquisition or any of the other transactions and events contemplated in this Agreement.

1.5      Further upon closing, Whitehead shall cause himself and Rockford to issue to Okada a security agreement in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against Lions Gate (the "Okada Security Agreement") within twenty-four (24) hours of closing of the BH LLC Acquisition, the specific terms of which are enumerated in the instructions appended as Exhibit A to this Agreement. The Okada Security Agreement becomes immediately due and payable upon the occurrence of any transaction involving Lions Gate that results in the receipt by Whitehead or Rockford of funds sufficient to fully retire the note.

1.6      Further upon closing, Okada shall receive non-voting ownership interest in Rockford in the amount of Nine Hundred and Fifty Thousand USD ($950,000) (the "Okada Ownership Interest").

1.7      Further upon closing, Whitehead shall receive the remaining ownership interest in Rockford.

1.8    **Appointment of Third Party Administrator/Trustee.** Rockford shall be managed by a third party administrator/trustee pursuant to written instructions agreed upon by the Parties, including but not limited to the instructions appended as Exhibit A to this Agreement. The Parties agree to hire Perdomo Law to serve as the third party administrator/trustee ("Perdomo"). Perdomo may not deviate from the instructions absent written consent from the Parties. Whitehead will have the unilateral right to approve any proposed transaction that would result in the receipt of funds sufficient to fully retire the Okada Note/ the Okada Ownership Interest. Okada shall have the right to hire local counsel at his expense in the event that he desires to monitor Perdomo.

1.9    Whitehead may buy out the Okada Note or the Okada Ownership Interest any time prior to the sale of Rockford or Lions Gate.

1.10    Upon receiving $950,000 plus any accrued interest outstanding by way of the purchase of Okada's interest in Rockford or the through proceeds of the sale of Lions Gate, the Okada Note shall be deemed satisfied, and the Okada Ownership Interest shall be transferred to Whitehead or the new buyer.

1.11    Whitehead shall enter into a stipulated judgment in the amount of Nine Hundred Thousand USD ($900,000) in the Whitehead Dispute currently pending in Orange County Superior Court (the "Stipulated Judgment").

1.12    Okada shall transfer to Whitehead all title and interest in the Ocean Ridge property.

1.13    The Parties agree to each share costs fifty-fifty (50-50) regarding any outstanding tax liabilities and other expenses related to the BH Property, fees owed to the California Franchise Tax Board, and the costs associated with filing all past and current unfiled tax returns for Beverly Hillbillys, LLC and Cheap As Chips, LLC.  Before disbursing the monies contemplated in sections 1.2 and 1.3 of this Agreement, the escrow agent responsible for overseeing the closing of the BH LLC Acquisition will withhold all amounts needed to pay off the costs contemplated in this section 1.13.  The remainder of the monies will be disbursed in accordance with sections 1.2 and 1.3 of this Agreement to reflect a 50-50 share of these costs. For example, if the total amount withheld by the escrow agent under this section is $50,000, then Okada and Whitehead will have their distributions in sections 1.2 and 1.3 of this Agreement reduced by $25,000 each.

1.14    **Whitehead Acknowledgment.** Whitehead acknowledges that Okada had no involvement with any dealings related to Dann Rogers, including allegations made by Dann Rogers regarding BH LLC, the BH Property and the BH LLC Acquisition, or the property known as El Dorado Beaubois, Castle Comfort, Roseau, Dominica  (the "Dominica Property").

1.15    **Whitehead Indemnification.** Okada shall hold a collateral interest to be secured against Lions Gate to satisfy any liabilities or costs of suit arising in connection with any prior dealings between Dann Rogers, Skywater Exchange, LLC, Larry Morales, Kevin Ralph, Blaise Carroz, Board Room Traders, Robert Glinert, the Dominica Property, BH LLC, the Buyers or Rockford including partnership dealings, that was not caused by Okada as a result of

fraud, negligence or wrongful conduct.  This includes any action brought by the Buyers or Rockford against BH LLC or Okada, including claims for damages, specific performance, indemnification or contribution, concerning any prior dealings with Dann Rogers, Skywater Exchange, LLC, Larry Morales, Kevin Ralph, Blaise Carroz, Board Room Traders, Robert Glinert, the Dominica Property or BH LLC.

      **1.16**    **Okada Indemnification.** Whitehead shall hold a collateral interest to be secured against the BH Note, Okada Note and Okada Ownership Interest to satisfy any liabilities arising in connection with Okada's acts of fraud, negligence or wrongful conduct, including, but not limited to, undisclosed liens or litigation affecting BH LLC, or the BH Property. In the event Okada should indemnify Whitehead for actions arising from his conduct the security interest shall be prioritized as follows: (1) the Okada Note; (2) the Okada Ownership Interest; and (3) the BH Note.

      **1.17**    **Dismissal of the CAC Dispute.**  Not later than five (5) business days after satisfaction of the $950,000 promissory note, Okada shall file a dismissal, with prejudice, of all claims against Whitehead and all other named defendants in the CAC dispute (the "Dismissal"). Following the close of the BH LLC Acquisition, Okada agrees to execute a stipulated stay of all proceedings in the CAC dispute to last until dismissal or Whitehead's breach of this Agreement.

      **1.18**    **Accord and Satisfaction of the Stipulated Judgment.** The Stipulated Judgment shall only be enforced against Whitehead in the event of breach this Agreement or in the event that the Buyers fail to close on the BH LLC Acquisition. Upon full satisfaction of all Consideration identified in Section 1 of this Agreement, Okada shall within five (5) business days file with the court accord and satisfaction of the Stipulated Judgment.

      **1.19**    **Whitehead Representations.**  Whitehead acknowledges that in entering into this Agreement, Okada has relied upon Whitehead's representation that he does not have any side agreements with the Buyers, Rockford or any other third party relating to the BH LLC Acquisition.  This includes the representation that Whitehead is not receiving any undisclosed compensation from the Buyers or Rockford relating to the BH LLC Acquisition.

      **2.**    **General Release.**  Except as to rights and obligations created by this Agreement, for value received, the receipt and adequacy of which is hereby acknowledged, the Parties hereby release each other, their respective parents, partners, subsidiaries, divisions, affiliates, and related entities or corporations, and their past and present owners, officers, directors, shareholders, employees, agents, partners, attorneys, heirs, successors, assigns, and insurers (collectively, the "Released Parties") from any and all claims or damages of any kind that are known which they now have against such Released Parties arising out of the  Disputes.

      **3.**    **No Admission.**  Notwithstanding anything stated otherwise in this Agreement, the Parties' execution of this Agreement is not an admission of any liability, fault or responsibility on the part of any released party. Any settlement made pursuant to this Agreement is regarded by the Parties hereto as payment to avoid the expense, inconvenience and uncertainty of litigation.

4.      **Cost of Dispute.**   Except as otherwise provided herein, each Party to this Agreement shall bear her/its own attorneys' fees and costs in all matters and proceedings settled and dismissed herein, or otherwise in connection with the Dispute.

5.      **No Reliance.**  The Parties represent and warrant that, in executing and entering into this Agreement, they are not relying and have not relied upon any representation, promise or statement made by anyone which is not recited, contained or embodied in this Agreement. Furthermore, each of the Parties to this Agreement has received independent legal advice, or has had the opportunity to receive independent legal advice, from such Party's respective attorneys with respect to the advisability of executing this Agreement.  The Parties are entering into this Agreement wholly of their own free will and volition.

6.      **Default.**

6.1    **Event of Default.**    Occurrence of any of the following events shall be deemed default by Whitehead:

a. Failure to comply with or perform terms, obligations, covenant or conditions contained in any duly executed agreements between Okada and Whitehead;

b. Failure by Rockford or Whitehead to comply with or perform any term or obligation under any laws and regulations of Dominican Republic which may have any impact on Okada's interest in Lions Gate.

c. Any warranty, representation or statement made by Whitehead to Okada with respect to any of executed agreements between Whitehead and Okada is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter;

d. If collateralization of Lions Gate ceases to be in full force and effect at any time and for any reason;

e. Dissolution or termination of Rockford's existence, or the commencement of any bankruptcy or insolvency laws against Rockford or Whitehead;

f. Any proceedings against Rockford or Whitehead that may have any negative impact on Okada's interests in Lions Gate; and

g. Any acts or omission of acts by Rockford or Whitehead that may have any negative impact on Okada's interests in Lions Gate.

6.2. **Available Remedies.**    In an event of any of the aforementioned events of default, Okada shall be entitled to any and all remedies available under relevant laws of Dominican Republic, including but not limited to immediate payment of entire indebtedness secured by Lions Gate, foreclosure sale and an option to transfer legal and equitable title of Lions Gate to any party (i.e., *Pagare Notarial*).

7.    **Entire Agreement.**  This Agreement comprises and contains the entire agreement between the Parties respecting the matters set forth in this Agreement, and supersedes and replaces all prior negotiations, understandings, proposed agreements and agreements between the Parties, written or oral.  Neither Party has made any statement, representation or promise, other than as expressly set forth herein, to any other party in entering into this Agreement, which has been relied upon by any other party entering into this Agreement.

8.    **Confidentiality and Nondisclosure.**  This Agreement and the terms hereof shall be maintained in confidence and shall not be disclosed by either of the Parties to this Agreement to any other person, company or agency (governmental or private), unless required by judicial order.  Each of the Parties to this Agreement shall use the same level of care to prevent the full or partial disclosure of this Agreement that it uses to protect its own confidential information and shall, in any event, take all reasonable precautions to prevent the disclosure of the contents of this Agreement.  The Parties further agree that any unauthorized disclosure to third parties of confidential information provided hereunder, or a violation or threatened violation of this clause, would cause irreparable damage to the aggrieved party and, therefore, the aggrieved party would be entitled to an injunction prohibiting any such disclosure, or attempted disclosure.  The Parties' obligations under this paragraph shall continue indefinitely.  Nothing contained herein shall be construed to prohibit the Parties from disclosing the terms of this Agreement:  (i) in confidence to their spouse, attorneys, accountants, or other professionals; or (ii) to the Internal Revenue Service, the California Franchise Tax Board, or to the clerical personnel in the offices thereof.

9.    **Construction of this Agreement.**  The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any Party hereto. Both Parties have participated in drafting this Agreement. The Parties understand and expressly assume the risk that any fact not recited, contained or embodied herein may turn out hereafter to be other than, different from, or contrary to the facts now known to them or believed by them to be true. Nevertheless, the Parties intend by this Agreement, and with the advice of their own, independently selected counsel, to release finally, fully and forever, all matters released hereunder and agree that this Agreement shall be effective in all respects notwithstanding any such difference in facts, and shall not be subject to termination, modification or rescission by reason of any such difference in facts.

10.    **Authority of Signatories.**  Each of the Parties to this Agreement represents and warrants that it is authorized to enter into this Agreement and that any required consents, authorizations, or approvals have been obtained.

11.    **No Assignment.**  The Parties have not made or suffered any assignment, subrogation, hypothecation or other disposition of any claim, right, title, interest, demand or obligation it may possess relating to the matters set forth herein.

12.    **Successors, Assigns, Personal Representatives.**  This Agreement shall be to the benefit of, and binding upon, the successors, heirs, personal representatives, and assigns of each of the Parties to this Agreement.

13.     **Notice.**  Unless advised in writing of a different name and address, all notices, submissions and communications of any kind required or otherwise made under this Agreement shall be sent (as required) to the following:

If to:  Donald Okada

Gaw | Poe, LLP
100 Pine St., Suite 1250
San Francisco, CA 94111
Attn: Randolph Gaw, Esq.
Fax No.: (415) 737-0642
E-mail address: rgaw@gawpoe.com


If to:  Mark Whitehead

The Cochran Firm California
4929 Wilshire Blvd. Suite 1040
Los Angeles, California 90010
Attn:  James A. Bryant II
Fax No.:  (310) 802-3829
E-mail address:  james.bryant@thecalawgroup.com

14.     **Further Assurances.**  Each Party agrees to take such further actions and to execute such further documents, instruments and agreements as may be reasonably requested by the other Party to further confirm and effect the consummation of the transactions contemplated by this Agreement.

15.     **Choice of Law/Venue.**  This Agreement is executed and delivered within the State of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with and governed by the laws of the State of California. In the event of any dispute in connection with this Agreement, the Parties hereto agree that the State or Federal Courts of Los Angeles County shall constitute the most appropriate venue for any such lawsuit or dispute due to the convenience of likely witnesses.

16.     **Waiver of Service.**  The Parties acknowledge that Whitehead may take residence outside the United States of California either on a temporary or permanent basis.  To effect the aims of this Agreement, the Parties agree, and hereby consent in advance, that service of process for any lawsuit or action related to this Agreement, including indemnification, may be effected by personal delivery to Randolph Gaw (on behalf of Donald Okada) or James A. Bryant II (on behalf of Mark Whitehead).

17.     **Specific Performance and Defense to Future Actions.**  The obligations and covenants set forth in this Agreement may be specifically enforced on or by any party entitled to the benefit hereof. This Agreement may, additionally, be pleaded as a full and complete defense to any and all claims and causes of action being released in accordance with this Agreement, and

7

the Parties hereto consent that it may be used as the basis for an injunction to halt any action suit or other proceeding based upon claims released by this Agreement.

18.     **Attorney's Fees and Costs.**  The Parties agree that in any action or lawsuit relating to this Agreement, including indemnification or prosecution of a foreclosure or collection action upon the $950,000 Security Agreement, the prevailing party will be entitled to its reasonable attorney's fees and the costs of suit, including expert witness fees.

19.     **Modification and Amendment.**  This Agreement may not be modified or amended in any way, except by a writing signed by the party to be charged therewith.

20.     **Counterparts.**  This Agreement may be signed in counterparts, and each counterpart so signed shall constitute a part of one valid original document.

21.     **Facsimile or PDF Transmission.**  This document may be signed by facsimile or as a PDF document.  A photocopy of this Agreement may be used as the original.

[Signatures to Follow]

**PLEASE READ CAREFULLY.  THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN CLAIMS.**

**EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.**

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____

9

**PLEASE READ CAREFULLY.  THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN CLAIMS.**

**EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.**

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____
James Bryant, Esq.

9

# EXHIBIT A
## ADMINISTRATOR INSTRUCTIONS

1.      **Power of Attorney**.  The Administrator shall receive Power of Attorney from SHR SOLAR 24, S.A., SHR SOLAR 134, S.A., SHR SOLAR 135, S.A., SHR SOLAR 136, S.A.. SHR SOLAR 137, S.A. (collectively the "DR Companies") as well as from their successor corporate identities, including but not limited to the possible conversion of the DR Companies from S.A. (Ltd.) to S.a.r.l. companies pursuant to Dominican Republic law, and Rockford Investment, Inc. a Belize corporation ("Rockford"), for purposes of

1.1     *Acto de Constitucion de Hipoteca*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against real property located at Seahorse Ranch, Puerto Plata, Dominican Republic, and currently held by the Dominican Republic entities called SHR SOLAR 24, S.A. (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), SHR SOLAR 134, S.A. (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata) (collectively, all of these real property assets are referred to as "Lions Gate"), in favor of Donald Okada, an individual ("Okada");

1.2     *Pagare Notarial*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against Lions Gate, in favor of Okada; and

1.3     *Acuerdo de Dacion de Pago*, in the event of default by Mark Whitehead ("Whitehead"), in favor of Okada.

2.      **Escrow**.  Administrator shall hold in escrow 100% of all present and future outstanding shares of Rockford and its subsidiaries on behalf of Okada until the full performance of Whitehead of any and every executed agreements between and by Okada and Whitehead, and Okada notifies Administrator in writing of Okada's intent to release such Rockford shares from escrow.

3.      **Manager of the DR Companies**.

3.1     Appointment: Okada and Whitehead will mutually agree upon the Manager of the DR Companies ("Manager").

3.2     Duties:  Manager of the DR Companies shall assume the duty of the Administrator once appointed.

4.      **Default**.

4.1     **Instructions in an Event of Default**.  In an event of default as agreed between Okada and Whitehead, and upon receipt by Administrator or Manager a notice of such default, Administrator or Manager shall perform the following duties on behalf of Okada:

(a)     Upon an event of default, among other remedies available under the agreements between Okada and Whitehead, Okada may declare the entire indebtedness secured by Lion's Gate immediately due and payable by delivery to Whitehead of written declaration of such default and of election to cause Lion's Gate to be sold.  If Okada so elects, Administrator or Manager shall, under the relevant laws of Dominican Republic, consider any and all necessary methods and execute to bring about such results.

(b)     Should Okada elects to claim the shares of Rockford and its subsidiaries in escrow, Administrator or Manager shall, under the relevant laws of Dominican Republic, promptly transfer every and all shares in escrow to Okada.  Further, Administrator or Manager shall consider any and all necessary methods and execute to bring about such results.

(c)     Should Okada elects to have a receiver appointed to take possession of all or any part of Lion's Gate, with the power to protect and preserve the Lion's Gate, to operate the Lion's Gate preceding foreclosure sale, and to collect rents or fees, if any, Administrator or Manager shall act as such Receiver.

(d)     Should Okada elects any other remedies as agreed between and by Okada and Whitehead, Administrator or Manager shall, within the confines of laws of Dominican Republic, perform all duties as requested by Okada.

4.2     **Notice to Okada of an Event of Default**.  In an event where any of the following occurs of which Administrator or Manager has actual or constructive notice or knowledge thereof, Administrator or Manager shall immediately notify Okada in writing of an event(s) where:

(a)     Rockford, DR Companies or Whitehead fails to comply with or to perform terms, obligations, covenant or condition contained in any agreements between Okada and Whitehead;

(b)     Rockford, DR Companies or Whitehead fails to comply with or perform any term or obligation under any laws and regulations of Dominican Republic which may have any impact on Okada's interest in Lion's Gate;

(c)     Any warranty, representation or statement made by Whitehead to Okada with respect to Lion's Gate or any other agreements is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter;

(d)     If collateralization of Lion's Gate ceases to be in full force and effect at any time and for any reason;

(e)    Dissolution or termination of Rockford's and/or DR Companies' existence, or the commencement of any bankruptcy or insolvency laws against Rockford, DR Companies or Whitehead;

(f)    Any proceedings against Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate; and

(g)    Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.    **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's interests in Lion's Gate.  Administrator or Manager shall be deemed a fiduciary of Okada under California and Dominican Republic law.

6.    **Administrative Expenses**.   All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead.  The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada.  The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.    **Change or Resignation of Administrator**.   Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.    **Term of Administrator and Manager**.  Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager.  Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

# EXHIBIT B

# ADMINISTRATOR INSTRUCTIONS

1.    **Power of Attorney**.  The Administrator shall receive Power of Attorney from SHR SOLAR 24, S.A., SHR SOLAR 134, S.A., SHR SOLAR 135, S.A., SHR SOLAR 136, S.A.. SHR SOLAR 137, S.A. (collectively the "DR Companies") as well as from their successor corporate identities, including but not limited to the possible conversion of the DR Companies from S.A. (Ltd.) to S.a.r.l. companies pursuant to Dominican Republic law, and Rockford Investment, Inc. a Belize corporation ("Rockford"), for purposes of

1.1    *Acto de Constitucion de Hipoteca*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against real property located at Seahorse Ranch, Puerto Plata, Dominican Republic, and currently held by the Dominican Republic entities called SHR SOLAR 24, S.A. (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), SHR SOLAR 134, S.A. (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata) (collectively, all of these real property assets are referred to as "Lions Gate"), in favor of Donald Okada, an individual ("Okada");

1.2    *Pagare Notarial*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against Lions Gate, in favor of Okada; and

1.3    *Acuerdo de Dacion de Pago*, in the event of default by Mark Whitehead ("Whitehead"), in favor of Okada.

2.    **Escrow**.  Administrator shall hold in escrow 100% of all present and future outstanding shares of Rockford and its subsidiaries on behalf of Okada and Whitehead until the full performance of Whitehead of any and every executed agreements between and by Okada and Whitehead, and Okada notifies Administrator in writing of Okada's intent to release such Rockford shares, held for his benefit, from escrow.

3.    **Manager of the DR Companies**.

3.1    Appointment: Okada and Whitehead will mutually agree upon the Manager of the DR Companies ("Manager").

3.2    Duties:  Manager of the DR Companies shall assume the duty of the Administrator once appointed.

4.    **Default**.

4.1    **Instructions in an Event of Default**.  In an event of default as agreed between Okada and Whitehead, and upon receipt by Administrator or Manager a notice of such default, Administrator or Manager shall perform the following duties on behalf of Okada:

DOC000105

(a)     Upon an event of default, among other remedies available under the agreements between Okada and Whitehead, Okada may declare the entire indebtedness secured by Lion's Gate immediately due and payable by delivery to Whitehead of written declaration of such default and of election to cause Lion's Gate to be sold.  If Okada so elects, Administrator or Manager shall, under the relevant laws of Dominican Republic, consider any and all necessary methods and execute to bring about such results.

(b)     Should Okada elects to claim the shares of Rockford and its subsidiaries in escrow, Administrator or Manager shall, under the relevant laws of Dominican Republic, promptly transfer every and all shares in escrow to Okada.  Further, Administrator or Manager shall consider any and all necessary methods and execute to bring about such results.

(c)     Should Okada elects to have a receiver appointed to take possession of all or any part of Lion's Gate, with the power to protect and preserve the Lion's Gate, to operate the Lion's Gate preceding foreclosure sale, and to collect rents or fees, if any, Administrator or Manager shall act as such Receiver.

(d)     Should Okada elects any other remedies as agreed between and by Okada and Whitehead, Administrator or Manager shall, within the confines of laws of Dominican Republic, perform all duties as requested by Okada.

4.2     **Notice to Okada of an Event of Default**.  In an event where any of the following occurs of which Administrator or Manager has actual or constructive notice or knowledge thereof, Administrator or Manager shall immediately notify Okada in writing of an event(s) where:

(a)     Rockford, DR Companies or Whitehead fails to comply with or to perform terms, obligations, covenant or condition contained in any agreements between Okada and Whitehead;

(b)     Rockford, DR Companies or Whitehead fails to comply with or perform any term or obligation under any laws and regulations of Dominican Republic which may have any impact on Okada's interest in Lion's Gate;

(c)     Any warranty, representation or statement made by Whitehead to Okada with respect to Lion's Gate or any other agreements is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter;

(d)     If collateralization of Lion's Gate ceases to be in full force and effect at any time and for any reason;

(e)     Dissolution or termination of Rockford's and/or DR Companies' existence, or the commencement of any bankruptcy or insolvency laws against Rockford, DR Companies or Whitehead;

(f)     Any proceedings against Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate; and

2

(g)     Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.     **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's and Whitehead's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada and Whitehead under California and Dominican Republic law.

6.     **Administrative Expenses**.   All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead.  The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada.  The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.     **Change or Resignation of Administrator**.   Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.     **Term of Administrator and Manager**.  Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager.  Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

Executed this 14th day of August, 2014.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

I accept the appointment of Manager of the DR Companies and Administrator of Rockford and consent to the responsibilities of the same as stated in these Administrator Instructions.

PERDOMO LAW

By:_____

3

DOC000107

(g)     Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.     **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's and Whitehead's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada and Whitehead under California and Dominican Republic law.

6.     **Administrative Expenses**.  All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead.  The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada.  The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.     **Change or Resignation of Administrator**.  Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.     **Term of Administrator and Manager**.  Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager.  Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

Executed this 14th day of August, 2014.


DONALD OKADA

By:_____


MARK WHITEHEAD

By:_____

I accept the appointment of Manager of the DR Companies and Administrator of Rockford and consent to the responsibilities of the same as stated in these Administrator Instructions.


PERDOMO LAW

By:_____

3

(g)    Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.    **Miscellaneous Duties.** Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's and Whitehead's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada and Whitehead under California and Dominican Republic law.

6.    **Administrative Expenses.**  All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead. The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada. The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.    **Change or Resignation of Administrator.**  Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.    **Term of Administrator and Manager.**  Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager.  Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.


Executed this 14th day of August, 2014.


DONALD OKADA

By:_____


MARK WHITEHEAD

By:_____


I accept the appointment of Manager of the DR Companies and Administrator of Rockford and consent to the responsibilities of the same as stated in these Administrator Instructions.


PERDOMO LAW

By:_____


3

DOC000109

# EXHIBIT C

## FIRST AMENDMENT TO SETTLEMENT AGREEMENT

This First Amendment to Settlement Agreement is made as of August 13, 2014 (the "Effective Date"), by and between Donald Okada ("Okada"), on the one hand, and Mark Whitehead ("Whitehead"), on the other hand, with respect to the following the facts and circumstances set forth below. Okada and Whitehead are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on or around July 31, 2014, Whitehead and Okada entered into a Settlement Agreement (the "Agreement") to resolve a number of claims relating to their joint ventures, and to effect the transfer of certain partnership property to Timo Lindberg, on behalf of Premium Invest Ltd. and Kamprad Venture Capital LP (collectively the "Buyers").

WHEREAS the Agreement specified that upon closing of the transaction between the Parties and Buyers, Okada would receive a non-voting ownership interest in Rockford Investment, Inc., a Belize corporation ("Rockford") in the amount of Nine Hundred and Fifty Thousand USD ($950,000) subject to the various other terms and conditions of the Agreement.

WHEREAS Buyers have represented that a conveyance of Okada's ownership interest in Rockford would delay closing of the transaction between the Buyers and the Parties.

WHEREAS, the Parties wish to memorialize a compromise between themselves to allow the transaction to proceed without delay by amending the Agreement, doing so freely and voluntarily, after having received the benefit of independent counsel and with full knowledge of the binding and conclusive nature thereof.

NOW THEREFORE, for good and valuable consideration (i.e., each party agreeing that such amendment will permit the transaction between Parties and Buyers to proceed), the receipt and sufficiency of which is hereby acknowledged, including the mutual promises contained in this Agreement, IT IS AGREED BETWEEN OKADA and WHITEHEAD that:

## TERMS AND CONDITIONS

1.      **Amendment.** In the event Okada cannot receive his ownership interest in Rockford upon closing, as required under section 1.6 of the Agreement, then upon closing, the entire ownership interest in Rockford, including legal title, will be conveyed directly to Perdomo Law instead of to Okada and Whitehead. Perdomo Law shall hold those ownership interests in trust for Okada and Whitehead in accordance with Section 2 of the Administrator Instructions.

2.      **No Reliance.** The Parties represent and warrant that, in executing and entering into this Amendment, they are not relying and have not relied upon any representation, promise or statement made by anyone which is not recited, contained or embodied in this Amendment. Furthermore, each of the Parties to this Amendment has received independent legal advice, or has had the opportunity to receive independent legal advice, from such Party's respective attorneys with respect to the advisability of executing this Amendment. The Parties are entering into this Amendment wholly of their own free will and volition.

1

3.      **No Other Amendment.**  The Parties agree that there are no other amendments to the Agreement.

4.      **Successors, Assigns, Personal Representatives.**  This Amendment shall be to the benefit of, and binding upon, the successors, heirs, personal representatives, and assigns of each of the Parties to the Agreement.

5.      **Choice of Law/Venue.**  This Amendment is executed and delivered within the State of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with and governed by the laws of the State of California. In the event of any dispute in connection with this Agreement, the Parties hereto agree that the State or Federal Courts of Los Angeles County shall constitute the most appropriate venue for any such lawsuit or dispute due to the convenience of likely witnesses.

6.      **Waiver of Service.**  The Parties acknowledge that Whitehead may take residence outside the United States of California either on a temporary or permanent basis.  To effect the aims of this Amendment, the Parties agree, and hereby consent in advance, that service of process for any lawsuit or action related to this Amendment may be effected by personal delivery to Randolph Gaw (on behalf of Donald Okada) or James A. Bryant II (on behalf of Mark Whitehead).

7.      **Specific Performance and Defense to Future Actions.**  The obligations and covenants set forth in this Amendment may be specifically enforced on or by any party entitled to the benefit hereof.

8.      **Attorney's Fees and Costs.**  The Parties agree that in any action or lawsuit relating to this Amendment, the prevailing party will be entitled to its reasonable attorney's fees and the costs of suit, including expert witness fees.

9.      **Modification and Amendment.**  This Amendment may not be modified or amended in any way, except by a writing signed by the party to be charged therewith.

10.     **Counterparts.**  This Agreement may be signed in counterparts, and each counterpart so signed shall constitute a part of one valid original document.

11.     **Facsimile or PDF Transmission.**  This document may be signed by facsimile or as a PDF document.  A photocopy of this Agreement may be used as the original.

[Signatures to Follow]

2

EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____

3

EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____