Randolph Gaw (S.B. #223718)
rgaw@gawpoe.com
Mark Poe (S.B. #223714)
mpoe@gawpoe.com
Victor Meng (S.B. #254102)
vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff and Counter-
defendant Donald Okada

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| DONALD OKADA | Case No. 8:15-CV-01449-JLS (KESx) |
| Plaintiff, | Judge: Josephine L. Staton<br>Mag. Judge: Karen E. Scott |
| v. | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| MARK WHITEHEAD | |
| Defendant. | |
| | Date:  August 26, 2016<br>Time: 2:30 p.m.<br>Courtroom: 10A |
| And all related counterclaims. | Complaint Filed: Sept. 3, 2015<br>Motion Cut-Off Date: July 1, 2016<br>Trial Date: Nov. 15, 2016 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 26, 2016, at 2:30 pm or as soon thereafter as the matter may be heard in the above-entitled Court located at the Ronald Reagan Federal Building and Courthouse, 411 West Fourth Street, Courtroom 10A, Santa Ana, California 92701, Plaintiff and Counter-defendant Donald Okada ("Okada") will and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 56, for summary judgment or, in the alternative, partial summary judgment, as to all claims for relief asserted by him against Defendant and Counter-claimant Mark Whitehead's ("Whitehead"), as to all counterclaims asserted by Whitehead against Okada, and as to all affirmative defenses asserted by Whitehead against Okada.  Okada brings this motion on the grounds that there is no genuine dispute as to any material fact as to all of these claims and counterclaims and that he is therefore entitled to judgment as a matter of law.

This motion is based upon this notice of motion and motion, the attached memorandum of points and authorities, the supporting declarations of Randolph Gaw, Donald Okada, Guido Perdomo, JP Martins, Jose Apolinar Lantigua, Judge Rafael Luciano Pichardo, Victor A. Garrido, Martin Breton, and Jose C. Loinaz, the Request for Judicial Notice, all exhibits attached to the aforementioned papers, and upon all papers and documents on file herein.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on June 21, 2016.

Dated:  July 1, 2016                    GAW | POE LLP

By: _____
Randolph Gaw
Attorneys for Plaintiff and
Counter-defendant Donald Okada

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS ............................................................................ 2

    A.   Background. ......................................................................................... 2

    B.   The Initial Settlement Negotiations Between the Parties. .............. 2

    C.   Whitehead's Pre-Settlement Awareness of How to Register a Lien. ............ 3

    D.   The Parties Finalize Their Settlement Agreement. ....................... 3

    E.   The Beverly Hillbillys LLC – Kamprad Transaction Closes. ........ 5

    F.   Okada Performs Under the Settlement Agreement. ...................... 6

    G.   Whitehead Fails to Record a Lien on Lions Gate for Okada. ........ 6

    H.   Whitehead Tries to Jeopardize Okada's Lien Interest. .................. 7

    I.   Okada Exercises His Contractual Remedies. ................................ 8

    J.   Whitehead's Post-Default Actions. ................................................. 9

LEGAL STANDARDS ................................................................................ 10

ARGUMENT ............................................................................................... 12

I.    OKADA IS ENTITLED TO DECLARATORY RELIEF ................................. 12

    A.   Okada Fully Performed Under the Settlement Agreement. .......... 12

    B.   Whitehead Defaulted by Failing to Promptly Register a Lien. ..... 13

        1.   Whitehead Was Required to Record a Lien. ............................. 14

        2.   It Was Not Impossible for Whitehead to Perform. ................... 16

        3.   Okada Did Not Waive His Rights. .......................................... 16

        4.   There Was No Mistake. .......................................................... 17

    C.   Whitehead Defaulted by Failing to Indemnify Okada. ................. 17

    D.   Whitehead Defaulted with His Actions Towards Lantigua. ......... 17

    E.   Whitehead Defaulted by Lying to Okada. ..................................... 18

    F.   Okada Properly Exercised His Contractual Remedies. ................. 18

        1.   Whitehead Agreed to Okada's Remedy. .................................. 19

2.    The Settlement Agreement Does Not Obligate Okada to Sue. ................20

II.    WHITEHEAD'S COUNTERCLAIMS ALL FAIL. .......................................21

A.    Okada Did Not Breach the Implied Covenant. ..............................................21

B.    Unjust Enrichment Is Inapplicable as a Matter of Law.................................22

III.    OKADA IS ENTITLED TO JUDGMENT ON HIS OTHER CLAIMS......23

A.    Whitehead Defrauded Okada and Breached His Fiduciary Duties..............23

B.    Whitehead Wrongfully Used Okada's Property............................................24

C.    Okada Is Entitled to Equitable Indemnity. ...................................................25

CONCLUSION.......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acoustics, Inc. v. Trepte Constr. Co.*,
  14 Cal. App. 3d 887, 92 Cal. Rptr. 723 (1971) .................................................. 19

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) .......................................................................... 11

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................... 11

*Basich v. Allstate Ins. Co.*,
  87 Cal. App. 4th 1112 (2001) ......................................................................... 17

*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*,
  162 Cal. App. 4th 858 (2008) ......................................................................... 23

*Clack v. State, Dep't of Pub. Works, Div. of Highways*,
  275 Cal. App. 2d 743 (1969) .......................................................................... 20

*Milne ex rel. Coyne v. Slesinger*,
  No. 2:02CV08508-FMC-PLAX, 2009 WL 3140439 (C.D. Cal.
  Sept. 25, 2009) .............................................................................................. 15

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III,
  Ltd.*,
  30 Cal. App. 4th 54 (1994) ............................................................................. 17

*Durell v. Sharp Healthcare*,
  183 Cal. App. 4th 1350 (2010) ....................................................................... 23

*Farmers Ins. Exch. v. Knopp*,
  50 Cal. App. 4th 1415 (1996) ......................................................................... 15

*Gilman v. Dalby*,
  176 Cal. App. 4th 606 (2009) ......................................................................... 24

*Hebrank v. Linmar Mgmt., Inc.*,
  No. 3:13-CV-2179-GPC-JMA, 2014 WL 3741634 (S.D. Cal. July
  29, 2014) ....................................................................................................... 16

*Hess v. Ford Motor Co.*,
  27 Cal. 4th 516 (2002) ........................................................................ 17

*Longest v. Green Tree Servicing LLC*,
  74 F. Supp. 3d 1289, 1302 (C.D. Cal. 2015) ...................................... 23

*In re Marriage of Oropallo*,
  68 Cal. App. 4th 997 (1998) ............................................................... 19

*Michel v. Palos Verdes Network Group, Inc.*,
  156 Cal. App. 4th 756 (2007) ............................................................. 24

*Miller v. Nat'l Broadcasting Co.*,
  187 Cal. App. 3d 1463 (1986) ............................................................ 24

*Oakley, Inc. v. Nike, Inc.*,
  988 F. Supp. 2d 1130 (C.D. Cal. 2013) .............................................. 10

*Oosten v. Hay Haulers Dairy Emp. & Helpers Union*,
  45 Cal. 2d 784 (1955) ........................................................................ 16

*Peel v. BrooksAmerica Mort. Corp.*,
  788 F. Supp. 2d 1149 (C.D. Cal. 2011) .............................................. 23

*Pellegrini v. Weiss*,
  165 Cal. App. 4th 515 (2008) ............................................................. 23

*Scott v. Harris*,
  550 U.S. 372 (2007) ........................................................................... 11

*Series AGI W. Linn of Appian Grp. Investors DE LLC v. Eves*,
  217 Cal. App. 4th 156 (2013) ............................................................. 21

*Stanford Ranch, Inc. v. Maryland Cas. Co.*,
  89 F.3d 618 (9th Cir. 1996) ................................................................ 11

*Steiner v. Thexton*,
  48 Cal. 4th 411 (2010) ....................................................................... 20

*Tribeca Companies, LLC v. First Am. Title Ins. Co.*,
  239 Cal. App. 4th 1088 (2015) ........................................................... 14

*Unichappell Music, Inc. v. Modrock Prods., LLC*,
  No. CV1402382DDPPLAX, 2016 WL 1065707 (C.D. Cal. Mar.
  16, 2016) ........................................................................................ 25

*United Guar. Mortgage Indem. Co. v. Countrywide Fin. Corp.*,
  660 F. Supp. 2d 1163 (C.D. Cal. 2009) ............................................. 11

*United States v. Dean*,
  945 F. Supp. 2d 1110 (C.D. Cal. 2013) ............................................. 10

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ........................................................... 11

*Wal-Noon Corp. v. Hill*,
  45 Cal. App. 3d 605 (1975) ........................................................ 17, 19

*Zepeda v. PayPal, Inc.*,
  777 F. Supp. 2d 1215 (N.D. Cal. 2011) ....................................... 11, 12

**Statutes**

Cal. Civ. Code § 1638 ............................................................................. 12

Cal. Civ. Code § 1639 ............................................................................. 14

Cal. Civ. Code § 1645 ............................................................................. 15

Cal. Civ. Code § 1646 ............................................................................. 15

**Other Authorities**

Fed. R. Civ. P. 56(c)(1) ........................................................................... 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

The relationship between Plaintiff and Counter-defendant Donald Okada ("Okada") and Defendant and Counterclaimant Mark Whitehead ("Whitehead") disintegrated because Whitehead simply would not honor his contractual obligations to his former business partner.  Multiple lawsuits ensued as Okada sought to recover what he was rightfully owed from Whitehead.  And all of that litigation was seemingly resolved when the parties came together to enter into a Settlement Agreement to facilitate the sale of their most successful enterprise – some real property located in Beverly Hills – to a foreign real estate investor.

This sale, however, was not a simple transaction, as it involved Okada and Whitehead taking over a Belizean holding company that owned valuable real property assets located in the Dominican Republic called Lions Gate.  Thus, the parties had to continue working together.  Given his distrust of Whitehead, however, Okada negotiated specific conditions in the Settlement Agreement that Whitehead had to follow at all times.  Should Whitehead fail to do so, it would constitute a default under that contract and, upon verification of such default by a third-party administrator, Okada would be expressly entitled to various non-judicial remedies available to him under Dominican Republic law.

Not all that surprisingly, Whitehead defaulted.  In fact, he defaulted multiple times on multiple issues.  He failed to live up to his contractual obligations under the Settlement Agreement, and had actually misrepresented to Okada about his ability to do so in order to induce Okada to enter into the Settlement Agreement.  Fed up, Okada declared a default, had his default confirmed, and exercised his contractual remedies – the same ones that the parties bargained for and agreed to.

As the Court will see in this memorandum and the voluminous evidence filed in support of this motion, it is undisputed that Whitehead breached the Settlement Agreement.  It is also undisputed that Whitehead defrauded Okada and breached his fiduciary duties to him.  It is also undisputed that Whitehead's counterclaims and

1  affirmative defenses – which are simply the inverse of Okada's claims for relief, are

2  entirely lacking in merit.  The Court should therefore grant summary judgment in

3  favor of Okada and end this protracted dispute once and for all.

## STATEMENT OF FACTS

### A.  Background.

Okada and Whitehead were members of various real estate partnerships and joint ventures, including one called Beverly Hillbillys LLC ("BH LLC") and another one called Cheap As Chips, LLC ("Cheap as Chips").  (Plaintiff's Statement of Uncontroverted Facts ("SUF") #1-2, 4.)  BH LLC acquired real property located in Beverly Hills, California (the "BH Property").  (SUF #2.)

Okada and Whitehead were also joint venturers in a property located at 9 Ocean Ridge, Newport Beach, California ("Ocean Ridge") in which they each had a 50% share in, but Whitehead decided to reside there.  (SUF #3, 143.)

The relationship between the parties deteriorated, and around spring 2014, Okada brought two separate lawsuits against Whitehead.  (SUF #5.)

### B.  The Initial Settlement Negotiations Between the Parties.

Beginning in late 2013, a group of international investors called Kamprad Venture Capital, LP and Premium Invest, Limited (collectively, "Kamprad") put forward an offer to purchase BH LLC in exchange for $1.2 million, a promissory note in the amount of $2,319,110 and the transfer of a 100% ownership interest in Rockford Investment, Inc. ("Rockford"), a Belizean real estate holding company.  (SUF #6.)  In turn, Rockford owned five Dominican Republic corporate entities called SHR SOLAR 24, SHR SOLAR 134, SHR SOLAR 135, SHR SOLAR 136 and SHR SOLAR 137.  (SUF #7.)  The SHR SOLAR companies themselves owned a series of real property lots that were collectively called Lions Gate.  (*Id.*)

Kamprad used the services of a Dominican Republic attorney named Guido Perdomo and his law firm Perdomo Law (collectively, "Perdomo") for Lions Gate and the SHR SOLAR companies.  (SUF #8.)  Okada was not initially interested in

the terms offered by Kamprad, but Whitehead repeatedly attempted in January –
March 2014 to persuade Okada to accept that deal.  (SUF #9.)  Okada and
Whitehead then engaged in settlement discussions to resolve all outstanding issues
between the parties, including a sale of BH LLC to Kamprad in exchange for cash,
a promissory note and ownership of Rockford.  (SUF #10.)  Whitehead performed
his own due diligence by engaging with Perdomo, a person widely viewed to be of
high integrity, to obtain relevant information about Lions Gate.  (SUF #36-37, 40.)

### C. Whitehead's Pre-Settlement Awareness of How to Register a Lien.

During Okada and Whitehead's settlement negotiations, the parties agreed
that as part of any final settlement agreement between them, Whitehead would
cause Rockford to enter into a promissory note with Okada in the amount of
$950,000, secured by a lien on Lions Gate.  (SUF #38.)  During Whitehead's due
diligence efforts, both Perdomo and a man named J.P. Martins (an agent for
Kamprad) (hereafter "Martins") informed Whitehead that the laws of the
Dominican Republic required that the SHR SOLAR COMPANIES be updated to
S.a.r.l. entities (also called SRL or S.r.l.) in order to conduct business.  (SUF #39.)

Martins and Perdomo both informed Whitehead, on multiple occasions in
April, May, and even July 2014, that the conversion of the SHR SOLAR
COMPANIES to S.a.r.l. entities would cost $10,000 and take 30 days to complete,
and that those companies and its assets could not be encumbered with a lien until
they were updated.  (SUF #41-46.)  But in late July, Whitehead told Okada that the
S.a.r.l. conversion process "has no bearing on note or ability to lien property."
(SUF #47.)  Whitehead never informed Okada about the truth.  (SUF #48.)

### D. The Parties Finalize Their Settlement Agreement.

The parties executed a Settlement Agreement on July 31, 2014.  (SUF #11;
Declaration of Randolph Gaw ("Gaw Decl."), Ex. 3 to Exhibit B.)  Under the
Settlement Agreement, Okada would agree to approve the transaction between
Beverly Hillbillys LLC and Kamprad.  (SUF #12.)  Among the terms, Okada would

1   receive an additional payment of $950,000 that was secured by a first priority lien

2   against Lions Gate as well as by Okada receiving a $950,000 non-voting ownership

3   interest in Rockford.  (SUF #13-14.)  In addition, Whitehead agreed to indemnify

4   Okada as any claims brought against Okada by a man named Dann Rogers

5   ("Rogers").  (SUF #81.)  Also under the Settlement Agreement, Okada was to

6   transfer his interest in Ocean Ridge to Whitehead.  (SUF #17.)  As it turned out,

7   Whitehead had been renting out Ocean Ridge, unbeknownst to Okada, collecting

8   $144,000 in rent through the end of December 2015.  (SUF #141-145.)

9        Per the Settlement Agreement, Whitehead was supposed to secure Okada's

10   first priority lien against Lions Gate within 24 hours after the closing of the

11   transaction between BH LLC and Kamprad.  (SUF #49.)  Due to his past history

12   with Whitehead, during the parties' negotiations over the Settlement Agreement,

13   Okada imposed an additional condition for that contract.  (SUF #116.)  The parties

14   had to agree that Rockford would be managed by a third party administrator

15   pursuant to written instructions jointly provided by Okada and Whitehead until the

16   $950,000 obligation was paid off.  (*Id.*)  Whitehead agreed to Okada's condition

17   that a third party administrator manage Rockford, but required that Perdomo be that

18   third party administrator.  (SUF #117.)  Okada agreed.  (*Id.*)  Under the terms of the

19   Settlement Agreement, the parties agreed to hire Perdomo to manage Rockford as a

20   third party administrator pursuant to Administrator Instructions appended to the

21   Settlement Agreement.  (SUF #118.)  The parties agreed that Perdomo could not

22   deviate from those Administrator Instructions without written consent.  (*Id.*)

23        The Settlement Agreement defined what remedies Okada would be entitled

24   to in the event of a default by Whitehead.  (SUF #119.)  Okada would be entitled to

25   any remedies under Dominican Republic law, including the option of having legal

26   and equitable title of Lions Gate transferred to himself.  (*Id.*)  The Administrator

27   Instructions, which were even more explicit as to Okada's remedies, stated that the

28   parties gave Power of Attorney to the Administrator (i.e., Perdomo) over Rockford

and the SHR SOLAR COMPANIES so that the Administrator could undertake certain actions in favor of Okada in the event of Whitehead's default.  (SUF #120.)  Under the Administrator Instructions, the Administrator would hold in escrow 100% of all present and future shares of Rockford and its subsidiaries until Whitehead had fully performed under the Settlement Agreement with Okada.  (SUF #123.)  The Administrator Instructions also state that, in the event of Whitehead's default, the Administrator would promptly transfer all shares of Rockford and its subsidiaries to Okada upon Okada's election.  (SUF #124.)  Okada specifically and deliberately bargained for these measures to protect himself.  (SUF #126.)

Whitehead's failure to comply with and perform any of the terms of the Settlement Agreement would result in a default under that contract.  (SUF #53.)  In addition, Whitehead's failure to comply with or perform any obligations under the laws of the Dominican Republic that might have a negative impact on Okada's interest in Lions Gate would also constitute a default under that contract, as would any acts or omissions by Whitehead or Rockford that could have any negative impact on Okada's interest in Lions Gate.  (SUF #88.)  Furthermore, any false or misleading misrepresentation made by Whitehead with respect to the Settlement Agreement would constitute a default under that contract.  (SUF #113.)

On August 13, 2014, Okada and Whitehead executed the First Amendment to Settlement Agreement, which clarified that under the circumstances, the entire ownership interest in Rockford, including legal title, would be conveyed to Perdomo Law to be held in trust for Okada and Whitehead.  (SUF #20-21.)

### E.    The Beverly Hillbillys LLC – Kamprad Transaction Closes.

The BH LLC – Kamprad transaction closed on August 15, 2014.  (SUF #26.)  Okada and Whitehead each received their promised monetary consideration from the BH LLC LLC – Kamprad transaction, and their respective ownership interests in Rockford were conveyed by Kamprad to Perdomo to be held in trust for Okada and Whitehead.  (SUF #27.)  During the closing, Okada transferred all interests in

1   Ocean Ridge to Whitehead and Whitehead's wife.  (SUF #30.)

2         **F.    Okada Performs Under the Settlement Agreement.**

3         After the close of the BH LLC – Kamprad transaction, Okada stayed (or

4   chose not to enforce) his pre-existing lawsuits against Whitehead.  (SUF #28-29.)

5   Whitehead has never presented a claim for indemnification to Okada.  (SUF #31.)

6   Okada and Whitehead also evenly split the costs regarding various tax liabilities

7   and expenses relating to BH LLC and Cheap As Chips.  (SUF #32.)  Okada also

8   filed all the tax returns for Cheap as Chips.  (SUF #33-34.)

9         **G.    Whitehead Fails to Record a Lien on Lions Gate for Okada.**

10        Beginning about a week after the close of the BH LLC – Kamprad

11  transaction, Okada's counsel began diligently inquiring of Whitehead's counsel

12  about the status of the lien on Lions Gate.  (SUF #54, 72.)  Whitehead's counsel

13  claimed there were misunderstandings and that he was very busy.  (SUF #54.)

14  Eventually, a conference call with Perdomo was proposed and accepted.  (*Id.*)

15        Also, at the end of August 2014, Whitehead paid a visit to Perdomo in the

16  Dominican Republic.  (SUF #55.)  During this conversation, Perdomo reminded

17  Whitehead that the SHR SOLAR COMPANIES needed to be updated to the S.a.r.l.

18  format and that it would cost $10,000 to do so.  (SUF #56.)  Whitehead did not

19  make any commitments in response to that reminder.  (*Id.*)

20        On September 15, 2014, a conference call took place between Okada,

21  Perdomo and Whitehead's attorney.  (SUF #57.)  During this call, Okada learned

22  for the first time that under Dominican Republic law, no lien could be placed on

23  Lions Gate until the SHR SOLAR COMPANIES were first updated to the S.a.r.l.

24  corporate structure and that this update process would take 30 days and cost

25  $10,000.  (SUF #58-59.)  Whitehead's attorney then represented that Whitehead

26  would immediately start the process of updating the SHR SOLAR COMPANIES to

27  the SRL corporate structure.  (SUF #59).  Nothing apparently happened, however,

28  as on October 3, 2014, Perdomo sent yet another reminder to Whitehead that he

1   was waiting for the $10,000 in funds needed to update the SHR SOLAR

2   COMPANIES.  (SUF #60.)  Then on October 6 and October 8, 2014, Whitehead

3   sent e-mails to Perdomo feigning ignorance and asking Perdomo how to update the

4   SHR SOLAR companies, the cost and the time frame despite having been

5   repeatedly told such details, including the September 15, 2014 conference call.

6   (SUF #61-62, 66.)  As of October 8, 2014, Whitehead had not even started the

7   process of placing a lien on Lions Gate.  (SUF #67.)

8           **H.     Whitehead Tries to Jeopardize Okada's Lien Interest.**

9           The appointed President of the SHR SOLAR COMPANIES, and the

10   manager of Lions Gate, was a man named Jose "Hito" Lantigua ("Lantigua").

11   (SUF #89-91.)  As Okada had only a non-voting ownership interest in Rockford

12   under the terms of the Settlement Agreement, Whitehead moved to the Dominican

13   Republic and took control of the SHR SOLAR COMPANIES and Lions Gate

14   following the BH LLC – Kamprad transaction.  (SUF #93.)  And on October 6,

15   2014, Whitehead decided to unilaterally terminate the services of Lantigua without

16   prior consultation with anyone.  (SUF #94.)

17           Under Dominican Republic law, Lantigua was entitled to an immediate

18   severance payment of approximately $20,000 from Rockford, and if such payment

19   was not made within a few days, Lantigua would be entitled to place a lien on Lions

20   Gate at a multiple of what he was owed that would have priority over any lien

21   belonging to Okada.  (SUF #95, 99.)  After his termination, Lantigua demanded his

22   severance payment from Whitehead and threatened to put a lien on Lions Gate if

23   this severance payment was not made.  (SUF #96.)

24           Whitehead was solely responsible for any severance payments owed to

25   Lantigua because Whitehead had specifically confirmed to Kamprad that he wanted

26   to keep all existing employees of the SHR SOLAR COMPANIES following the

27   transaction.  (SUF #104.)  Moreover, prior to Whitehead's termination of Hito,

28   Martins had warned him that terminating the employment of any of Lions Gate's

1  employees – including Lantigua – would result in an obligation to pay them a

2  severance/liquidation payment.  (SUF #97.)  Whitehead acknowledged receiving

3  Martins' advice.  (*Id.*)

4  Perdomo privately informed Whitehead that because Lantigua was their

5  president, the SHR SOLAR COMPANIES could not be transformed into S.a.r.l

6  entities without his consent and Lantigua was withholding his consent until he

7  received his severance payment.  (SUF #100, 103.)  Alarmed by the development,

8  Okada's counsel provided notice to Whitehead on October 6, 2014, that his actions

9  in refusing to pay Lantigua a severance payment and thereby allowing him to put a

10  lien on Lions Gate was unacceptable.  (SUF #101.)  Later that same day, Whitehead

11  sent an e-mail to Perdomo refusing to make any severance payment to Lantigua and

12  daring Lantigua to file a lawsuit.  (SUF #102.)

13  **I.    Okada Exercises His Contractual Remedies.**

14  Finally fed up with everything, on October 8, 2014, Okada issued to

15  Perdomo and Whitehead a formal notice of Whitehead's default under the

16  Settlement Agreement and requested to exercise his default remedies pursuant to

17  the Settlement Agreement.  (SUF #63-64.)  Only after this happened did Whitehead

18  finally wire $10,000 to Perdomo to begin the process of transforming the SHR

19  SOLAR COMPANIES.  (SUF #67.)  Whitehead could have easily wired the

20  $10,000 payment earlier.  (SUF #68.)

21  Additionally, on October 9, 2014, Perdomo sent an e-mail to Whitehead to

22  notify him that there was an additional $19,000 that needed to be paid in fees in

23  order to record a lien on Lions Gate for Okada.  (SUF #69.)  This was the same

24  information that Martins had provided to Whitehead back in April and May of

25  2014.  (SUF #42.)  By October 13, 2014, however, Perdomo still had not received

26  any of the additional $19,000 in funds.  (SUF #70.)

27  Following Mr. Okada's declaration of default, there was no written

28  communication of any kind from Whitehead or his attorney disputing the grounds

for that default. (SUF #128.) Lantigua's situation also remained unresolved, as on October 10, 2014, Perdomo notified the parties that Lantigua's severance payment had been negotiated down to $8,500. (SUF #105.) Lantigua, however, agreed to a reduced severance payment only because he thought he would receive it promptly. (SUF #106.) If he did not receive this payment, he was planning to bring a lawsuit and a lien against the SHR SOLAR COMPANIES and Lions Gate. (*Id.*)

Nevertheless, Whitehead never made a severance payment to Lantigua. (SUF #107.) On October 13, 2014, Perdomo notified the parties that he was still unable to update the SHR SOLAR COMPANIES because Lantigua was withholding his consent for not having received his payment. (SUF #108.)

Also on October 13, 2014, Perdomo transferred all shares of Rockford over to Okada. (SUF #129.) Perdomo did this because, using his own independent judgment, he had concluded there was overwhelming evidence that Whitehead had defaulted under the Settlement Agreement, and therefore he was obligated to transfer over all of the shares under Dominican Republic Law. (SUF #121-124, 129-130.) Whitehead instructed Rockford's attorney, who had been engaged only by Kamprad, not to transfer any shares in Rockford over to anyone without prior approval. (SUF #131.) This attorney, however, transferred Rockford's shares anyway because Kamprad concluded that Okada's actions were all done in accordance with the parties' contract and local law. (*Id.*)

### J.    Whitehead's Post-Default Actions.

Whitehead continued to refuse to pay Lantigua, and therefore, with the threat of litigation and a priority lien hanging over him and Lions Gate, Okada arranged for payment of $8,500 to Lantigua on or around November 7, 2014. (SUF #109.) Because Okada had agreed to pay Lantigua's severance, Lantigua executed a release of all potential claims he had against the SHR SOLAR COMPANIES and Lions Gate. (SUF #110.) Without this release, Lantigua continued to have the right to place a superior lien on Lions Gate for a multiple of $20,000. (SUF #111.)

On or around December 2, 2014, Okada was named as a defendant in a lawsuit brought by Rogers.  (SUF #82.)  This lawsuit alleged that Whitehead and Okada had breached an oral agreement with Rogers regarding the disposition of BH LLC.  (*Id.*)  On January 6, 2015, Okada made a demand for indemnification to Whitehead in connection with this lawsuit.  (SUF #83.)  Whitehead, however, has not even responded to this demand for indemnification and Okada has spent $30,295 in defending himself against Rogers' claims.  (SUF #84-86.)

Whitehead never relinquished possession of Lions Gate and has rented it to a number of people since October 8, 2014.  (SUF #150.)  He has collected at least $147,000 in rental income from Lions Gate through the end of 2015, and also resided in that estate for at least 250 days.  (SUF #151, 153.)  The daily average rental rate for Lions Gate has been at least $2,500.  (SUF #154.)

For whatever reason, Whitehead still has not recorded the Grant Deed for Ocean Ridge.  (SUF #156.)  As a result, the homeowners' associations for Ocean Ridge have sued Okada for Whitehead's failure to pay HOA fees.  (SUF #157-161.)

## LEGAL STANDARDS

Summary judgment or partial summary judgment is only appropriate "where the record, read in the light most favorable to the nonmoving party, indicates that 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"  *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1134 (C.D. Cal. 2013) (quoting Fed. R. Civ. P. 56(c)(2)).  "In deciding a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *United States v. Dean*, 945 F. Supp. 2d 1110, 1115 (C.D. Cal. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In ruling on a motion for summary judgment, the Court may consider depositions, declarations, documentary evidence, and discovery responses.  Fed. R. Civ. P. 56(c)(1).  In particular, "[f]actual assertions in pleadings and pretrial orders,

1  unless amended, are considered judicial admissions **conclusively binding** on the

2  party who made them…. A statement in a complaint, answer or pretrial order is a

3  judicial admission, as is a failure in an answer to deny an allegation." *Am. Title Ins.*

4  *Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (emphasis added).

5      "If the evidence is merely colorable, or is not significantly probative,

6  summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal

7  citations omitted).  "'[T]he mere existence of some alleged factual dispute between

8  the parties will not defeat an otherwise properly supported motion for summary

9  judgment; the requirement is that there be no **genuine** issue of material fact.'  When

10  opposing parties tell two different stories, one of which is blatantly contradicted by

11  the record, so that no reasonable jury could believe it, a court should not adopt that

12  version of the facts for purposes of ruling on a motion for summary judgment."

13  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alteration and emphasis in original;

14  internal citations omitted).  Thus, "court[s] [have] refused to find a 'genuine issue'

15  where the only evidence presented is 'uncorroborated and self-serving' testimony."

16  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citations

17  omitted).

18      "'Because this action was removed to federal district court under diversity

19  jurisdiction, the substantive law of California, the forum state, applies.'" *Stanford*

20  *Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir. 1996) (citation

21  omitted).  "California contracts in a diversity case 'will be interpreted so as to reach

22  the same results as would be reached in a California court.'" *Zepeda v. PayPal,*

23  *Inc.*, 777 F. Supp. 2d 1215, 1219 (N.D. Cal. 2011) (quoting *Republic Pictures*

24  *Corp. v. Rogers*, 213 F.2d 662, 664 (9th Cir. 1954)).  "Contract interpretation is a

25  matter of law and 'solely a judicial function, unless the interpretation turns on the

26  credibility of extrinsic evidence.'" *United Guar. Mortgage Indem. Co. v.*

27  *Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1175 (C.D. Cal. 2009) (quoting

28  *Super. Dispatch, Inc. v. Ins. Corp. of New York*, 176 Cal. App. 4th 12, 31 (2009)).

<u>**ARGUMENT**</u>

At its heart, this motion and this case is simply about the proper interpretation of the Settlement Agreement, as the parties' actions and conduct leading up to and following the execution of that contract are largely undisputed. Here, Whitehead has admitted that the contract was (1) never terminated, (2) not ambiguous, and (3) is fully integrated.  (SUF #22-24.)  Furthermore, the parties expressly assumed the risk that any fact not mentioned in the Settlement Agreement might turn out to be different from whatever they had believed.  (SUF #127.)

Accordingly, the Court should simply read the Settlement Agreement according to its plain terms.  *See Zepeda*, 777 F. Supp. 2d at 1219 ("'If contractual language is clear and explicit, it governs.'") (quoting *County of San Diego v. Ace Prop. & Cas. Ins. Co*., 37 Cal. 4th 406, 415 (2005)).  *See also* Cal. Civ. Code § 1638.  And under those terms, it is pretty obvious from the undisputed facts that Whitehead has repeatedly breached the contract.  Therefore, Okada requests that the Court enter summary judgment in his favor, or in the alternative, partial summary judgment as to individual causes of action, counterclaims, and affirmative defenses (or, if needed, as to discrete elements of those claims and defenses).

## I.    OKADA IS ENTITLED TO DECLARATORY RELIEF.

As far as the judicial systems of the Dominican Republic and Belize are concerned, Okada is the lawful owner of Rockford and its assets, including Lions Gate.  Okada now seeks judicial confirmation under California law of the same.  Specifically, he seeks a declaration that (1) he fully performed under the parties' Settlement Agreement, (2) that Whitehead defaulted under that contract, and (3) that Okada validly exercised his contractual remedies.  (Complaint (ECF No. 1) at ¶¶ 112-20.)  And here, he is entitled to all three as a matter of law.

### A.    Okada Fully Performed Under the Settlement Agreement.

Okada's obligations under the Settlement Agreement were discrete and straightforward.  (SUF #14-19, 25.)  And it is unquestioned that he performed all of

1   them, including staying (or not enforcing) his pre-existing lawsuits against

2   Whitehead, fully conveying Ocean Ridge to Whitehead, evenly splitting all costs,

3   and taking care of and filing the tax returns for Cheap as Chips.  (SUF #27-34.)

4       **B.**    **Whitehead Defaulted by Failing to Promptly Register a Lien.**

5       Under the Settlement Agreement, Whitehead needed to quickly record a

6   $950,000 lien on Lions Gate in favor of Okada following the close of the Beverly

7   Hillbillys LLC – Kamprad transaction.  As the contract states:

8       Further upon closing, Whitehead shall cause himself and Rockford to

9       issue to Okada a security agreement in the amount of Nine Hundred and

10      Fifty Thousand USD ($950,000) for a term of eighteen (18) months,

11      bearing a rate of two percent (2%) simple interest per annum, **to be**

12      **secured as a first priority lien against Lions Gate** (the "Okada Security

13      Agreement") within twenty-four (24) hours of closing of the BH LLC

14      Acquisition, the specific terms of which are enumerated in the

15      instructions appended as Exhibit A to this Agreement.

16  (Settlement Agreement at § 1.5) (emphasis added.)  (*See also* SUF #49.)  Failure to

17  do so would constitute a default.  (Settlement Agreement at § 6.1(a); SUF #53.)

18      Under Dominican Republic law, the act of securing a lien against real

19  property involves having a party record that lien with the appropriate Dominican

20  Republic authorities.  (SUF #51.)  Yet despite having a 24-hour requirement,

21  Whitehead had done absolutely nothing by the time Okada finally declared a

22  default on October 8, 2014.  (SUF #65.)  In fact, Whitehead did not even disclose to

23  Okada his prior awareness (upon being told multiple times by Martins and

24  Perdomo) that the SHR SOLAR COMPANIES first needed to be updated before a

25  lien could even be placed upon them and that the process would take around 30

26  days.  (SUF #41, 43-46, 48, 56, 58, 62.)  Nor did Whitehead disclose to Okada his

27  prior awareness that the process of recording a lien would take several weeks by

28  itself.  (SUF #42, 58.)  Whitehead did nothing even after being reminded multiple

times by Perdomo that he needed to pay the $10,000 fee to update SHR SOLAR
COMPANIES.  (SUF #56, 60, 62.)  Only after Okada declared a default under the
Settlement Agreement did Whitehead send the $10,000 needed to update the SHR
SOLAR COMPANIES (despite also receiving Rockford's bank accounts
containing nearly $10,000 in funds).  (SUF #67-68.)  And by the time Perdomo
independently concluded that Whitehead was in default, Whitehead had not sent the
approximately $19,000 needed to pay the fees and taxes associated with registering
a $950,000 lien on Lions Gate.  (SUF #70.)  Moreover, because Whitehead was
unlawfully refusing to pay severance to Lantigua following his abrupt and unilateral
termination, the SHR SOLAR COMPANIES could not even be updated because
Lantigua was withholding the necessary consent for this process.  (SUF #103.)

The evidence of Whitehead's default is so overwhelming that he has resorted
to inventing a host of novel assertions as set forth in his Second Amended Answer
and Counterclaims (ECF No. 83).  None of them have any merit (to the extent they
can even be understood, given that many of them are simply incomprehensible).

### 1.    Whitehead Was Required to Record a Lien.

Whitehead alleges that the mere act of him executing the Administrator
Instructions, which all the parties agreed would constitute the "Security
Agreement" (*see* SUF #50), automatically had the effect of securing a first priority
lien against Lions Gate and that there was never any requirement that he actually
record a lien with the Dominican Republic authorities.  (Counterclaims ¶¶ 221 –
233.)  This claim, however, is wholly invented out of thin air and legally frivolous.

California contract law requires that the intention of the parties "to be
ascertained from the writing alone, if possible[.]"  Cal. Civ. Code § 1639.  "'The
terms of a contract are determined by objective rather than subjective criteria.  The
question is what the parties' objective manifestations of agreement or objective
expressions of intent would lead a reasonable person to believe.'"  *Tribeca
Companies, LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1111 (2015).

In other words, Whitehead's personal beliefs are irrelevant in determining how Section 1.5 should be interpreted.

And using objective standards, one can see that Whitehead's interpretation of Section 1.5 is nonsensical.  If it were the case that simply executing the Administrator Instructions was sufficient for Okada's purposes, then the entire phrase "to be secured as a first priority lien against Lions Gate… within twenty-four (24) hours of closing… the specific terms of which are enumerated in the instructions appended as Exhibit A to this Agreement" would be completely unnecessary.  That would violate well-established canons of contract interpretation. *See Farmers Ins. Exch. v. Knopp*, 50 Cal. App. 4th 1415, 1421 (1996) ("Since contracts… are to be construed to avoid rendering terms surplusage, we will look to other reasonable interpretations of this policy language.").

Thus, the only reasonable interpretation then is that something more was needed to complete Whitehead's obligations under Section 1.5, namely, that he had to record the liens in order to "secure" them.  Such an interpretation also has the nice benefit of actually complying with Dominican Republic law, which unambiguously requires one to record a lien on real property in order to secure it. (SUF #51.)  *See also* Cal. Civ. Code § 1645 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate"); Cal. Civ. Code § 1646 ("A contract is to be interpreted according to the law and usage of the place where it is to be performed").

Moreover, this interpretation is the only one that makes sense in light of how everyone acted prior to the occurrence of this dispute. *See Milne ex rel. Coyne v. Slesinger*, No. 2:02CV08508-FMC-PLAX, 2009 WL 3140439, at *4 (C.D. Cal. Sept. 25, 2009) ("The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.") (quoting *Kennecott Corp. v. Union Oil Co*, 196 Cal. App. 3d 1179, 1190 (1987)).  Here, there were numerous communications between

Okada, Whitehead, Martins and Perdomo all concerning the topic of registering or recording a lien both before execution of the Settlement Agreement and afterwards. (SUF #52.)  None of this would be happening if everyone thought that simply signing the Administrator Instructions would secure Okada's lien.

### 2.    It Was Not Impossible for Whitehead to Perform.

Whitehead's second affirmative defense appears to allege that he was excused from recording a lien at all because it was "impossible" to do so – mainly because the 24-hour period following the closing was a Saturday.  (Answer ¶ 155.)  Perhaps this argument might have merit if Okada had declared default on August 18, 2014, but instead Okada declared default on October 8, 2014.  It certainly was not impossible for Whitehead to have performed by that date, especially under the standard needed to show impossibility.[1]  *See Oosten v. Hay Haulers Dairy Emp. & Helpers Union*, 45 Cal. 2d 784, 789 (1955) (holding that impossibility requires defendant to prove that failure to perform "was proximately caused by a contingency within its terms; that, in spite of skill, diligence and good faith on his part, performance became impossible or unreasonably expensive").  *See also Hebrank v. Linmar Mgmt., Inc.*, No. 3:13-CV-2179-GPC-JMA, 2014 WL 3741634, at *4 (S.D. Cal. July 29, 2014) ("for performance to be excused, it must be objectively-not subjectively-impossible or impracticable").  The remaining examples of impossibility provided by Whitehead do not reflect "impossible" events, but merely examples of him making careless mistakes.

### 3.    Okada Did Not Waive His Rights.

Whitehead's third affirmative defense alleges that Okada waived his right to declare a default.  (Answer ¶ 156.)  The sole evidence for this defense appears to be

---

[1] Whitehead's argument also ignores that the closing date was set by the parties a week after the Settlement Agreement was executed, and he never raised an objection at that time.  (Gaw Decl. ¶ 32.)  This is likely because he easily could have performed within the original 24-hour period.  (SUF #68.)

1    the existence of the September 15, 2014 conference call.  (SUF #135.)  By contrast,

2    Okada's actions and intent all show he never waived anything, as previously

3    conceded by Whitehead's own attorney.  (SUF #76, 136.)  Moreover, "the party

4    claiming a waiver of a right [must] prove it by clear and convincing evidence that

5    does not leave the matter to speculation, and 'doubtful cases will be decided against

6    a waiver.'"  *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.*,

7    30 Cal. App. 4th 54, 60 (1994).  *See also Basich v. Allstate Ins. Co.*, 87 Cal. App.

8    4th 1112, 1118 (2001) ("Where the plaintiff's ultimate burden of proof will be by

9    'clear and convincing' evidence, the higher standard of proof must be taken into

10    account in ruling on a summary judgment motion.").

11    **4.    There Was No Mistake.**

12    Whitehead's twelfth affirmative defense relies on the doctrine of mutual

13    mistake alleging that the parties did not know that the non-compliant SHR SOLAR

14    COMPANIES could not have a lien recorded on them.  (Answer ¶ 163.)  This is a

15    puzzling defense, because Whitehead **actually did know this fact** but instead kept

16    it to himself.  (SUF #41-46.)  And "gross negligence or 'preposterous or irrational'

17    conduct will preclude a finding of mutual mistake."  *Hess v. Ford Motor Co.*, 27

18    Cal. 4th 516, 529 (2002).  *See also Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605,

19    615 (1975) ("Failure to make reasonable inquiry to ascertain or effort to understand

20    the meaning and content of the contract upon which one relies constitutes neglect of

21    a legal duty such as will preclude recovery for unilateral mistake of fact.")

22    **C.    Whitehead Defaulted by Failing to Indemnify Okada.**

23    The Settlement Agreement expressly requires Whitehead to indemnify Okada

24    in the event that Rogers filed a lawsuit against him.  (Settlement Agreement at §§

25    1.14 & 1.15; SUF #81.)  Whitehead, however, has not complied with this obligation

26    and damaged Okada as a result.  (SUF #82-86.)

27    **D.    Whitehead Defaulted with His Actions Towards Lantigua.**

28    Under the Settlement Agreement, Whitehead's failure to comply with

Dominican Republic laws, or any actions in general, that could have a negative impact on Okada's lien in Lions Gate would constitute a default.  (Settlement Agreement at §§ 6.1(b), 6.1(f) & 6.1(g); SUF #88.)  Whitehead violated these rules when he terminated Lantigua's employment as the President of the SHR SOLAR COMPANIES and the longtime manager of Lions Gate.  (SUF #89-91, 94.)

Of course, it was within Whitehead's right to terminate Lantigua.  But Lantigua was owed an immediate severance payment under Dominican Republic law, as Whitehead already knew.  (SUF #95, 97.)  But even after Lantigua threatened to take legal action, and after Whitehead was told that Lantigua would be allowed to place a superior lien on Lions Gate worth multiples of his severance payment, Whitehead instead dared Lantigua to file a lawsuit.  (SUF #95-96, 99, 102.)  Even after Lantigua's severance payment was negotiated down to $8,500, Whitehead refused to pay anything.  (SUF #101, 105-107.)

### E. Whitehead Defaulted by Lying to Okada.

The Settlement Agreement holds that any false or misleading misrepresentation made by Whitehead with respect to that contract would constitute a default.  (Settlement Agreement at § 6.1(c); SUF #113.)  It turned out that Whitehead had breached that provision when, on July 29, 2014, he sent text messages to Okada falsely stating that the need to update the SHR SOLAR COMPANIES had no bearing on the ability to put a lien on Lions Gate.  (SUF #47.)

### F. Okada Properly Exercised His Contractual Remedies.

Whitehead claims that Okada could never unilaterally declare a default against Whitehead and, instead, he was supposed to first adjudicate his claims of default in a court in Los Angeles County.  (Counterclaims ¶ 225.)  As an initial matter, Okada did not unilaterally transfer Rockford to himself.  It was Perdomo, a neutral third party given power of attorney by both sides to manage Rockford, who independently determined that Okada's declaration of default was valid and thus transferred Rockford and its assets to Okada.  (SUF #129.)  More importantly, the

1   Settlement Agreement specifically permitted Okada to exercise **non-judicial**

2   remedies such as a foreclosure sale in the event of default.  (SUF #119.)

3   ### 1.     Whitehead Agreed to Okada's Remedy.

4   Specifically, the Administrator Instructions expressly permitted the third

5   party administrator (i.e., Perdomo) to perform *Acuerdo de Dacion de Pago* in favor

6   of Okada in the event of Whitehead's default under the Settlement Agreement.

7   (SUF #121.)  As explained by Okada's expert witnesses, one of whom was

8   formerly the second-highest ranking judge in the Dominican Republic, the legal

9   concept of *Acuerdo de Dacion de Pago* (Payment In Lieu) is a contractual

10  agreement where a debtor promises **in advance** to convey, and the creditor agrees

11  to accept, a substitute item in satisfaction of the debtor's debt to the creditor.  (SUF

12  #122.)  There is no judicial determination involved.  (*Id.*)  The Administrator

13  Instructions constitute an *Acuerdo de Dacion de Pago*.  (*Id.*)  Okada specifically

14  bargained to receive Lions Gate as Payment in Lieu should Whitehead (again)

15  refuse to honor his debts and not follow through on his obligations.  (SUF #126.)

16  Thus, Dominican Republic law obligated Perdomo to transfer all shares of

17  Rockford and its assets to Okada upon request once Perdomo could confirm

18  Whitehead's default under the Settlement Agreement.  (SUF #125.)  And tellingly,

19  Rockford's attorney and Kamprad refused to block this transfer because everything

20  Okada did complied with local laws.  (SUF #131.)  Should the Court entertain the

21  slightest doubt that anything was done improperly, it should consider that several

22  disinterested third parties familiar with Dominican Republic law all apparently

23  agreed that Okada's actions were proper.

24  Moreover, California law has repeatedly recognized that parties may contract

25  to give themselves non-judicial remedies for breach of that contract.  *See In re*

26  *Marriage of Oropallo*, 68 Cal. App. 4th 997, 1007 (1998) (noting that note-holder

27  may "elect [ ] to forego judicial remedies in favor of the expeditious process of

28  enforcing the power of sale clause in the deeds of trust"); *Acoustics, Inc. v. Trepte*

1  *Constr. Co.*, 14 Cal. App. 3d 887, 908, 92 Cal. Rptr. 723, 737 (1971) ("Gross error,

2  as that term has been employed in construction contracts, establishes a nonjudicial

3  remedy for the settlement of disputed contract claims."); *Clack v. State, Dep't of*

4  *Pub. Works, Div. of Highways*, 275 Cal. App. 2d 743, 746 (1969) ("We held that

5  section 9(f) establishes a nonjudicial remedy for the settlement of disputed contract

6  claims; that this remedy must be pursued to completion before recourse to the

7  courts[.]").  Dominican Republic law has the same principle.  Thus, given that the

8  Settlement Agreement and applicable law both explicitly grant Okada the option of

9  pursuing non-judicial remedies, Whitehead's argument that Okada must first file a

10  lawsuit to exercise his contractual remedies is wrong as a matter of law and simple

11  contract interpretation.  *See Steiner v. Thexton*, 48 Cal. 4th 411, 418 (2010)

12  ("parties may, by express provisions of the contract, grant the right to engage in the

13  very acts and conduct which would otherwise have been forbidden…").

14  **2.**  **The Settlement Agreement Does Not Obligate Okada to Sue.**

15  There is also no language anywhere in the Settlement Agreement obligating

16  Okada to first file a lawsuit to determine that Whitehead had failed to perform.

17  When directly queried to identify all language in the Settlement Agreement that

18  supported his interpretation, Whitehead could point only to section 15 of the

19  Settlement Agreement.  (SUF #132.)

20  Section 15, however, is nothing more than a combined choice of law and

21  forum selection clause.  (Settlement Agreement § 15.)  There is no language in that

22  section obligating anyone to file any lawsuits at all; it merely holds that if a lawsuit

23  was filed, then the Settlement Agreement would be interpreted pursuant to

24  California law and that Los Angeles County would be the appropriate venue for

25  such a lawsuit.  (*Id.*)  Now, there were certainly numerous scenarios where either

26  side might choose to file a lawsuit because there was no appropriate non-judicial

27  remedy under the circumstances.  For example, Okada could have separately sued

28  Whitehead in a Los Angeles court for indemnification for claims brought against

Okada by third parties.  Section 15 exists to govern the parties' duties for such situations.  It does not operate to create an entirely new duty that was not within the contemplation of the parties at the time of agreement.

Put simply, if the parties wanted to establish a requirement that a party's default under the Settlement Agreement could not be established absent a judicial declaration of the same, they could have easily put in language to that effect.  They did not do so and there is no basis to re-write the Settlement Agreement to include such a requirement.  See *Series AGI W. Linn of Appian Grp. Investors DE LLC v. Eves*, 217 Cal. App. 4th 156, 169 (2013) ("Implied terms 'are disfavored at law. The courts will not imply a better agreement for parties than they themselves have been satisfied to enter into, or rewrite contracts whenever they operate harshly.'")

## II.   WHITEHEAD'S COUNTERCLAIMS ALL FAIL.

Summary judgment is necessitated upon Whitehead's first counterclaim for breach of contract and sixth counterclaim for declaratory relief given that they are simply the inverse of Okada's claims in this action.  The remaining counterclaims also all fail as a matter of law.[2]

### A.   Okada Did Not Breach the Implied Covenant.

Okada previously moved to dismiss Whitehead's second counterclaim for breach of the implied covenant of good faith and fair dealing on the grounds that it was duplicative of his breach of contract counterclaim, and because all actions complained of by Whitehead were expressly permitted under the contract.  (Pltf's Mot. to Dismiss (ECF No. 43) at 8-10.)  In denying this motion, the Court held that Whitehead had pled facts suggesting that Okada and his agents had acted in bad faith because they never suggested to Whitehead that Whitehead was in default for

---

[2] The Court should dismiss with prejudice Whitehead's fourth counterclaim for constructive trust, as he improperly re-alleged this counterclaim as an independent cause of action after the Court already issued an order dismissing it.  (Order re Plt'fs Mot. to Dismiss (ECF No. 72) at 10-11.)

1  his failure to record the lien.  (Order re Plt'fs Mot. to Dismiss (ECF No. 72) at 7.)

2  The Court also held that there was an inference of bad faith because Okada had

3  delayed by 72 hours in executing the Administrator Instructions.  (*Id.* at 8.)

4      The Court had no way to know, of course, that Whitehead was lying in his

5  Counterclaims much as he's lied to everyone involved in this situation.  Okada did

6  nothing to prevent Whitehead from recording a lien on Lions Gate.  (SUF #75.)

7  And in reality, Okada's counsel began repeatedly putting Whitehead on notice that

8  he was defaulting under the contract less than one week after the close of the BH

9  LLC – Kamprad transaction.  (SUF #76.)  Certainly, Okada could have declared

10 default earlier than October 8, 2014, but one would think that Okada not rushing to

11 do so should be commended rather than condemned as a bad faith action.

12     As for the "delay," this is yet another false claim.  It was Whitehead, not

13 Okada, that made substantive changes to the Administrator Instructions at the last

14 minute.  (SUF #77.)  And Okada, in fact, gave Whitehead's counsel an executed

15 copy of that document on August 15, 2014.  (SUF #78.)  Whitehead's counsel,

16 however, strangely asked another lawyer working for Okada to forward a copy of

17 Perdomo's executed copy instead of directly asking Perdomo himself (or even

18 asking Okada's regular counsel).  (SUF #79.)  When Okada's regular counsel found

19 out about the request on August 18, 2014, the document was immediately

20 forwarded.  (*Id.*)  None of these facts could possibly demonstrate any bad faith on

21 Okada's part.  More importantly, Okada did not declare Whitehead to be in default

22 on August 18, 2014, but on October 8, 2014.  There's no way for Whitehead to

23 argue that a 72-hour delay somehow prevented him from even starting the process

24 of updating the SHR SOLAR COMPANIES by October 8.

25     **B.    Unjust Enrichment Is Inapplicable as a Matter of Law.**

26     Whitehead's entire theory of unjust enrichment is based on Okada's

27 purportedly unlawful taking of Rockford and its assets pursuant to the Settlement

28 Agreement.  (Counterclaims ¶¶ 251-255.)  These claims therefore fail as a matter of

- 22 -

1  law, because they are dependent upon the Settlement Agreement itself.  *See Longest*
2  *v. Green Tree Servicing LLC*, 74 F. Supp. 3d 1289, 1302 (C.D. Cal. 2015)
3  ("Defendants are correct that, under both California and Florida law, a party may
4  not pursue a quasi-contract claim for unjust enrichment or restitution when an
5  express contract governs the same subject matter."); *Durell v. Sharp Healthcare*,
6  183 Cal. App. 4th 1350, 1370 (2010) ("An unjust enrichment theory is inapplicable
7  because Durell alleges the parties entered into express contracts.").

8  **III.   OKADA IS ENTITLED TO JUDGMENT ON HIS OTHER CLAIMS.**

9  Okada is entitled to summary judgment as to his remaining claims for fraud,
10 breach of fiduciary duty, trespass to land, and equitable indemnity.[3]

11 **A.   Whitehead Defrauded Okada and Breached His Fiduciary Duties.**

12 A fraud claim based upon concealment has the following elements: (1)
13 concealment of a material fact, (2) a duty to disclose that fact, (3) intent to defraud,
14 (4) the plaintiff was unaware of that fact and would have acted differently if aware,
15 and (5) damage caused by the concealment of that fact.  *Blickman Turkus, LP v. MF*
16 *Downtown Sunnyvale, LLC*, 162 Cal. App. 4th 858, 868 (2008).  And a breach of
17 fiduciary duty claim has three elements: (1) the existence of a fiduciary
18 relationship, (2) its breach, and (3) damage proximately caused by the breach.
19 *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 524 (2008).

20 Here, Whitehead had a fiduciary relationship with Okada because Ocean
21 Ridge was a joint venture.  (SUF #147.)  *See Pellegrini*, 165 Cal. App. 4th at 524
22 ("joint venturers have a fiduciary duty to act with the highest good faith towards
23 each other regarding affairs of the partnership or joint venture").  Similarly, as a
24 joint venturer, Whitehead had a duty to disclose material facts to Okada.  *Peel v.*
25 *BrooksAmerica Mort. Corp.*, 788 F. Supp. 2d 1149, 1161 (C.D. Cal. 2011).

26 Whitehead never disclosed to Okada that he was renting out Ocean Ridge.

27
28 [3] Okada requests summary judgment and a permanent injunction on his breach of
contract claim for the same reasons as his claim for declaratory relief.

(SUF #141-142.)  Okada never knew about Whitehead renting out the property and had no reason to know, considering he had Whitehead personally served with process at that residence only a few months prior.  (SUF #143-144.)  There is no question that this constitutes intentional concealment of a material fact; at all times, Okada owned 50% of the property and was therefore entitled to half of any proceeds derived from that property.  Whitehead did not tell him because, as with everything else, he wanted to cheat Okada out of what was rightfully his.  Had Okada known the truth, he would have demanded a right to half of the rents from Ocean Ridge as part of the Settlement Agreement.  (SUF #146.)  This was fraud, pure and simple.  It was also a breach of Whitehead's fiduciary duties.  *See Michel v. Palos Verdes Network Group, Inc.*, 156 Cal. App. 4th 756, 762 (2007) ("A fiduciary's failure to share material information with the principal is constructive fraud, a term of art obviating actual fraudulent intent.").  *See also Gilman v. Dalby*, 176 Cal. App. 4th 606, 614 (2009) ("traditional examples of fiduciary relationships include… joint adventurers[.]  'Inherent in each of these relationships is the duty of undivided loyalty the fiduciary owes to its beneficiary[.]") (citation omitted).  This wrongful act damaged Okada in the amount of $72,000.  (SUF #145.)

## B.    Whitehead Wrongfully Used Okada's Property.

Trespass to land simply involves the unauthorized entry by the defendant onto the land of the plaintiff.  *Miller v. Nat'l Broadcasting Co.*, 187 Cal. App. 3d 1463, 1480 (1986).  A defendant is liable even if he acted under the reasonable belief that he was committing no wrong.  *Id.* at 1480-81.  The defendant is liable for all direct consequences from the wrongful use.  *Id.* at 1481.

Should the Court determine that Okada is the rightful owner of Lions Gate, then Whitehead is liable for trespass to land, pure and simple.  Okada's damages from such trespass are straightforward.  He is owed the $147,000 in income that Whitehead has amassed from renting out Lions Gate.  (SUF #150-152.)  In addition, Whitehead has personally resided in Lions Gate for at least 250 days; at an

average daily rental rate of approximately $2,500, Okada is entitled to $625,000 from the value of Whitehead's use and enjoyment of the land.  (SUF #152-154.)  Of course, this motion seeks damages only through the end of December 2015, and Okada would be entitled to bring an action to recover damages after that date.

### C.  Okada Is Entitled to Equitable Indemnity.

Equitable indemnity requires (1) a showing of fault on the part of the indemnitor and (2) resulting damages to the indemnitee for which the indemnitor is contractually or equitably responsible.  *Unichappell Music, Inc. v. Modrock Prods., LLC*, No. CV1402382DDPPLAX, 2016 WL 1065707, at *13 (C.D. Cal. Mar. 16, 2016).  All of these elements are met here.  (SUF #155-163.)  As Whitehead was supposed to pay all of the homeowner's association dues in exchange for living at Ocean Ridge – and failed to do so – it is his fault that the various HOAs filed a lawsuit against Okada for non-payment of those dues.  Whitehead's deliberate refusal to record the Grant Deed has also resulted in his creditors continuing to pursue Okada regarding Ocean Ridge.  Thus, Whitehead should be required to indemnify Okada in the amount of $42,038.11, as well as for the *Pelican Ridge* lawsuit and any future lawsuits over any obligation concerning Ocean Ridge.

### CONCLUSION

For the reasons stated herein, Plaintiff and Counter-defendant Donald Okada respectfully requests that the Court grant summary judgment, or in the alternative, partial summary judgment, in his favor on all claims, counterclaims, and affirmative defenses asserted by the parties in this action.

Dated:  July 1, 2016    GAW | POE LLP

        By: _____

          Randolph Gaw
          Attorneys for Plaintiff and
          Counter-defendant Donald Okada