# EXHIBIT B

```
RANDOLPH GAW (SB#223718)
GAW|POE LLP
4 EMBARCADERO, SUITE 1400
SAN FRANCISCO, CA 94111
TELEPHONE: (415) 766-7451
FACSIMILE: (415) 737-0642
RGAW@GAWPOE.COM

Attorneys for Defendant and
Cross-Complainant Donald Okada
```

SUPERIOR COURT FOR THE STATE OF CALIFORNIA
COUNTY OF ORANGE

CASE NO.:  30-2014-00759167-CU-CO-CJC


DANNY W. ROGERS,                  NOTICE OF DEPOSITION OF
                                       MARK WHITEHEAD
            Plaintiff,

 -vs-

MARK JOHN WHITEHEAD, et al.,

            Defendants.
_____/
DONALD OKADA,

            Cross-complainant,

   -vs-

MARK WHITEHEAD,

            Cross-defendant.
_____/

VOLUME 1 OF 1

DEPOSITION OF MARK WHITEHEAD


Thursday, August 27, 2015
9:23:28 a.m. - 2:54:40 p.m.
One Southeast Third Avenue
Miami, Florida 33131


{Stenographically} Reported By:

APPEARANCES:


On Behalf of the Defendant and Cross-Complainant DONALD OKADA:

    GAW POE LLP,
    4 EMBARCADERO,
    SUITE 1400,
    SAN FRANCISCO, CALIFORNIA, 94111
    415-766-7451
    RGAW@GAWPOE.COM

    BY: RANDOLPH GAW, ESQUIRE


On Behalf of the Defendant and Cross-Defendant MARK JOHN WHITEHEAD:

    THE COCHRAN FIRM,
    4929 WILSHIRE BOULEVARD,
    SUITE 1010,
    LOS ANGELES, CALIFORNIA, 90010
    1-800 THE FIRM
    JBRYANT@COCHRANFIRM.COM

    BY:  JAMES A. BRYANT, II, ESQUIRE

1    A.    To be honest, I couldn't find one.  Only the

2    e-mail that was sent to me in 2014 sometime.  I'm not

3    sure.

4        Q.    So you previously had a copy and you can't find

5    that copy anymore?

6        A.    I don't know if I previously had a copy, that's

7    12, 11 years ago.  I don't remember to be honest.  At

8    this point, I just don't remember.

9        Q.    Okay.  Now, Beverly Hillbillys went on to acquire

10   a piece of real estate located in Beverly Hills, correct?

11       A.    Correct.

12       Q.    So we can put Exhibit 2 aside and mark another

13   document here as Exhibit 3.

14           (Exhibit No. 3, Document Titled Settlement

15       Agreement and General Release, was marked for

16       identification.)

17   BY MR. GAW:

18       Q.    Exhibit 3 has the title, General Agreement and

19   General Release, and Exhibit 3 is a settlement agreement

20   between you and Mr. Okada dated July 31, 2014, correct?

21       A.    Correct.

22       Q.    Let me ask you to turn to Page 9 of Exhibit 3.

23   And there are actually two Page 9s so I'll ask you to go

24   to the second Page 9, if that makes any sense.

25       A.    Okay.

1    Q.    So here on the second Page 9, that's your

2    signature, correct?

3    A.    Correct.

4    Q.    Below Mark Whitehead?

5    A.    Correct.

6    Q.    And that appears to also be the signature of your

7    attorney, James Bryant, under the Cochran Firm, correct?

8    A.    I don't know James's signature, to be honest with

9    you.

10   Q.    Well, somebody has signed under that provision,

11   correct?

12   A.    Yes.

13   Q.    And let's go back to the first page of Exhibit 3,

14   please.

15   A.    The first page?

16   Q.    Yes.

17   A.    Okay.  Right.

18   Q.    Now, you see the heading called recitals?

19   A.    Correct.  Yes.

20   Q.    And underneath the recitals there are a number of

21   paragraphs.  Let me ask you to look at the first

22   paragraph under recitals.

23   A.    Okay.

24   Q.    That first paragraph, does that accurately state

25   the real estate that had been acquired by

1        A.    Correct.

2        Q.    So you can put Exhibit 3 back off to the side.

3              Let's look at another document that I will mark

4     as Exhibit 9.

5              (Exhibit No. 9, E-mail Dated 4/8/14, was marked

6        for identification.)

7     BY MR. GAW:

8        Q.    Now, Exhibit 9, that is an e-mail from a

9     jpm.fgn@mail.com, to you with a copy to Mr. Lindberg and

10    another person, correct?

11       A.    Correct.

12       Q.    It looks like it's dated April 8, 2014, right?

13       A.    Correct.

14       Q.    And jpm.fgn@mail.com is the e-mail address that

15    was used by a man named J.P. Martins, correct?

16       A.    Yes.

17       Q.    And Mr. Martins was some kind of representative

18    for Kamprad?

19       A.    Correct.

20       Q.    And at the bottom right of Exhibit 9 we see

21    something called DOC000142.  Do you see that?

22       A.    Yes.

23       Q.    That's called a Bates number.  So if I refer to

24    Bates numbers in the rest of the deposition, that's what

25    I'm referring to.

1    A.    Yes.

2    Q.    And this Bates number here symbolizes that you

3    produced this document, correct?

4    A.    I guess, yes.

5    MR. GAW:  James, why did you use DOC?

6    MR. BRYANT:  You know what, my assistant, they

7    just -- I looked at it, I was like --  usually I have

8    a little name but I said -- never mind.  Let me get

9    this over.

10    MR. GAW:  Because I was scratching my head.  What

11    is this supposed to signify?

12    MR. BRYANT:  It was supposed to be a last name

13    but --

14    MR. GAW:  Okay.

15    MR. BRYANT:  But I can always go back and have

16    them change it, if you don't mind.

17    MR. GAW:  No, it was out of my own curiosity.

18    MR. BRYANT:  I thought, you know, Randy may very

19    well ask and you did.

20    MR. GAW:  I guess it means document or something.

21    MR. BRYANT:  Yeah.  I suppose.

22    MR. GAW:  I was thinking is this is Donald Okada,

23    but I was, no, this is DOC so --

24    MR. BRYANT:  I think, you know, they just put DOC

25    and they should have referenced Whitehead, but when I

1    looked at it I said, look, I need to get this out

2    so --

3         MR. GAW:  No, I totally understand.

4    BY MR. GAW:

5    Q.    Sorry for the digression, Mr. Whitehead.

6         So at this point, April 2014, you were not

7    communicating with Kamprad in any fashion through

8    Mr. Rogers anymore, right?

9    A.    No.

10   Q.    And now you were instead communicating either

11   with Mr. Lindberg or with Mr. Martins, correct?

12   A.    Correct.

13   Q.    How did Mr. Rogers drop out of the picture, do

14   you recall?

15   A.    I told him to stop in, I'm not sure, maybe

16   November of the year before.  I'm not sure of the exact

17   time.

18   Q.    Okay.

19   A.    Yeah.

20   Q.    And Kamprad didn't have a problem with that?

21   A.    There was no deal.

22   Q.    Okay.  Did Kamprad express any confusion as to

23   why Mr. Rogers was suddenly not involved in any

24   communications anymore?

25   A.    I don't recall at this stage what happened there.

Q.   Now, looking at Exhibit 9, is it fair to say that Mr. Martins here was replying to an e-mail that you had sent him?

A.   Yes.

Q.   And that e-mail is below, it's from you to Mr. Martins on, it says April 9, 2014, but I guess that's a time zone difference there, right?

A.   Possibly, yeah.

Q.   Where is Mr. Martins located, do you have any idea?

A.   Either Finland or London.  He would float in between Europe somewhere and a lot of business was in Russia, so he was over there somewhere.

Q.   You were communicating with him from Southern California and he was communicating from somewhere in Europe?

A.   Correct.

Q.   So that explains why the time zones, the dates may sometimes be different.

A.   Correct.

Q.   And Mr. Martins' reply to you, he basically bolded the text in your e-mail?

A.   Correct.

Q.   And if we look here at paragraph 1 of his reply, it seems like he is providing you with a certificate for

1    good standing for Rockford.

2        A.    In the first paragraph?

3        Q.    Yeah.

4        A.    It says, "Fresh certificate of good standing.

5    You have that correct all with David Elbaz.  Also the

6    details of a Belize and L-I-L-A-C," I don't know,

7    whatever is there.

8            Well, remember, I see it is referencing Rockford,

9    yes.

10       Q.    Just so we're clear, what you just read, that was

11   your e-mail you had read and Mr. Martins' reply to that

12   below is in bold?

13       A.    Okay.  Yes.  I was reading the wrong part.  Yes.

14       Q.    In your e-mail to him you had asked for due

15   diligence on the companies in the Dominican Republic and

16   Belize, and you're referring to the SHR SOLAR entities

17   and Rockford, correct?

18       A.    Yes.

19       Q.    And Mr. Martins was telling you here in Exhibit 9

20   we have a certificate of good standing for March of 2014,

21   here's a scanned copy, correct?

22       A.    Yes.

23       Q.    And he also says the DR entities, meaning the

24   SHR SOLAR entities, are all up-to-date, correct?

25       A.    Correct.

1    Q.   And then below that, that's your question to him

2    saying, "Is there anything more on the company structures

3    for Lions Gate I need or that you can send again,"

4    correct?

5    A.   Correct.

6    Q.   And Mr. Martins replied saying that the legal

7    description is correct and the draft of the contract he

8    had been proposing and that the escrow lawyer, Perdomo

9    Law, holds everything in hand and is waiting for further

10   instruction by you, correct?

11   A.   Yes.

12   Q.   Perdomo Law, that refers to a lawyer in the

13   Dominican Republic named Guido Perdomo?

14   A.   Correct.

15   Q.   And then Mr. Martins also writes, "There will be

16   ten to $15,000 in closing costs in total in the Dominican

17   Republic with Mr. Perdomo," correct?

18   A.   Correct.

19   Q.   He mentions this includes updating all of the

20   SHR SOLAR companies according to the new Dominican

21   Republic law, which is a routine procedure and takes

22   about 30 days, correct?

23   A.   Correct.

24   Q.   So you can put Exhibit 9 away.

25        MR. GAW:  Let's take a ten-minute break.

1          (A brief recess was taken from 10:46 a.m. to

2     10:59 a.m.)

3     BY MR. GAW:

4          Q.   So let's mark this document as Exhibit 10.

5               (Exhibit No. 10, E-mail Dated 4/9/14, was marked

6          for identification.)

7     BY MR. GAW:

8          Q.   Now Exhibit 10 is an April 9, 2014, e-mail from

9     CDC@mail.com to Mr. Whitehead.

10              And, Mr. Whitehead, is CDC@mail.com, is this

11    another e-mail address used by Mr. Martins?

12         A.   I think it is, yes.

13         Q.   It's JPM-M?

14         A.   Yeah.

15         Q.   And this is -- you received this e-mail, correct?

16         A.   Correct.

17         Q.   And in Mr. Martins' e-mail here, the top e-mail,

18    it appears that he's discussing with you the SHR SOLAR

19    entities?

20         A.   Correct.

21         Q.   And he's telling you that the updating of the

22    companies needed to be done to be converted from

23    something called SA to SARL format?

24         A.   Correct.

25         Q.   And that Mr. Perdomo would advise you more if

1    anything more is needed and it's a routine process,

2    correct?

3        A.    Correct.

4        Q.    And you can put -- now, do you recall that by

5    this time, April 9, 2014, Mr. Okada had filed a lawsuit

6    against you in Orange County Superior Court?

7        A.    I don't recall when he filed the lawsuit

8    specifically, if it was before April 9th or after.  I

9    can't recall off the top of my head.

10       Q.    Why don't you put Exhibit 10 away and just you

11   can look at Exhibit 3 again.

12            And if you look in the third paragraph under

13   recitals, it says, "On or about March 27, 2014, Okada

14   filed a lawsuit against Whitehead."

15            Do you see that?

16       A.    Yes.

17       Q.    Does that refresh your memory that sometime in

18   late March, Mr. Okada had filed a lawsuit against you?

19       A.    Yes.

20       Q.    And you can put three back down.

21            So by April, 2014, even though you were still

22   trying to convince Mr. Okada to do the deal with Kamprad,

23   your negotiations were colored by the fact that there's

24   this existing lawsuit between the two you at that time,

25   correct?

1    you and he both agreed that as part of any settlement, it

2    would involve the Beverly Hills and Kamprad transaction

3    going through?

4        A.    Yes.

5        Q.    So in other words, for it to settle Donald had to

6    agree to do the deal with Kamprad, correct?

7        A.    We both had to do.

8        Q.    You already wanted to do it so Donald had to

9    basically sign off on the deal, too, correct?

10       A.    Well, yes.

11       Q.    And just to refresh, the deal involved someone

12   getting the Lions Gate property and then also cash and a

13   promissory note from Kamprad, and then you guys would

14   give up your interest in the Beverly Hillbillys, LLC and

15   the BH property, correct?

16       A.    Correct.

17       Q.    You can put Exhibit 12 away.

18            Mark this as Exhibit 13, please.

19            (Exhibit No. 13, E-mail Dated 5/19/14, was marked

20       for identification.)

21   BY MR. GAW:

22       Q.    Exhibit 13 is a May 19, 2014, e-mail from Guido

23   Perdomo to Mark Whitehead.

24            Did you receive this e-mail, Mr. Whitehead?

25       A.    Yes.

Q.    Now, do you see the Bates numbers at the bottom right-hand corner?

A.    Yes.

Q.    Let me ask you to turn to the page number with the Bates number 272.

A.    Okay.

Q.    So at the bottom here, the very bottom of Page 272, that's an e-mail from Mr. Perdomo to you on or around January 12, 2014, right?

A.    Yes.

Q.    And it continues, we can see this actually continues over to the next page, 273, correct?

A.    Yes.

Q.    And in Mr. Perdomo's e-mail, he's letting you know that he would be happy to help you out on a transaction involving Lions Gate, correct?

A.    Correct.

Q.    And you recall that Mr. Perdomo had been recommended to you by Mr. Martins?

A.    Correct.

Q.    And at this time, you trusted the advice of Mr. Perdomo, correct?

A.    I more trusted Mr. Martins.  I didn't know Perdomo.  All I knew was he was a lawyer.

Q.    So you trusted Mr. Martins' advice for you to

1  rely on Mr. Perdomo, correct?

2      A.    Correct.

3      Q.    Let's go back to Page 269.  And you see at the

4  top of Page 269 --

5      A.    Yes.

6      Q.    -- that appears to be an e-mail from you,

7  correct, to Mr. Perdomo?

8      A.    It looks like it was sent from James.

9      Q.    So let's go back to Page 268.  Do you see at the

10  very bottom there's something that says, you know, 19 de

11  Mayo 2014, which I assume is Spanish for May, Mark

12  Whitehead, does that remind you -- and then you turn to

13  the next Page 269 -- does that refresh your memory that

14  you sent an e-mail to Mr. Perdomo?

15      A.    Okay.  Yes.

16      Q.    And in your e-mail you write, "It's Mark

17  Whitehead.  I've settled the deal with a partner on the

18  Lions Gate home which will be in my name, and I need to

19  have a lien or note on the home in favor of Okada for

20  $950,000.  Can you arrange that and contact my lawyers

21  here on setting that up?"

22      A.    Yes.

23      Q.    So you wrote that, correct?

24      A.    Yes.

25      Q.    And then you gave Mr. Bryant's contact

1     information, correct?

2          A.     Right.

3          Q.     And then if you turn back to Page 268, and at the

4     bottom of the page, that's Mr. Perdomo's e-mail replying

5     to your e-mail, correct?

6          A.     Correct.

7          Q.     And then he writes, "This can be done but

8     companies must be updated.  I mean transforming of them

9     to SRL.  You could also make a normal contract but no

10    liens could be placed at title's office until this update

11    is completed," correct?

12         A.     That's what he says, yes.

13         Q.     And it was your understanding that Mr. Perdomo's

14    referring to the SHR SOLAR entities when he says

15    companies must be updated, correct?

16         A.     Yes.

17         Q.     And then you reply back to his e-mail on the same

18    page further up, you see right above that from Mark to

19    Guido Perdomo?

20         A.     Yes.

21         Q.     And then you qualify, "Just a lien on title or

22    loan will do that correct, like any other lien," right?

23         A.     Yes.

24         Q.     And the very top of Exhibit 13 on Page 268 here,

25    Mr. Perdomo replies to you again, correct?

1      A.    Yes.

2      Q.    And he says, "Correct, but for that we need

3  updated companies," correct?

4      A.    Yes.   That's what he says, correct.

5      Q.    So, again, so Mr. Perdomo is informing you here

6  that in order to put a lien on Lions Gate, the SHR SOLAR

7  entities needed to be updated, correct?

8      A.    No.

9      Q.    Well, he says, "Correct, but for that we need

10  updated companies," right?

11      A.    It's not a bar, as I understand it, to putting a

12  lien on the SHR titles in the title's office.

13      Q.    But just so we're clear, the bottom here on page

14  DOC 268, you see Mr. Perdomo's e-mail below?

15      A.    Yes.

16      Q.    He says, "You could also make a normal contract

17  but no liens could be placed at title's office till this

18  update is completed," correct?

19      A.    That's what he says.

20      Q.    Okay.   You can put Exhibit 13 aside here.

21           Let's mark this as Exhibit 14.

22           (Exhibit No. 14, E-mail Dated 5/20/14, was marked

23      for identification.)

24  BY MR. GAW:

25      Q.    Exhibit 14 is an e-mail from you to Mr. Bryant on

1   May 20, 2014, correct?

2       A.    Correct.

3       Q.    I see your koala bear, so you sent this e-mail?

4       A.    Yes.

5       Q.    And it looks like you had simply copy and pasted

6   a Skype chat with Mr. Martins and sent this on to

7   Mr. Bryant, correct?

8       A.    Correct.

9       Q.    And so we're clear, Skype is an internet chat

10  program that you can use to send instant messages to

11  other people?

12      A.    Yes.

13      Q.    And you had done Skype chats with Mr. Martins

14  before regarding the Lions Gate transaction, right?

15      A.    Correct.

16      Q.    Now I have highlighted for clarity a couple of

17  lines here on page DOC 285.   Do you see that?

18      A.    The yellow highlight, yes.

19      Q.    And the first highlighted line on May 19, 2014,

20  you had written to Mr. Martins, "I guess the companies

21  have to be updated according to Guido, does that make

22  sense," right?

23      A.    Yes.

24      Q.    And then Mr. Martins in the next two lines

25  basically says, yes, I discussed this earlier with you

1    and there's a new system in place so the SAs need to be

2    converted to SARL, right?

3        A.    Yes.

4        Q.    And he also says that it will cost about $2,000

5    per company according to Mr. Perdomo, correct?

6        A.    Correct.

7        Q.    With five SHR SOLAR entities, that's about

8    $10,000 total, right?

9        A.    Correct.

10       Q.    So you can put Exhibit 14 away.

11             And let's mark this as Exhibit 15.

12             (Exhibit No. 15, Letter from Guido Perdomo Dated

13        5/23/14, was marked for identification.)

14   BY MR. GAW:

15       Q.    Mr. Whitehead, Exhibit 15 is a letter from

16   Mr. Perdomo to you dated May 23, 2014, right?

17       A.    Correct.

18       Q.    And you received this letter, correct?

19       A.    Yes.

20       Q.    And Mr. Perdomo writes that he would be happy to

21   assist and represent you and Mr. Okada in a transaction

22   involving Lions Gate and its associated companies, right?

23       A.    Yes.

24       Q.    And by that he means the Rockford and SHR SOLAR

25   entities, correct?

1        A.    Yes.

2        Q.    And in the last sentence to you on Exhibit 15, he

3   writes, "I remind you that all companies must be updated

4   according to the new corporate law of the Dominican

5   Republic," right?

6        A.    Yes.

7        Q.    And it's your understanding he was, again,

8   referring to updating the SHR SOLAR entities to SRL

9   format, right?

10        A.    Yes.

11        Q.    You can put Exhibit 15 aside, and I'd like to

12   mark this as Exhibit 16.

13            (Exhibit No. 16, E-mail Dated 8/11/15, was marked

14       for identification.)

15   BY MR. GAW:

16        Q.    Let me ask you to turn to Page 2 of Exhibit 16

17   here.

18        A.    Okay.

19        Q.    Now do you see at the bottom of Page 2, it

20   appears to be an e-mail from Mr. Perdomo to you on

21   July 8, 2014?

22        A.    Yes.

23        Q.    And he's writing here the titles and registration

24   for the companies, right?

25        A.    Yes.

Q.   Do you recall that around that time Mr. Perdomo
had sent you the titles and registration for the SHR
SOLAR entities?

A.   Yes.

Q.   And then we move up from that e-mail on Page 2
here.  You replied to Mr. Perdomo's e-mail, correct?

A.   You mean where I said, "Do you send to the
lawyers who represent Okada?"

Q.   Yes.

A.   Yes.

Q.   So you wrote that, correct, to Mr. Perdomo in
reply?

A.   Yeah.  It's in Spanish but my name is here, so,
yeah.

Q.   And you're asking if Mr. Perdomo had forwarded on
the title and registrations on to Mr. Okada's lawyer,
correct?

A.   Correct.

Q.   And then we see further up here on that page,
Mr. Perdomo replies back to you saying that, yes, you
know, Mr. Okada's lawyer has those documents, right?

A.   He says, yes, all documents plus all the other
material requested, yes.

Q.   And you recall receiving that e-mail from him,
right?

78

1      A.    Yes.    I guess.

2      Q.    And then we turn to Page 1 of Exhibit 16 here.

3  Now at the bottom, that is an e-mail from you to

4  Mr. Perdomo replying to him on around July 8th, correct?

5      A.    Yes.

6      Q.    And then you say, "Gaw said that the companies

7  were not compliant and he explained to his lawyer what

8  needs to happen and that it does not affect the ability

9  to lien the property and then you will make them

10  compliant on close," correct?

11      A.    Yes.

12      Q.    And you're referring to me when you say Gaw,

13  correct?

14      A.    Yes.

15      Q.    You're asking Mr. Perdomo to explain liens could

16  be put on Lions Gate after the close of the transaction,

17  right?

18      A.    Yes.

19      Q.    And that Mr. Perdomo replies to you, you see the

20  e-mail immediately above?

21      A.    Yes.

22      Q.    And he says, "The companies must be updated

23  according to the corporate law.  I explained Chris

24  Noblett about this," right?

25      A.    Yes.

1    Q.    So it's your understanding that he is saying that

2    the SHR companies must be updated to SLR format, correct?

3    A.    Yes.    I don't know who Chris Noblett is.

4         MR. GAW:    Chris, N-O-B-L-E-T-T.

5    BY MR. GAW:

6    Q.    So you can put Exhibit 16 away.

7         Let's mark this as Exhibit 17.

8         (Exhibit No. 17, E-mail Dated 7/8/14, was marked

9    for identification.)

10   BY MR. GAW:

11   Q.    Exhibit 17 is a July 8, 2014, e-mail from you to

12   me, correct?

13   A.    It says from Guido to me.

14   Q.    At the very top?

15   A.    Yes.

16   Q.    Do you see that?

17   A.    Yes.    From me to you, yes.

18   Q.    And you recall you mentioned Guido so you were

19   forwarding on Mr. Perdomo's e-mail to you that had

20   attached the titles and registration for the SHR SOLAR

21   company, right?

22   A.    Yes.

23   Q.    And we can turn to the second page of Exhibit 17.

24   This appears to be a registration for the entity that's

25   called SHR SOLAR 135 SA, right?

1    A.    Yes.

2    Q.    And if you look in the middle of the page, you

3 see a listing of the corporate -- what appears to be a

4 listing of the corporate officers for SHR SOLAR 135,

5 right?

6    A.    Yes.

7    Q.    And next to the title of president, there's the

8 name José, A-P-O-L-I-N-A-R, L-A-N-T-I-G-U-A,

9 B-A-L-B-U-E-N-A.

10        So just to re-ask my questions, next to the title

11 president here on for this registration for SHR SOLAR 135

12 we see that José Apolinar Lantigua Balbuena is listed as

13 the president, right?

14    A.    Correct.

15    Q.    Now, let me ask you to turn to the third page of

16 Exhibit 17.    Here this appears to be a registration for

17 the entity called SHR SOLAR 24, right?

18    A.    Yes.

19    Q.    And we also see it listed as president is José

20 Apolinar Lantigua Balbuena, right?

21    A.    Yes.

22    Q.    Just for shorthand, everyone just calls him José

23 Lantigua right?

24    A.    Hito.

25    Q.    So Hito and Mr. Lantigua?

1    A.    Same.

2    Q.    Interchangeable.    Okay.

3          Let's turn to Page 4 of Exhibit 17.    And this is

4    the registration for SHR SOLAR 136, right?

5    A.    Yes.

6    Q.    And Mr. Lantigua, otherwise known as Hito, is the

7    president of this entity as well, right?

8    A.    Right.

9    Q.    Turn to Page 5 of Exhibit 17.    This is the

10   registration for SHR SOLAR 137, right?

11   A.    Yes.

12   Q.    And Mr. Lantigua is the president of this entity,

13   right?

14   A.    Correct.

15   Q.    Turn to Page 6 of Exhibit 17.    This is the

16   registration for SHR SOLAR 134, correct?

17   A.    Yes.

18   Q.    And Mr. Lantigua is listed as the president,

19   right?

20   A.    Yes.

21   Q.    And then the remaining pages, I guess these are

22   some kind of certificates of title, it appears to be, for

23   the SHR SOLAR entities?

24   A.    It's in Spanish but it kind of looks like that.

25   Q.    It says Certificado de Titulos, I assume

certificate of title.  At least that was your understanding when you received it, right?

A.    Yes.

Q.    You can put Exhibit 17 back.  Let's go back to Exhibit 3, the settlement agreement.

So Exhibit 3 here, you and Mr. Okada executed the settlement agreement because by then, everyone had finally agreed to the terms of the transaction with Kamprad, right?

A.    Yes.

Q.    And in the settlement agreement, it also reflects how you and Mr. Okada would essentially split the proceeds of that transaction, right?

A.    Correct.

Q.    And I ask you to turn to Page 2 of Exhibit 3. So, for example, under Section 1.2 here, both of you had agreed that Mr. Okada would receive 1.1 million cash from the Kamprad transaction, right?

A.    Yes.

Q.    And then if we look at Section 1.3, you would receive $100,000 cash from that transaction, right?

A.    Yes.

Q.    And both of you agreed you would reduce the amounts received to pay certain fees and taxes that had to be done at closing, right?

1   A.   Right.

2   Q.   And if we look at paragraph Section 1.5 here of

3   the agreement, do you see that?

4   A.   Yes.

5   Q.   And that requires you to secure from Okada a

6   first priority lien in the amount of $950,000 against

7   Lions Gate, right?

8   A.   Yes.

9   Q.   And the Section 1.5 says that the lien must be

10  secured within 24 hours of the closing of the transaction

11  of Kamprad, correct?

12  A.   Yes.

13  Q.   And then finally Section 1.5 says that you and

14  Rockford would issue a security agreement to Mr. Okada in

15  the amount of $950,000, and the terms of which are

16  enumerated in the instructions appended as Exhibit A to

17  the settlement agreement, right?

18  A.   Okay.  Yes.

19  Q.   So let's turn to page -- sorry.  Do you see

20  Section 1.6 and 1.7 at the bottom here at Page 2?

21  A.   Yes.

22  Q.   And those two paragraphs basically say that at

23  the closing of the Kamprad transaction, Mr. Okada would

24  receive a non-voting ownership interest of $950,000 in

25  Rockford, and you would receive the remaining ownership

1    interest, right?

2        A.   Correct.

3        Q.   Let's turn to Page 3 of Exhibit 3, and do you see

4    Section 1.8?

5        A.   Yes.

6        Q.   And Section 1.8 says that Rockford will be

7    managed by third party administrator/trustee pursuant to

8    written instructions agreed upon by you and Mr. Okada

9    including, but not limited to the instructions attached

10   as Exhibit A to the settlement agreement, right?

11       A.   Yes.

12       Q.   And that Section 1.8 clarifies that Mr. Perdomo

13   will serve as the third party administrator/trustee,

14   right?

15       A.   Yes.

16       Q.   And Section 1 point also says that Mr. Perdomo

17   was not allowed to deviate from the instructions without

18   the written consent from you and Mr. Okada, right?

19       A.   Correct.

20       Q.   Now, can you go to Section 1.12?

21       A.   Okay.

22       Q.   Here as part of one of the conditions of the

23   settlement agreement, Mr. Okada would transfer to you all

24   title and interest in the Ocean Ridge property, right?

25       A.   Yes.

1    Q.   That was another one of your real estate

2    partnerships or joint ventures, right, Ocean Ridge?

3    A.   Correct.

4    Q.   At the time you and your family were living in

5    that property?

6    A.   Yes.

7    Q.   And it's 9 Ocean Ridge Drive in Newport Beach,

8    California?

9    A.   Correct.

10   Q.   Let me show you a document that I'll mark as

11   Exhibit 18.

12       (Exhibit No. 18, Grant Deed, was marked for

13   identification.)

14   BY MR. GAW:

15   Q.   So Exhibit 18 has the title, "Grant Deed."

16   Mr. Whitehead, Exhibit 18 appears to be a grant deed from

17   Mr. Okada to you, correct?

18   A.   Yes.

19   Q.   For the property known as 9 Ocean Ridge.  Newport

20   Beach, California, 92657?

21   A.   Yes.

22   Q.   This is the Ocean Ridge property that is referred

23   to in the settlement agreement?

24   A.   Yes.

25   Q.   This is dated August 15, 2014?

1      A.    It's dated, yes.

2      Q.    And there's a notary seal also at the bottom on

3   August 15, 2014?

4      A.    August -- yes, yes.

5      Q.    And you received this grant deed Exhibit 18,

6   correct?

7      A.    I think it went to James.

8      Q.    Did Mr. Bryant pass it along to you or notify you

9   that he had received it?

10     A.    I'm sure he did.   I don't recall exactly when

11  but, yeah.

12     Q.    So regardless, Exhibit 18 was presented either to

13  you or to your representative, Mr. James Bryant, correct?

14     A.    I think so.

15     Q.    Now you can put Exhibit 18 away and let's go back

16  to Exhibit 3.

17          Let me ask you to go to Page 5 of Exhibit 3.   Do

18  you see Section 6.1 here?

19     A.    Yes.

20     Q.    So Section 6.1, states that the occurrence of a

21  number of enumerated events will be deemed default by you

22  under the settlement agreement, correct?

23     A.    Yes.

24     Q.    And then we see, like, there's A through G,

25  right?

1      A.   Yes.

2      Q.   6.1 A through G.  For example, 6.1 A says that
3  the failure by you to comply with the terms or perform
4  the terms of any obligations or covenants or conditions
5  in any executed agreements between you and Mr. Okada
6  would be an event of default under the settlement
7  agreement, right?

8      A.   Yes.

9      Q.   And then we look at 6.1 C, if any warranty
10 representation or statement made by you to Mr. Okada with
11 respect to any executed agreement between you two, if any
12 that becomes materially false or misleading, that's also
13 an event of default, right?

14     A.   Yes.

15     Q.   Then if we look at F, 6.1 F, any proceedings
16 against Rockford or you that could have any negative
17 impact on Mr. Okada's interest in Lions Gate, that's an
18 event of default, right?

19     A.   Okay.

20     Q.   And 6.1 G, states that any acts or omissions of
21 acts by you or Rockford that could have any negative
22 impact on Mr. Okada's interest in Lions Gate, that's also
23 an event of default, right?

24     A.   Okay.

25     Q.   And let's go to Section 6.2 at the bottom.  Do

1    you see that?

2        A.    Yes.

3        Q.    Section 6.2 identifies the remedies Mr. Okada is

4    entitled to in the event of your default under the

5    settlement agreement, right?

6        A.    Yes.

7        Q.    It states that he's entitled to any and all

8    remedies available under the relevant laws of the

9    Dominican Republic, correct?

10       A.    Yes.

11       Q.    And it lists out some of the remedies including,

12   but not limited to, foreclosure sale of Lions Gate or an

13   option to transfer legal and equitable title of Lions

14   Gate to anyone, right?

15       A.    Okay.

16       Q.    And there is no language anywhere in Section 6.2

17   that says that Mr. Okada has to wait for a court to issue

18   a decision before he is entitled to any revenues, right?

19       A.    In 6.2?

20       Q.    Yes.

21           MR. BRYANT:  Objection.  Calls for legal

22   conclusion as to what 6.2 means.

23   BY MR. GAW:

24       Q.    Unless your attorney instructs you not to answer,

25   even after the objection, you have to answer the

question.

So the question is, there is no language in 6.2 stating that Mr. Okada has to wait for a court decision before he's entitled to any remedies under the settlement agreement, correct?

A.    I don't think I can answer that.

Q.    Well, I mean --

MR. BRYANT:  It's just a literal.  Literally, does it state that?

THE WITNESS:  Literally, it does state that.

BY MR. GAW:

Q.    I'm not asking about your understanding of what 6.2 means, just whether it actually says X or it says Y.

Let's go to the next page, Page 6 of Exhibit 3. Do you see Section 9 there?

A.    Yes.

Q.    Section 9, basically states that you and Mr. Okada both understand that any fact not stated in the settlement agreement may turn out to be different from or contrary to any of the facts known by you or Mr. Okada at the time you signed the settlement agreement, correct?

A.    Okay, yes.

Q.    And then there's a couple of more pages of the settlement agreement before the signature pages, right? It looks like it goes up to paragraph, Section 21, kind

1    of the last section, and then we have the signature

2    pages, right?

3       A.   Yes.

4       Q.   Now, I want you to take the time to review all of

5    the Exhibit 3, as much time as you need.   And after you

6    finish reviewing it, I'd like to ask you to point to me

7    the section, where in the section in the contract it says

8    that Mr. Okada has to first obtain a court decision, a

9    court judgment against you before he can exercise his

10   remedies in the event of your default.

11          MR. BRYANT:   And just for the record, I will

12      object.   Calls for a legal conclusion as to the

13      interpretation of the settlement agreement.

14          THE WITNESS:   Page 7, clause 15.

15   BY MR. GAW:

16      Q.   Where it says, "Choice of law venue"?

17      A.   Yes.

18      Q.   Is there anywhere else in the settlement

19   agreement that says that Mr. Okada is obligated to first

20   obtain a court judgment against you before he can

21   exercise his remedies in the event of your default?

22      A.   That was understood.   I'm no lawyer, so I don't

23   understand.   I think Clause 15 says it all.

24      Q.   Okay.   Now, is there anything in Exhibit 3, the

25   settlement agreement, any language identifying what legal

1    remedies Mr. Okada must first exhaust before he can

2    declare you to be in default under the settlement

3    agreement?

4        A.    Again, I'm not a lawyer.    I can't answer that.

5        Q.    So you're not aware of any language in Exhibit 3

6    that requires that Mr. Okada must first exhaust some

7    legal remedies before he can declare you in default?

8        A.    Clause 15.

9        Q.    Can you show me where in Exhibit 3 it says that

10   Mr. Okada is supposed to file the tax returns for Cheap

11   As Chips, LLC as one of the conditions of settlement?

12       A.    I'm trying to see Cheap As Chips in here.    My

13   eyes are not that good.    Oh, okay.  Page 3, 1.13.    Does

14   that make sense?

15       Q.    So under 1.13, you're saying that obligates

16   Mr. Okada to file the tax returns for Cheap As Chips, LLC

17   as a condition under the settlement agreement?

18       A.    It doesn't say specifically that Okada has to

19   file the tax returns.

20       Q.    So it doesn't say it.    Is there anywhere else in

21   Exhibit 3 that says Mr. Okada has to file the tax returns

22   for Cheap As Chips, LLC?

23       A.    Can't see it.

24       Q.    Okay.  Regardless, Mr. Okada actually did file

25   the tax returns for Cheap As Chips, LLC, right?

1      A.   He changed accountants and didn't tell me.  So I

2    don't know.

3      Q.   Let me show you a document that I will mark as

4    Exhibit 19.

5           (Exhibit No. 19, E-mail Dated 12/2/14, was marked

6           for identification.)

7    BY MR. GAW:

8      Q.   Exhibit 19 is a December 2nd, 2014, e-mail from

9    Donald Okada to Mark Whitehead.   You received Exhibit 19,

10   right?

11     A.   Looks like it, yeah.

12     Q.   And here in the e-mail, Mr. Okada is sending you

13   a copy of your 2014 K-1 tax return for Cheap As Chips,

14   LLC, right?

15     A.   Mr. Okada is sending me a tax return that he

16   prepared with a new accountant that I had no knowledge

17   of.  And I questioned him as to why he changed

18   accountants after he sent me information and I found that

19   he had been using some of Cheap As Chips money to pay his

20   own staff.

21     Q.   Okay, but again, Exhibit 19 is just an e-mail

22   where he is attaching your K-1 tax return for 2014 for

23   Cheap As Chips, LLC, correct?

24     A.   I didn't accept it.

25     Q.   Okay.  If you look at the third page of

1   Exhibit 19, does that appear to be a Schedule K-1 for

2   2014, the short year 2014, for Cheap As Chips for you?

3       A.   Yes, but prepared without my knowledge.

4       Q.   Okay.  And on the second page, that's the 2014

5   short year Schedule K-1 for you for Beverly Hillbillys,

6   LLC, correct?

7       A.   Same deal, prepared without my knowledge.

8       Q.   But you received these documents, correct?

9       A.   Yes.

10      Q.   Let's mark this next document as Exhibit 20.

11           (Exhibit No. 20, Short year 2014, US Return of

12      Partnership Income, was marked for identification.)

13  BY MR. GAW:

14      Q.   Exhibit 20 is a document that says, "Short year

15  2014, US return of partnership income, now Cheap As

16  Chips?

17           Mr. Whitehead, Exhibit 20 appears to be the 2014

18  federal tax return for Cheap As Chips, LLC, correct?

19      A.   It says Cheap As Chips, yeah.

20      Q.   And you have no reason to believe that this tax

21  return was not filed, correct?

22      A.   I have no idea who Brian Willard is, who prepared

23  this.  So yes, I can't verify it has been filed.

24      Q.   So you have no reason, one way or another, to

25  dispute whether or not this has been filed?

1    A.    I don't know that it was filed.    I do know that I

2    was not a party to it.    I had no idea what was going on

3    and why he changed accountants.    I kind of do but

4    that's --

5    Q.    So you don't know that it was filed, you don't

6    know that it was not filed, if that makes any sense,

7    right?    You have no knowledge one way or the other,

8    correct?

9    A.    Correct.    Because Brian Willard never sent

10   anything to me.    I didn't sign it.

11   Q.    Okay.    Who was the accountant that was normally

12   used by Cheap As Chips?

13   A.    Donald Collie, Collie Accounting, for ten years.

14   Q.    Was that your personal accountant?

15   A.    Yes.

16   Q.    You could put Exhibit 20 away.

17        Let me show you a document that I will request be

18   marked as Exhibit 21.

19        (Exhibit No. 21, Short Year, US Return of

20        Partnership Income, was marked for identification.)

21   BY MR. GAW:

22   Q.    Exhibit 21 is a document with the title, "Short

23   Year 2014 US Return of Partnership Income, Beverly

24   Hillbillys, LLC."

25        Now, Mr. Whitehead, Exhibit 21 appears to be the

1    2014 Federal Tax Return for Beverly Hillbillys, LLC,

2    right?

3        A.    Yes.

4        Q.    And again --

5        A.    Can I have a second to talk to him?

6        Q.    Yes, of course.

7              (A discussion was held off the record.)

8              (A brief recess was taken from 11:50 a.m. to

9    11:54 a.m.)

10             (The question was read by the reporter.)

11   BY MR. GAW:

12       Q.    So we've come back from the break now.

13             Mr. Whitehead, similar to Exhibit 20, you have no

14   knowledge one way or the other whether or not Exhibit 21

15   was filed with the government, right?

16       A.    First time I've seen this document.

17       Q.    Okay.  So you can put Exhibit 21 away.  And you

18   have not been contacted by the US government regarding

19   any missing tax returns for either Cheap As Chips, LLC or

20   Beverly Hillbillys, LLC, right?

21       A.    Me, personally, no.

22       Q.    I'll mark the next document as Exhibit 22.

23             (Exhibit No. 22, E-mail Dated 12/2/14, was marked

24   for identification.)

25

BY MR. GAW:

Q.   Exhibit 22 is an e-mail from Donald Okada to Mark Whitehead on December 2nd, 2014.   You received Exhibit 22, correct?

A.   Mark at TaxSux, yes.

Q.   And here in Exhibit 22, Mr. Okada is sending you a copy of your 2013 K-1 tax return for Cheap As Chips, LLC, right?

A.   Where are you seeing this?

Q.   "This was sent to James.   2013 K-1 for Cheap As Chips and Beverly Hillbillys.   I just sent you the K-1 for 2014."

         That's what Mr. Okada wrote, right?

A.   Yes.

Q.   And we see here starting with the third page of Exhibit 22, so this is 2013 K-1 for Beverly Hills, LLC for you, right?

A.   Yes.

Q.   And then on the next page --

A.   Can I --

Q.   Do you have a question?

A.   Partner's address, that's not my address.

Q.   PO Box 3208 is not your address?

A.   No.   It's not my address.

Q.   It looks like that might be an error.

1        A.    On the K-1?

2        Q.    Here on the fourth page, that's the K-1 for 2013

3    for Cheap As Chips for you, correct?

4        A.    With the correct address, yes.

5        Q.    And you recall receiving these attachments to the

6    e-mail that's Exhibit 22, right?

7        A.    I'm not sure, to be honest.

8        Q.    Well, you see here on the first page of

9    Exhibit 22, the first page --

10       A.    Yes.

11       Q.    -- you see under attachments, it says 2013

12    Beverly Hillbillys K-1 underscore Whitehead?

13       A.    Okay.

14       Q.    And 2013 Cheap as Chips underscore Whitehead dot

15    PDF.

16       A.    Yes.

17       Q.    Does this refresh your memory that the K-1s were

18    attached to the e-mail, Exhibit 22?

19       A.    Yes.    Because I asked the question who prepared

20    them, yeah.

21       Q.    So you can put Exhibit 22 away.

22            MR. GAW:  Please mark this exhibit as Exhibit 23.

23            (Exhibit No. 23, Letter from Brian Willard Dated

24    9/15/14, was marked for identification.)

25

BY MR. GAW:

Q.   Exhibit 23 has R. Brian Willard, CPA, September 15, 2014.   It's a letter addressed to Cheap As Chips.

Now, Mr. Whitehead, Exhibit 23, that appears to be a letter from Mr. Willard stating that the 2013 tax returns for Cheap As Chips will be electronically filed with the federal government, right?

A.   I never saw this.   I've never seen this document.

Q.   But that's what it appears to say, correct?

A.   Yes.

Q.   And if we look, starting at Page 2, this appears to be the tax returns for Cheap As Chips 2001, right?

A.   Yes.

Q.   And, you know, you said you have a company called TaxSux that prepares tax returns for people, right?

A.   Yes.

Q.   So you're generally familiar with what tax filings and tax returns look like, right?

A.   Yes.

Q.   And you have no reason to believe that this 2001 tax return wasn't filed, correct?

A.   Yes.   Because I was not aware of it.   He says it's going to be electronically filed.   I just don't know.

Q.   So you have no understanding one way or the other

1     whether or not this tax return was filed, correct?

2          A.    Correct.

3     Q.    You can put Exhibit 23 away.

4          Let's go back to Exhibit 3 here and turn to

5     Page 10 of Exhibit 3.

6     A.    Can I ask a question?

7     Q.    Of course.

8     A.    Is that supposed to be Okada's signature?

9     Q.    Are you looking at Exhibit 23 here?

10    A.    Yeah.

11    Q.    I assume -- I don't know.  It looks like a

12    digital signature to me.  I don't know.

13    A.    Okay.

14    Q.    So Exhibit 3, Page 10.  Are you on that page?

15    A.    Page 10?

16    Q.    Yes.

17    A.    Okay.

18    Q.    So starting on Page 10 here, Exhibit A, that's

19    Exhibit A, the administrator instructions to the

20    settlement agreement, correct?

21    A.    Yes.

22    Q.    And you may recall these are the instructions

23    that Mr. Perdomo was supposed to follow in terms of

24    administering and managing Rockford, correct?

25    A.    Yes.

Q.   And so in paragraph 1 here on the administrator instructions, you and Mr. Okada are granting Mr. Perdomo the power of attorney over the SHR SOLAR entities to do various things, correct?

A.   Yes.

Q.   And then it lists out what those things are, you know, paragraph 1.1, 1.2 and 1.3, correct?

A.   Yes.

Q.   Paragraph 1.1 is something called Acto de Constitucion de Hipoteca?

A.   Correct.

Q.   That's what it says, right?

A.   Yes.

Q.   And then paragraph 1.2 says something called Pagare Notarial?

A.   Right.

Q.   And paragraph 1.3 says Acuerdo de Dacion de Pago, correct?

A.   Yes.

Q.   And it says for that paragraph 1.3, "In the event of default by Mark Whitehead in favor of Okada," right?

A.   We disputed the default.

Q.   Right.  I'm just saying that's what paragraph 1.3 says, Acuerdo de Dacion de Pago, in the event of default by Mark Whitehead in favor of Okada, that's all.  I'm

1    just saying that's what it says, right?

2        A.    Yes.

3        Q.    And paragraph 2 is an escrow provision stating

4    that Mr. Perdomo would hold in escrow 100 percent of all

5    shares of Rockford until you had fully performed under

6    your agreements with Mr. Okada, right?

7        A.    Yes.

8        Q.    Now let's turn to Page 11 of Exhibit 3 here.

9              And you see paragraph 1.4 is called,

10   "Instructions in the event of default"?

11       A.    It's paragraph 4.1.

12       Q.    Correct.  Did I say something else?

13       A.    You said 1.4.

14       Q.    Paragraph 4.1.  These are the instructions in the

15   event of default to Mr. Perdomo, correct?

16       A.    It says the administrator or manager, not

17   Perdomo, specifically.

18       Q.    But everyone understood Mr. Perdomo was to be the

19   administrator, correct?

20       A.    Correct.

21       Q.    In fact, in subparagraphs A through D under

22   paragraph 4.1, those are the various remedies that

23   Mr. Okada could elect to claim in the event of a default

24   by you under the settlement agreement, correct?

25       A.    Yes.

1   Q.   Subparagraph B, here we see that Mr. Okada has

2   the right to elect to claim the shares of Rockford and

3   its subsidiaries under escrow, right?

4   A.   Was this B?

5   Q.   Yes.

6   A.   Yes, but again, we dispute there was a default,

7   we disputed the default.

8   Q.   Again, I'm just saying that's what paragraph B

9   says.

10   A.   I know what you're saying.

11   Q.   Also, under paragraph B the administrator or

12   manager for Rockford shall, under the relevant laws of

13   the Dominican Republic, promptly transfer any and all

14   shares in escrow to Mr. Okada, correct, just what it

15   says?

16   A.   Yes.

17   Q.   Now, we've already looked at the settlement

18   agreement so now I'm asking you to look at the

19   administrator instructions to your Exhibit A.

20        Can you please show me where in the administrator

21   instructions that Mr. Okada is obligated to first obtain

22   a court judgment or court decision before Mr. Perdomo or

23   the administrator could carry out the written

24   instructions?

25   A.   Where is the administrator instructions?

1    Q.    We've been looking at it.

2    A.    It says settlement agreement and general release.

3          MR. BRYANT:  I'm going to say objection.  Calls

4    for a legal conclusion.

5    BY MR. GAW:

6    Q.    So Pages 10 through 12 of Exhibit 3?

7    A.    Okay.

8    Q.    So 10 through 12, these are the administrator

9    instructions that were attached as Exhibit A to the

10   settlement agreement, right?

11   A.    Correct.

12   Q.    So my question is, here in the administrator

13   instructions, only in the administrator instructions, can

14   you please point to me where in that document where it

15   says Mr. Okada is obligated to first obtain a court

16   judgment or court decision against you before Mr. Perdomo

17   can carry out the written instructions in the event of

18   your default?

19         MR. BRYANT:  I'm going to object based upon calls

20   for a legal conclusion as to the interpretation of the

21   instructions and as to the definition of default.  So

22   I'm going to instruct my client not to answer, not to

23   answer his legal interpretation.  He can just answer

24   sort of a lay interpretation.

25         THE WITNESS:  I suppose the lay interpretation is

1    that in the administrator instructions, it doesn't say

2    that specifically, but that's part of the settlement

3    agreement.  And as a layperson, that's how I

4    understood it.

5  BY MR. GAW:

6        Q.   So previously you had referred to Section 15 of

7    the settlement agreement as carrying out.  So is it your

8    understanding that Section 15 also -- you know, that

9    obligation in Section 15 also applies in the

10   administrator instructions as well?

11       A.   Correct.

12       Q.   Is it also your understanding that Section 15 of

13   the settlement agreement applies to the administrator

14   instructions in that it obligates Mr. Okada to seek a

15   court judgment or decision before exercising any remedy

16   under -- here under the administrator instructions?

17       MR. BRYANT:  Objection.  Calls for a legal

18   conclusion.  You can answer.  If you know the answer

19   fine.  If you don't, you don't.  Don't answer a

20   specific legal interpretation.

21       THE WITNESS:  I can't answer a legal -- you know,

22   that legally, so --

23  BY MR. GAW:

24       Q.   Where in the administrator instructions, can you

25   point to me where the language is in the administrator

1    instructions that says that Mr. Okada has to exhaust

2    certain legal remedies first before Mr. Perdomo can carry

3    out the written instructions here?

4            MR. BRYANT:  For clarity, are we referring to the

5        literal written language?

6            MR. GAW:  Yes.  The literal written language.

7            THE WITNESS:  In the administrator instructions,

8        I don't believe it says that.

9    BY MR. GAW:

10       Q.   Okay.  So just for clarity again, you identified

11   Section 15 before of the settlement agreement.  Is it

12   also your belief that Section 15, you know, applies to

13   the administrator instructions in obligating Mr. Okada to

14   first exhaust legal remedies before Mr. Perdomo can carry

15   out the written instructions in the event of your

16   default?

17       A.   Yes.

18       Q.   Now, you and Mr. Okada and Mr. Perdomo all agreed

19   to these administrator instructions, correct?

20       A.   I think so.  We all signed it, right?

21       Q.   Let me present you another document.  I'll mark

22   as Exhibit 24, please.

23            (Exhibit No. 24, Administrator Instructions, was

24       marked for identification.)

25

BY MR. GAW:

Q.   So Exhibit 24, the title of this document is administrator instructions.  And Mr. Whitehead, it's fair to say that Exhibit 24, this is a copy of the administrator instructions that we reviewed as the attachment to the settlement agreement, correct?

A.   It appears to be, yeah.

Q.   And if we look on page DOC 108, that's your signature, correct?

A.   Correct.

Q.   And you recall signing this document?

A.   Yeah.

Q.   And now, Pages 107 and 108, there are signatures that purport to be Donald Okada and Guido Perdomo's signature, correct?

A.   This only has my signature.

Q.   On Pages 107 and 109, we see also there's a signature for the -- Donald Okada signature block and a signature for the Perdomo signature block.

A.   Okay.  Yes.

Q.   And it was your recollection that both Mr. Okada and Mr. Perdomo had separately executed the administrator instructions, right?

A.   Yes.  These instructions are an exhibit to the -- it's Exhibit A to the settlement agreement, right?

1    Q.    Correct.

2    A.    But this doesn't say Exhibit A (indicating).

3    Q.    Right.   This is just a copy of Exhibit A that was

4    separately executed by you, Mr. Okada and Mr. Perdomo,

5    correct?

6    A.    So it shouldn't say Exhibit A on top?

7    Q.    Well, it doesn't apparently.

8    A.    So the question is, shouldn't it say that because

9    it's a different document?

10        MR. BRYANT:   Well, it's just the exhibit.   It's

11    just saying that this is the document so, yeah.

12    BY MR. GAW:

13    Q.    Because you raised a question, can I ask you to

14    please confirm that Exhibit 24 here is identical to

15    Exhibit A of the settlement agreement except Exhibit 24

16    doesn't start with the Exhibit A?

17    A.    Okay.

18    Q.    Is it identical?

19    A.    Yes.   Apart from -- yeah.

20    Q.    Do you recall that the reason why you and

21    Mr. Okada signed the administrator section separately is

22    because Mr. Perdomo had requested a separate document

23    that was executed by everybody?

24    A.    No.   I don't recall that.

25    Q.    Do you recall why you all separately executed

1    this document then?

2        A.   I assume because it was all remotely done.

3        Q.   No.  I guess that's not my question.  Do you

4    recall why you guys signed the administrator instructions

5    when it was already an exhibit to the settlement

6    agreement?

7        A.   No.  I don't know why.

8        Q.   And let me mark this next document as Exhibit 25.

9            (Exhibit No. 25, First Amendment to Settlement

10   Agreement, was marked for identification.)

11   BY MR. GAW:

12       Q.   Exhibit 25 has the title, "First Amendment to

13   Settlement Agreement."

14           Mr. Whitehead, Exhibit 25 is the first amendment

15   to the settlement agreement made between you and

16   Mr. Okada, correct?

17       A.   Correct.

18       Q.   Dated August 13, 2014, right?

19       A.   Correct.

20       Q.   And on the very last page of Exhibit 25, that's

21   your signature there?

22       A.   Correct.

23       Q.   And someone signs for Mr. Bryant there in the

24   Cochran Firm signature block, right?

25       A.   Yeah.

1     A.    Yes.

2     Q.    So you can put Exhibit 26 --

3     A.    Mr. Okada got a million and 89,000, right.

4     Q.    That's correct.  And you recall he was supposed

5     to receive a little over a million in cash for the

6     transaction?

7     A.    Right.

8     Q.    By the end of August, 2014?

9     A.    I'm done with this?

10    Q.    Yes.  By the end of August, 2014, there were not

11    yet any liens on Lions Gate in favor of Mr. Okada,

12    correct?

13    A.    Sorry.  What was that again?

14    Q.    By the end of August, 2014, you had not yet put

15    any liens on Lions Gate in favor of Mr. Okada, correct?

16    A.    I understood that you guys were doing that.

17    Q.    Right.  My question is, by the end of August,

18    2014, you had not put any liens, there were no actual

19    liens on Lions Gate in favor of Mr. Okada at that time,

20    correct?

21    A.    I don't believe so but, as I said, I understood

22    that's what you were doing.  That you were, you and your

23    lawyers in Dominican Republic were doing that.

24    Q.    So when you say you, do you mean, like, me,

25    personally --

1    A.    Correct.

2    Q.    Or do you mean, like, all the lawyers together

3    were supposed to be doing it?

4    A.    The lawyers were working it out.

5    Q.    Or Mr. Okada was supposed to be doing it?

6    A.    I guess someone was supposed to do it but I

7    believe that was something that the lawyers were working

8    out how to do it.

9    Q.    That was your understanding --

10    A.    Yes.

11    Q.    -- that the lawyers were supposed to work it out

12    putting the liens on the property and you weren't

13    supposed to do that?

14    A.    I'm not the lawyer.  I couldn't do that.

15    Q.    Okay.  Now, do you recall that there was a

16    conference call in mid-September, 2014, between your

17    attorney, Mr. Bryant, Guido Perdomo, Mr. Okada and Mr.

18    Okada's attorneys?

19    A.    I know there was a conference call.  I don't

20    think I was a party to that call, but I know there was a

21    conference call at some stage in September, yeah.

22    Q.    Do you recall you were informed by someone that a

23    conference took place on or around September 15?

24    A.    Yes.

25    Q.    And the purpose of that call was to disclose the

1  liens being put on Rockford -- on Lions Gate in favor of

2  Mr. Okada, right?

3      A.    Yes.

4      Q.    And so as of September 15th, 2014, there still

5  were no liens on Lions Gate in favor of Mr. Okada,

6  correct?

7      A.    I guess not because you guys were doing it.  You

8  guys were communicating between each other on how to do

9  it.

10     Q.    And did you get this -- did you obtain the

11  understanding that during the September 15th conference

12  call, Mr. Perdomo had informed everybody that no liens

13  could be recorded on Rockford in favor of Mr. Okada or

14  anybody until the SHR SOLAR entities were first updated

15  to SRLs?

16     A.    I don't -- I understood, from day one, that the

17  liens could be placed on the titles of the property as

18  opposed to Rockford, per se, but on the titles of the

19  property.  That's -- I've always understood that.  That

20  was the lien offer from JP.

21     Q.    I didn't phrase my question correctly.

22          So did you understand during the conference call,

23  the September 15th conference call, that Mr. Perdomo had

24  informed everyone that no liens could be recorded on

25  Lions Gate in favor of Mr. Okada or anyone else until the

1      MR. GAW:  By the way, that was SHRs, not SARs.  I

2      don't recall if he actually said -- it should have

3      been SHR.

4    BY MR. GAW:

5      Q.   Thank you for that answer, Mr. Whitehead.  And I

6    understand, you were not on the call.  I'm just saying

7    that was it your understanding after the September 15th,

8    2014, conference call that no lien could be placed on

9    Lions Gate until the SHR companies had been updated to

10   the SRL format?

11     A.   Yes, but with -- it's contrary to what I

12   understood previously, right?

13          MR. BRYANT:  Yeah, he is just asking at that

14   time.

15          THE WITNESS:  Yeah.

16          MR. BRYANT:  So just to help the record, just

17   answer specifically the question he asks.  If he wants

18   to go back, he'll ask.

19          THE WITNESS:  Okay.

20   BY MR. GAW:

21     Q.   Was it your understanding that during the

22   September 15th, 2014, conference call, Mr. Bryant said

23   that you would start the process of updating the SHR

24   companies to SRLs right away?

25     A.   Yes.

1    Q.   Or as soon as possible?

2    A.   Yes.

3    Q.   But by the end of September, 2014, you still had

4    not started the process of updating the SHR companies to

5    SRLs, correct?

6    A.   I gave the money to Guido Perdomo.  I'm not sure

7    exactly the dates I gave it to him to stop that process.

8    He asked -- I asked him, again, what's required, he told

9    me it was $10,000.  I wired the money to him.  I don't

10   know specifically the dates when he actually got it, but

11   I know it was pretty quickly after.

12   Q.   Let's look at a document that we'll mark as

13   Exhibit 27.

14        (Exhibit No. 27, E-mail Dated 10/6/14, was marked

15   for identification.)

16   BY MR. GAW:

17   Q.   Exhibit 27 is an e-mail from Mark Whitehead to

18   Guido Perdomo, carbon copy to James Bryant on

19   October 6, 2014.

20        Do you recall sending this e-mail?

21   A.   It's got my logo on it so I'm sure I did.

22   Q.   And do you recall blank carbon copying me on this

23   e-mail?

24   A.   I don't recall that.  Your name doesn't show up.

25   James does and Guido.  Your name doesn't show up, but

1    maybe I did.  It doesn't show here.

2        Q.   But you did occasionally blank copy me or

3    Mr. Okada on some of your communications with Mr.

4    Perdomo, right?

5        A.   Yes, I did.  I tried as always to keep everybody

6    as informed as I was about what was going on, so if I

7    could, I would let Don know and say, hey, I'm trying to

8    do whatever I'm supposed to do, right, so here's a letter

9    so -- to that effect.

10       Q.   So here in Exhibit 27, you were asking

11   Mr. Perdomo to advise you on the steps to update the

12   SHR SOLAR entities to SRLs, right?

13       A.   Yes.

14       Q.   And you're also asking for the costs and the time

15   frame?

16       A.   Yes.

17       Q.   And you sent this e-mail about three weeks or so

18   after the September 15th conference call, right?

19       A.   If it was the 15th, that would be about three

20   weeks, yeah.

21       Q.   And so does this refresh your memory that you had

22   not started the process of updating the SHR SOLAR

23   entities as of October 6, 2014?

24       A.   Yeah.  Yes.

25       Q.   And now you're asking Mr. Perdomo to advise you

1  about the steps, but Mr. Perdomo had already informed you

2  multiple times before an e-mail as to what needed to be

3  done, right?

4      A.   Mr. Perdomo had informed me probably six or seven

5  months earlier when I asked the question, when it was

6  raised about the companies not being compliant or

7  whatever you call it, and he said, well, this is what

8  needs to happen.  They need to be conformed to the new

9  process there and it takes about 30 days to happen, but

10 you can't do it until you own the property.  I couldn't

11 start the process until I actually owned the property

12 because they weren't going to let me transfer their

13 interest in the property if we didn't close.  Couldn't

14 happen.

15      And then also Guido he had -- because he was the

16 one who was the president, he was the one who had to sign

17 off and he was not willing to sign off.

18      Q.   But my question is simply, Mr. Perdomo had

19 informed you on multiple occasions prior to October 6th?

20      A.   Maybe two occasions, and JP Martins the same.

21      Q.   Had separately informed you, correct?

22      A.   Yes.

23      Q.   And you recall that Mr. Perdomo actually, on

24 several occasions, had told you that a lien could not be

25 put on Lions Gate until the companies had been updated,

1      **correct?**

2          A.    No.   The companies had to be updated but there

3      was no indication from Guido that a lien could not be put

4      on the individual titles of the company.   It's quite the

5      opposite, actually.   There was nothing about it because I

6      have e-mails from JP saying there's no reason why you

7      can't put the liens on the actual individual titles.

8          **Q.    Okay.**

9          MR. BRYANT:   For clarity, when you're saying

10     title, you're referring to the company or you're

11     referring to the lands?

12         THE WITNESS:   The lands.

13         MR. GAW:   The Lions Gate is defined as just the

14     land.   Lions Gate refers to the lands.   SHR SOLARs

15     refer to the companies and Rockford refers to the

16     Rockford.

17         MR. BRYANT:   Right.

18         MR. GAW:   It's a very convoluted deal.

19     BY MR. GAW:

20         **Q.    You recall prior to this e-mail that's**

21     **Exhibit 27, Mr. Perdomo had told you it cost $2,000 per**

22     **company or approximately $10,000 total to update the**

23     **companies into SRLs, right?**

24         **A.    Correct.**

25         **Q.    And you recall that Mr. Perdomo had previously**

1  told you it would take 30 days to complete the process,

2  right?

3      A.    Yes.

4      Q.    And you had not started this process by

5  October 6, 2014, right?

6      A.    Because -- no, I had not, but because, as I

7  always understood it, it was not a bar, B-A-R, to putting

8  the lien, recording the interest against the individual

9  SHRs.  So it was something that had to be done for sure,

10 but as many e-mail communications from JP that it's

11 not -- you know, there's no reason that it has to be

12 done, but it does have to be done.  You can't do it until

13 you own it, that's one thing for sure, and two, you can't

14 do it -- it's not an obstruction to putting the liens on.

15 That's how I always understood it.

16     Q.    So you can put Exhibit 27 away there.

17          Let me show you another document that I'd like to

18 mark as Exhibit 28.

19          (Exhibit No. 28, E-mail Dated 10/6/14, was marked

20     for identification.)

21 BY MR. GAW:

22     Q.    Exhibit 28 is an e-mail from Guido Perdomo to

23 Mark Whitehead, Donald Okada, and a bunch of other people

24 dated October 6, 2014.

25          Mr. Whitehead, you received this e-mail from

1    Mr.  Perdomo, correct?

2        A.    Yes.

3        Q.    And here in this e-mail Mr. Perdomo is informing

4    everyone that you had terminated the employment of José

5    Lantigua, Hito, right?

6        A.    Yes.

7        Q.    So Hito was the administrator for the SHR SOLAR

8    companies, right?

9        A.    Yes.

10       Q.    Mr. Perdomo, in Exhibit 28 here, is also

11   informing everyone that Mr. Lantigua is owed a severance

12   payment and has threatened to take legal action that

13   could result in a lien being put on Lions Gate, right?

14       A.    That's what he says here, but he's wrong.   Mr.

15   Lantigua is not entitled to a severance pay under

16   Dominican law.

17       Q.    Are you a -- do you have any legal training?   Are

18   you a lawyer?

19       A.    No.

20       Q.    Have you been trained, received any education or

21   training in the laws of the Dominican Republic?

22       A.    Only from discussions with my lawyers here.

23       Q.    But not independently yourself?

24       A.    No.

25       Q.    You can put Exhibit 28 away.   Let's look at a new

1      document.  Please mark this as Exhibit 29.

2              (Exhibit No. 29, E-mail Dated 10/6/14, was marked

3      for identification.)

4  BY MR. GAW:

5      Q.   Exhibit 29 is an e-mail from J.P. Martins to Mark

6  Whitehead with a CC to Guido Perdomo, Donald Okada, and

7  some other people dated October 6, 2014.

8          You received this e-mail, correct?

9      A.   Yes.

10     Q.   And Mr. Martins is apparently weighing in with

11 his thoughts on the termination of Mr. Lantigua, right?

12     A.   Yes.

13     Q.   And in the second paragraph, Mr. Martins writes

14 that at least in his view, there was no need to liquidate

15 any of the SHR SOLAR employees, right?

16     A.   Yes.

17     Q.   So he had -- well, he's basically saying in his

18 view there was no need to terminate the employment of any

19 of the SHR SOLAR administrators, right?

20     A.   Staff.  He doesn't say administrator.  He says

21 employees.

22     Q.   Of which Mr. Lantigua was one, correct?

23     A.   He was the president of the company.

24     Q.   And Mr. Martins also writes that a severance

25 payment may actually be due to Mr. Lantigua, right?

1        A.    From him.

2        Q.    Well, from someone?

3        A.    Yeah.

4        Q.    Right?

5        A.    But he was employed by J.P. Martins for six

6    years.    He worked for me for three weeks before we

7    realized that he was stealing.

8        Q.    And Mr. Martins writes in his last paragraph that

9    whether or not a severance payment is owed to Mr.

10   Lantigua, Mr. Perdomo would know better in that he would

11   know what the right amount would be, correct?

12       A.    Mr. Perdomo and -- Guido Perdomo and Hito were

13   best friends for 23 years.    I'll leave it at that.

14       Q.    But my question is, Mr. Martins is writing that

15   Mr. Perdomo would know at least better than Mr. Martins

16   as to whether or not a severance payment was owed to Mr.

17   Lantigua, right?

18       A.    An executive at point.    Guido Perdomo told me

19   specifically that Hito is not entitled to anything from

20   me.    If anything, he is entitled from JP.

21       Q.    My question is simply, in Exhibit 29, Mr. Martins

22   wrote that whether or not Mr. Lantigua is entitled to a

23   severance payment, Mr. Perdomo would know better and

24   would know the actual -- would know how to calculate that

25   amount, correct?

1    A.    Okay.  Yes.  That's what it says, yes.

2    Q.    You can put Exhibit 29 away.

3        Let's look at a document that I will have marked

4    as Exhibit 30.

5        (Exhibit No. 30, E-mail Dated 10/6/14, was marked

6    for identification.)

7    BY MR. GAW:

8    Q.    Exhibit 30 is an October 6, 2014, e-mail from you

9    to Mr. Martins, Mr. Perdomo and Mr. Okada and some

10   others, correct?

11   A.    To yourself and to James, yes.

12   Q.    You recall sending this e-mail, right?

13   A.    Yes.

14   Q.    You see in the first -- the e-mail leads off with

15   your writing that Mr. Lantigua is not entitled to a

16   severance payment under Dominican Republic law, correct?

17   A.    Correct.

18   Q.    When we look at the bottom of the first page of

19   Exhibit 30, you are saying that Mr. Lantigua is welcome

20   to file a lawsuit and you are welcome to defend it as

21   needed, right?

22   A.    Yes.

23   Q.    And that lawsuits don't scare you?  That's what

24   you wrote, correct?

25   A.    Yes.

133

1    kind of thumb drive then?

2        A.    It's a USB, I guess.

3        Q.    So you're basically representing there's a number

4    of documents that have been saved on that, you're going

5    to pass that along to your attorney?

6        A.    Yes.  Correct.  I'll pass it along now.

7            MR. GAW:  Let the record reflect that the thumb

8        drive has been given to Mr. Bryant right now.  And

9        James, you and I can have an off line discussion about

10       that.

11           MR. BRYANT:  Yes.

12   BY MR. GAW:

13       Q.    So let's mark the next exhibit, Exhibit 31.

14             (Exhibit No. 31, E-mail Dated 10/8/14, was marked

15       for identification.)

16             (A brief recess was taken from 1:56 p.m. to

17       2:02 p.m.)

18   BY MR. GAW:

19       Q.    So when we left off, we had just marked

20   Exhibit 31 which is an October 6, 2014, e-mail from you

21   to --

22       A.    It's October 8th.

23       Q.    An October 8th e-mail from you to Guido Perdomo

24   with a CC to James Bryant, correct?

25       A.    Correct.

1    Q.    And you sent Exhibit 31, right?

2    A.    Yes.

3    Q.    And here in Exhibit 31, you are confirming that

4  -- to Mr. Perdomo that you had sent him a wire payment to

5  have SHR SOLAR entities updated to SRLs, right?

6    A.    Correct.

7    Q.    And you had wired him $10,000?

8    A.    Correct.

9    Q.    Now, what was stopping you from just sending the

10  wire payment on August 16, 2014?

11    A.    I went to -- on August 16th?  That's when we

12  closed.  Because, as I understood it, I understood pretty

13  clearly that updating the companies, while had to be

14  done, was not a bar to giving Okada his liens on the

15  titles.  That's how it was explained to me.

16        And I specifically went to Guido Perdomo's office

17  and my wife, three days after we closed or four days

18  after we closed, had a meeting with him and I asked him,

19  is everything in order, is everything done, is there

20  anything I have to do, and he said, no, everything is in

21  order.

22    Q.    Do you recall Mr. Perdomo during this meeting

23  reminded you that the companies needed to be updated?

24    A.    He said, yes.  He said yes, and he said, the only

25  thing is the companies will need to be updated at some

1    stage.  I said okay.  That was it.

2           But as I understood it very clearly, that there

3    was no reason why Okada's liens on the land could not be

4    done.

5        Q.    And you actually write to that effect -- well,

6    actually, strike that.

7           Here in Exhibit 31, in your second paragraph, you

8    write, had you known it was critical to registering the

9    liens for Okada you would have done it sooner, right?

10       A.    Exactly.  Yeah.  I mean, yeah.

11       Q.    And you also write, had you known that -- well,

12   it says, Hito, but you're referring to Hito/Mr. Lantigua,

13   right?

14       A.    Yes.

15       Q.    So had you known Mr. Lantigua was the manager of

16   record for the companies, you would have dealt with that

17   situation differently as well, correct?

18       A.    Correct.

19       Q.    But you knew that Mr. Lantigua was the president

20   of each of the SHR SOLAR companies, didn't you?

21       A.    It was never told to me that he was.  And

22   although it's in the documents from the title's office or

23   whatever it is, I never -- I actually never understood

24   that he was the manager, per se.  I always thought it was

25   JP, so --

Q.   So even though the registrations that we saw that you had actually forwarded on to me said that Mr. Lantigua was the president, you're saying you didn't know he was the president?

A.   What I'm saying is I didn't understand, read in that much detail.  Number one, I didn't associate Hito with José Lantigua and all those other names, I don't know who that is, right, so and I didn't associate it and I just -- no, I didn't.  No.

Q.   And you say you didn't know it was critical to registering the liens for Mr. Okada and had you known that, you would have done it sooner, right?

A.   Because I was told differently.

Q.   But you were aware that the settlement agreement said that you needed to record the liens within 24 hours after the closing of the Kamprad transaction, right?

A.   And I assumed from Guido that he had done that because I asked him specifically, "Is everything in order?"  He says, "Everything is in order."

What am I supposed to assume from that?  He knew what had to happen.  He was the third party administrator.  He was supposed to be independent and had a fiduciary duty to me and to Okada to do what he had to do, and I assumed that's what happened.

Q.   And after the -- I mean, within 24 hours after

1    the Kamprad transaction closed, you hadn't even started

2    the process of putting a lien on Lions Gate for

3    Mr. Okada, right?

4        A.    Because you guys were doing it.

5        Q.    Okay.

6        A.    I'm not the lawyer.  You had an arrangement.

7        Q.    So you can put Exhibit 31 away, thank you.  Let's

8    look at another document that I'd like to have marked as

9    Exhibit 32, please.

10            (Exhibit No. 32, E-mail Dated 10/8/14, Second

11        Page, was marked for identification.)

12    BY MR. GAW:

13        Q.    Let me ask you to go to the second page of

14    Exhibit 32.  Here on the second page, that's an e-mail

15    from you to Guido Perdomo on October 8, 2014, right?

16        A.    Yes.

17        Q.    You recall sending that e-mail?

18        A.    I mean, it's from me to Guido Perdomo and it has

19    my TaxSux logo on it, so I'm sure I did.

20        Q.    You're telling Mr. Perdomo, "I was not aware that

21    the liens could not be put on the property by Okada until

22    the companies were compliant," right?

23        A.    Yes.

24        Q.    And so property refers to Lions Gate and the

25    companies refer to the SHR SOLAR entities, correct?

1       A.    Correct.

2       Q.    Now let's go to the first page of Exhibit 32 and

3   look at the bottom.   The bottom here, that's

4   Mr. Perdomo's e-mailed response to you on or around

5   October 8, 2014, right?

6       A.    Right.

7       Q.    And you received that e-mail, correct?

8       A.    Yes.

9       Q.    And so Mr. Perdomo is explaining to you that the

10  companies, Mr. Lantigua needs to sign his resignation and

11  he's refusing to do it until he's paid a severance,

12  correct?

13      A.    Yes.

14      Q.    And he also writes at the end that he finds it

15  strange you did not know that to file the liens the

16  companies had to be updated and he says, "I'm almost sure

17  that the information is written in one of several e-mails

18  we shared," correct?

19      A.    Yes.

20      Q.    And he's referring to the several e-mails that he

21  sent you --

22      A.    Yes.

23      Q.    -- where he told you that the SHR SOLAR entities

24  need to first be updated before a lien could be put on

25  Lions Gate, correct?

1    Q.    Okay.  Let's put away Exhibit 33.

2         Let's mark as Exhibit 34 this document.

3         (Exhibit No. 34, Letter Dated 10/8/14 to Guido

4    Perdomo from Randolph Gaw, was marked for

5    identification.)

6    BY MR. GAW:

7         Q.    Exhibit 34 is a letter dated October 8th, 2014,

8    to Guido Perdomo from Randolph Gaw with a CC to James

9    Bryant, Donald Okada, correct, and Mark Whitehead?

10        A.    Okay.

11        Q.    Mr. Whitehead, did you receive this document that

12   is Exhibit 34?

13        A.    Yeah, I did get it, yes.  I think I got it from

14   James.

15        Q.    Do you recall that Exhibit 34 is Mr. Okada's

16   notice of your default under the settlement agreement?

17        A.    Yes, and we disputed it.  We clearly disputed it

18   and told Guido it's in dispute.  We don't acknowledge any

19   default and as such, per the settlement agreement, if

20   there is such a default or alleged default, it has to be

21   dealt with in the courts in California, per the

22   settlement agreement.

23        He had a fiduciary duty to me and to Okada as a

24   third party independent person not to do anything which

25   is now the subject of the lawsuit I have against him,

1    which you're aware of, in Dominican Republic and against

2    Okada with Ferdinand Ramos, the lawyer in Dominican

3    Republic who is suing Mr. Okada and Mr. Guido Perdomo.

4        MR. BRYANT:  And for the record, just to

5    streamline the process, we're just going to stick to

6    the specific answer to the question.

7        THE WITNESS:  Okay.

8        MR. GAW:  I don't interrupt witnesses when they

9    answer, but feel free to interrupt him if he is

10   wandering outside the bounds of the question,

11   obviously.

12       MR. BRYANT:  Sure.  I just didn't want to look

13   like I'm interrupting, so, okay.  Yeah.  We'll just

14   keep it going forward.

15       MR. GAW:  Okay.

16       THE WITNESS:  I just want the facts out.

17   BY MR. GAW:

18       Q.  So I assume you e-mailed Mr. Perdomo and you told

19   him, "I'm disputing this notice of default," right?

20       A.  Absolutely.  Went and saw him, I think, as well

21   in his office.

22       Q.  So if there's -- and those e-mails you turned

23   over subsequently to Mr. Bryant, correct?

24       A.  Yes.

25       Q.  You never responded directly to Mr. Okada, did

BY MR. GAW:

    Q.   Exhibit 35 is an October 13, 2014, e-mail from Guido Perdomo to Mark Whitehead, Donald Okada, James Bryant and myself.  You received this e-mail, correct?

    A.   Yes.

    Q.   And here, Mr. Perdomo is informing everyone that he is transferring the shares of Rockford over in favor of Mr. Okada, correct?

    A.   Yes, in complete breach of his fiduciary duties, but that's fine.

    Q.   And he also is informing that he has not been able to obtain the signature of Mr. Lantigua because Mr. Lantigua is still waiting for his severance payment, right?

    A.   From the previous owners, yes.

    Q.   So you never paid Mr. Lantigua that severance payment?

    A.   I was not obliged to pay Mr. Lantigua.  He worked for me for three weeks.  Apart from that, he's not entitled to liquidations, particularly for three weeks, that's nothing.  The first three months is free.  There is no liquidation in the Dominican Republic.

    Q.   So very simple question, you never paid a severance payment to Mr. Lantigua?

    A.   I never paid a severance payment to Mr. Lantigua.

1    Q.    Okay.   Thank you.

2         And in Exhibit 35 here, Mr. Perdomo is explaining

3    that without Mr. Lantigua's signature, the process of

4    updating the SHR SOLAR entities to SRLs that couldn't

5    even begin, correct?

6    A.    Correct.

7    Q.    And Mr. Perdomo says that he is returning the

8    $10,000 that you have wired to him, right?

9    A.    Yes.

10   Q.    And Mr. Perdomo also says that he has not

11   received any other funds for any other purpose including

12   the registration of the liens, right?

13   A.    Well, he did receive the registration of liens.

14   He sent it back.

15   Q.    He is saying he didn't receive any other funds

16   for any other purposes including, but not limited to, the

17   registration of the liens, correct?

18   A.    Right.   Right.

19   Q.    He is referring to the $19,000, you know, that he

20   had referred to you?

21   A.    No, he's not.

22        MR. BRYANT:  Objection.  Calls for speculation as

23   to what Mr. Perdomo was saying.

24        THE WITNESS:  He doesn't say that at all.  You're

25   reading into this something completely different.

1    your understanding that refers to the $19,000 that he had

2    sent in that prior e-mail we looked at?

3        A.   No.

4        Q.   So it's fair to say that by October 13, 2014,

5    there was no liens on Lions Gate in favor of Mr. Okada,

6    correct?

7        A.   No.  Because that's between -- you two guys were

8    working it out.

9        Q.   Right.

10       A.   You lawyers were working it out.  I'm not the

11   lawyer.  I'm just a dumb owner here who's saying, here's

12   my lawyer, here's your lawyer, go work it out.  There's

13   communication between you two to say you, specifically

14   you, saying that I've got it under control.

15           What does that mean, you know, throw a bag of

16   crap up in the air and let it fall?  I don't know what it

17   means.

18           If you say you have it under control and you

19   don't do your job, how am I at fault?  I'm really

20   confused.

21       Q.   I'm not ascribing any fault here, I'm just simply

22   saying as of October 13, 2014, there were no liens on

23   Lions Gate in favor of Mr. Okada as of October 13, 2014,

24   right?

25           MR. BRYANT:   Just yes or no.

1          THE WITNESS:  No.

2   BY MR. GAW:

3       Q.    Okay.  I understand your passion about this

4   issue.  I don't blame you.  All litigants are passionate,

5   so it's fine, but just please do actually listen to what

6   I'm asking because otherwise I have to keep repeating my

7   question over and over until I get the answer to the

8   actual question I ask.

9       A.    But when you add a little quibble about the

10  19,000, that's not what you were asking about.  You tried

11  to slip something in there, right?  I'm not stupid.

12          MR. BRYANT:  We'll just answer his question.  If

13      you don't agree with it, it's just a simple I don't

14      agree.  If you don't agree with that interpretation,

15      that's all you have to say.

16  BY MR. GAW:

17      Q.    Your attorney can ask you questions when I'm

18  done, to clarify whatever you need to clarify.

19      A.    Fine.  I just want it on the record.  That's all.

20      Q.    That is totally fine.

21          And as of October 13, 2014, obviously the process

22  of transforming the SHR SOLAR entity to the SRL format

23  had not yet begun, correct?

24      A.    It hadn't begun because he sent the money back.

25      Q.    Now, let's look at a document that I'd like to

1          mark as Exhibit 36.

2                    (Exhibit No. 36, E-mail Dated 11/21/14, was

3          marked for identification.)

4     BY MR. GAW:

5          Q.    Exhibit 36, this is an e-mail from a man named

6     Gabriel Tribaldos to you and a CC to James Bryant and

7     another person, right?

8          A.    Correct.   I don't know who the other person is.

9          Q.    With a Bates number DOC OOO301 through 302.

10         A.    To me and James.

11         Q.    And you received this e-mail, correct?

12         A.    Yes.

13         Q.    Mr. Tribaldos was the lawyer for Rockford prior

14    to the Kamprad transaction, right?

15         A.    Well, he was still the lawyer.   He was still the

16    lawyer for Rockford after the Kamprad transaction.

17         Q.    Okay.   And he had -- you can see in his e-mail he

18    writes, "Dear Mark, your instructions has been noted,"

19    correct?

20         A.    Yes.

21         Q.    And below his e-mail he was replying to an e-mail

22    that you had sent to him, it looks like on around

23    November 21, 2014, right?

24         A.    Yes.

25         Q.    And if we look at this e-mail, which spills over

1    to the second page, you're instructing him not to make

2    any authorized transfer to Rockford without proper

3    approval from you or James Bryant, correct?

4        A.    Correct.

5        Q.    And in the end, however, Mr. Tribaldos did

6    actually transfer Rockford without your approval, right?

7        A.    Yes.   Which he shall answer to it accordingly.

8        Q.    Let's put Exhibit 36 away.

9              Let's mark this as Exhibit 37, please.

10             (Exhibit No. 37, E-mail Dated 11/28/14, was

11       marked for identification.)

12   BY MR. GAW:

13       Q.    Exhibit 37 is a document Bates number DOC 000283.

14   This is a November 28, 2014, e-mail from JP Martins to

15   Mark Whitehead.   Did you receive this e-mail,

16   Mr. Whitehead?

17       A.    You know, probably, yeah, yeah.   To

18   mark@markwhitehead.com again, so I'm sure I did.   Yeah.

19       Q.    You're aware that it came from your records?

20       A.    Yes.

21       Q.    And here Mr. Martins is saying that he will talk

22   to Mr. Perdomo because I guess everything you were

23   telling him about Mr. Perdomo sounded unbelievable,

24   right?

25       A.    Um-hm.

Q.    And that Mr. Martins also writes he has known Mr. Perdomo for over a decade and considers him to be an honest and trustworthy lawyer, right?

A.    Um-hm.

Q.    Okay.  Put away Exhibit 37.

Now, you obviously dispute the default that Mr. Okada has declared on you, correct?

A.    Yes.

Q.    And have you been continuing to live in the Lions Gate mansion?

A.    We don't live there, per se.  We are there on a regular basis because it's a large property, it has to be maintained and staff, and we're trying to improve the property so we can sell it.  That's the whole basis.

So I don't get any money out of this transaction until I sell the house, and I've been barred from doing that by Okada because he is sending out e-mails to people telling them that in the beginning of the year, that I don't own the property, telling all the agents and sending out malicious e-mails that, you know, I can't sell it, I can't do this, I can hear them saying, we don't want to get involved in this, we don't want to touch this because there's obviously a fight going on and an agent doesn't want to represent the property if they can't sell it, can't close and cannot get paid.  They're

1 their name?

2  A. Leonova, Oleg Leonova, L-E-O-N-O-V-A, O-L-E-G.

3  **Q. Have you discussed price with Mr. Leonova?**

4  A. No, he has expressed interest.  He's been to the

5 property.  He's expressed interest in the property, but

6 again, we haven't gone over any specifics.  His wife

7 loves it.  And that's -- and the guy's a billionaire so

8 happy wife, happy life.  So we haven't gone into any

9 specifics about it to a point where I would always say to

10 people, if you are interested in the property, give me an

11 offer so at least I can put it on the table and then we

12 can start haggling with you, but no one has actually done

13 that.

14  **Q. Are you interacting directly with these people**

15 **that you told me about?**

16  A. Yes.

17  **Q. Or are you working through an intermediary?**

18  A. No, directly.

19  **Q. Is Mr. Rogers involved in any way in any of these**

20 **interactions?**

21  A. No, no, no.  I haven't spoke to Rogers for over a

22 year.  I don't know.  Probably a year.  Nothing to do

23 with him.

24  **Q. Now the 9 Ocean Ridge property, let's go back to**

25 **that, you're currently renting out that property, right?**

A.   Yes.

Q.   When did that rental start?

A.   I think in December 1st, it's been 18 months.

Q.   So December 1st of this year or last year?

A.   Yeah, this year.   It would be 18 months.

Q.   So it sounds like around June-ish of 2014, is that right?

A.   Something like that.   Yes.   That's when we moved to Miami.

Q.   And you never told Mr. Okada you were renting out Ocean Ridge, correct?

A.   I never told him?

Q.   Yes.

A.   When?

Q.   You never told Mr. Okada that you were renting out Ocean Ridge in 2014, correct?

A.   I don't know if I did or not.   I don't remember to be honest.

Q.   And how much is it renting for, Ocean Ridge?

A.   $9,000 a month.

Q.   And there is some kind of judgment against you by the Ocean Ridge Homeowners Association, correct?

A.   Yeah, there probably is, yes, against Okada and me.   It's part of the settlement agreement.

Q.   And you haven't paid off that judgment yet, have

1        you?

2            A.    No.

3            Q.    Do you intend to?

4            A.    The house would have been sold a long time ago

5        except Mr. Okada refused to sign the note, refused to

6        sign the sale, the short sale.  Would have been done

7        almost two years ago.  There are e-mails.  Refused to

8        sign it.  What am I supposed to do is?

9            Q.    My question is, do you intend to pay the

10       judgment?

11           A.    As soon as we sell the damn thing.

12           Q.    Are you trying to sell Ocean Ridge?

13           A.    It's been for sale for five years now.

14           Q.    Why don't you use the proceeds of the rent to pay

15       the judgment?

16           A.    The proceeds of the rent to pay the judgment?

17           Q.    Uh-huh.

18           A.    Why?  It would come from the sale of the house.

19       It has to come from the sale of the house.

20           Q.    Why does your payment of the judgment from the

21       HOA have to come from the sale of the house?  Why not use

22       other money that you have to pay off the judgment?

23           A.    I don't know how much the judgment is right now,

24       I don't know.  I don't know.

25                 MR. GAW:  Okay.  Let's take a ten-minute break.

```
 1                          CERTIFICATE OF OATH

 2

 3     THE STATE OF FLORIDA,          )

 4     COUNTY OF MIAMI-DADE.          )

 5

 6

 7          I, Donna Gunion, Florida Professional Reporter,
       Notary Public, State of Florida, certify that MARK
       WHITEHEAD personally appeared before me and was duly
 8     sworn.

 9
                    Witness my hand and official seal.
10                  Signed:  September 7, 2015

11

12

13                         Donna L. Gunion, FPR
                       Notary Public - State of Florida
14                     My Commission# FF 33525
                          Expires:  8/03/2017
15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA,          )
                               ) ss
COUNTY OF MIAMI-DADE.          )


        I, Donna L. Gunion, Florida Professional Reporter, certify that I was authorized to and did report the deposition of MARK WHITEHEAD in the foregoing proceedings, that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

        I further certify that I am not a relative, employee or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

        DATED:  September 7, 2015, at Miami-Dade County, Florida.


_____
        Donna L. Gunion, FPR
        Florida Professional Reporter

# EXHIBIT 3

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release (the "Agreement") is made as of July 31, 2014 (the "Effective Date"), by and between Donald Okada ("Okada"), on the one hand, and Mark Whitehead ("Whitehead"), on the other hand, with respect to the following facts and circumstances set forth below. Okada and Whitehead are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on or around February 26, 2004, Whitehead and Okada formed the entity Beverly Hillbillys, LLC, a California limited liability company ("BH LLC"), for the purpose of acquiring real property assets, including a 10.7024 acre residential property on Drake Lane, Beverly Hills, California 90210 (the "BH Property"), and selling ownership interest in BH LLC or its real property assets.

WHEREAS, on or around January 14, 2014, Timo Lindberg, on behalf of Premium Invest Ltd. and Kamprad Venture Capital LP (collectively the "Buyers"), submitted to the Parties an offer to purchase 100% ownership interest in BH LLC, in exchange Three Million Eight Hundred and Fifty Thousand USD ($3,850,000) and an in-kind exchange for 100% ownership interest in Rockford Investment, Inc., a Belize corporation ("Rockford"), including Rockford's real property assets located at Seahorse Ranch, Puerto Plata, Dominican Republic and currently held by the Dominican Republic entities called SHR SOLAR 24 (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), S.A., SHR SOLAR 134 (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), S.A., SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata), (collectively, all of these real property assets are referred to as "Lions Gate") (the "BH LLC Acquisition").

WHEREAS, on or about March 27, 2014, Okada filed a lawsuit against Whitehead, among others, entitled Donald Okada v. Mark Whitehead et al., in the Orange County Superior Court Case No. 30-2014-00713110-CU-CL-CJC (the "Whitehead Dispute").

WHEREAS, on or about April 16, 2014, Okada filed a lawsuit against Whitehead, among others, entitled Donald Okada v. Cheap As Chips, LLC et al., in the Orange County Superior Court Case No. 30-2014-00717179-CU-FR-CJC (the "CAC Dispute").

WHEREAS, in addition to the Disputes, the Parties have encountered a number of partnership related challenges, and collectively with the Whitehead Dispute and CAC Dispute shall be referred hereinafter as the "Disputes."

WHEREAS, the Parties have now reached a compromise and settlement of the Disputes and all related claims and causes of action thereto, and wish to memorialize their compromise and settlement by entering into this Agreement, doing so freely and voluntarily, after having received the benefit of independent counsel and with full knowledge of the binding and conclusive nature thereof.

EXHIBIT
3 dg
8-27-15

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including the mutual promises contained in this Agreement, IT IS AGREED BETWEEN OKADA and WHITEHEAD that:

## TERMS AND CONDITIONS

1.     **Consideration.** In addition to the consideration of the release of claims set forth below, the Parties agree as follows:

1.1     Okada shall approve the terms of the BH LLC purchase agreement and the BH Note, that is to be negotiated in good faith between Okada, Whitehead and the Buyers.

1.2     Upon closing of the BH LLC Acquisition Okada is to receive monies in the amount of One Million One Hundred Thousand USD ($1,100,000), less any amounts withheld pursuant to section 1.13 of this Agreement.  Okada is to receive these funds upon the closing of the BH LLC Acquisition regardless of any concurrent or subsequent developments regarding the BH LLC Acquisition or any of the other transactions and events contemplated in this Agreement.

1.3     Further upon closing, Whitehead is to receive monies in the amount of One Hundred Thousand USD ($100,000), less any amounts withheld pursuant to section 1.13 of this Agreement.  Whitehead is to receive these funds upon the closing of the BH LLC Acquisition regardless of any concurrent or subsequent developments regarding the BH LLC Acquisition or any of the other transactions and events contemplated in this Agreement.

1.4     Further upon closing, the Buyers shall issue to Okada a promissory note in the amount of Two Million Three Hundred Nineteen Thousand One Hundred and Ten USD and 40/100 ($2,319,110.40) to be secured against the BH Property (the "BH Note").  Okada is to receive the BH Note upon the closing of the BH LLC Acquisition regardless of any concurrent or subsequent developments regarding the BH LLC Acquisition or any of the other transactions and events contemplated in this Agreement.

1.5     Further upon closing, Whitehead shall cause himself and Rockford to issue to Okada a security agreement in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against Lions Gate (the "Okada Security Agreement") within twenty-four (24) hours of closing of the BH LLC Acquisition, the specific terms of which are enumerated in the instructions appended as Exhibit A to this Agreement. The Okada Security Agreement becomes immediately due and payable upon the occurrence of any transaction involving Lions Gate that results in the receipt by Whitehead or Rockford of funds sufficient to fully retire the note.

1.6     Further upon closing, Okada shall receive non-voting ownership interest in Rockford in the amount of Nine Hundred and Fifty Thousand USD ($950,000) (the "Okada Ownership Interest").

1.7     Further upon closing, Whitehead shall receive the remaining ownership interest in Rockford.

1.8    **Appointment of Third Party Administrator/Trustee.** Rockford shall be managed by a third party administrator/trustee pursuant to written instructions agreed upon by the Parties, including but not limited to the instructions appended as Exhibit A to this Agreement. The Parties agree to hire Perdomo Law to serve as the third party administrator/trustee ("Perdomo"). Perdomo may not deviate from the instructions absent written consent from the Parties. Whitehead will have the unilateral right to approve any proposed transaction that would result in the receipt of funds sufficient to fully retire the Okada Note/ the Okada Ownership Interest. Okada shall have the right to hire local counsel at his expense in the event that he desires to monitor Perdomo.

1.9    Whitehead may buy out the Okada Note or the Okada Ownership Interest any time prior to the sale of Rockford or Lions Gate.

1.10    Upon receiving $950,000 plus any accrued interest outstanding by way of the purchase of Okada's interest in Rockford or the through proceeds of the sale of Lions Gate, the Okada Note shall be deemed satisfied, and the Okada Ownership Interest shall be transferred to Whitehead or the new buyer.

1.11    Whitehead shall enter into a stipulated judgment in the amount of Nine Hundred Thousand USD ($900,000) in the Whitehead Dispute currently pending in Orange County Superior Court (the "Stipulated Judgment").

1.12    Okada shall transfer to Whitehead all title and interest in the Ocean Ridge property.

1.13    The Parties agree to each share costs fifty-fifty (50-50) regarding any outstanding tax liabilities and other expenses related to the BH Property, fees owed to the California Franchise Tax Board, and the costs associated with filing all past and current unfiled tax returns for Beverly Hillbillys, LLC and Cheap As Chips, LLC. Before disbursing the monies contemplated in sections 1.2 and 1.3 of this Agreement, the escrow agent responsible for overseeing the closing of the BH LLC Acquisition will withhold all amounts needed to pay off the costs contemplated in this section 1.13. The remainder of the monies will be disbursed in accordance with sections 1.2 and 1.3 of this Agreement to reflect a 50-50 share of these costs. For example, if the total amount withheld by the escrow agent under this section is $50,000, then Okada and Whitehead will have their distributions in sections 1.2 and 1.3 of this Agreement reduced by $25,000 each.

1.14    **Whitehead Acknowledgment.** Whitehead acknowledges that Okada had no involvement with any dealings related to Dann Rogers, including allegations made by Dann Rogers regarding BH LLC, the BH Property and the BH LLC Acquisition, or the property known as El Dorado Beaubois, Castle Comfort, Roseau, Dominica (the "Dominica Property").

1.15    **Whitehead Indemnification.** Okada shall hold a collateral interest to be secured against Lions Gate to satisfy any liabilities or costs of suit arising in connection with any prior dealings between Dann Rogers, Skywater Exchange, LLC, Larry Morales, Kevin Ralph, Blaise Carroz, Board Room Traders, Robert Glinert, the Dominica Property, BH LLC, the Buyers or Rockford including partnership dealings, that was not caused by Okada as a result of

fraud, negligence or wrongful conduct. This includes any action brought by the Buyers or Rockford against BH LLC or Okada, including claims for damages, specific performance, indemnification or contribution, concerning any prior dealings with Dann Rogers, Skywater Exchange, LLC, Larry Morales, Kevin Ralph, Blaise Carroz, Board Room Traders, Robert Glinert, the Dominica Property or BH LLC.

      1.16   **Okada Indemnification.** Whitehead shall hold a collateral interest to be secured against the BH Note, Okada Note and Okada Ownership Interest to satisfy any liabilities arising in connection with Okada's acts of fraud, negligence or wrongful conduct, including, but not limited to, undisclosed liens or litigation affecting BH LLC, or the BH Property. In the event Okada should indemnify Whitehead for actions arising from his conduct the security interest shall be prioritized as follows: (1) the Okada Note; (2) the Okada Ownership Interest; and (3) the BH Note.

      1.17   **Dismissal of the CAC Dispute.** Not later than five (5) business days after satisfaction of the $950,000 promissory note, Okada shall file a dismissal, with prejudice, of all claims against Whitehead and all other named defendants in the CAC dispute (the "Dismissal"). Following the close of the BH LLC Acquisition, Okada agrees to execute a stipulated stay of all proceedings in the CAC dispute to last until dismissal or Whitehead's breach of this Agreement.

      1.18   **Accord and Satisfaction of the Stipulated Judgment.** The Stipulated Judgment shall only be enforced against Whitehead in the event of breach this Agreement or in the event that the Buyers fail to close on the BH LLC Acquisition. Upon full satisfaction of all Consideration identified in Section 1 of this Agreement, Okada shall within five (5) business days file with the court accord and satisfaction of the Stipulated Judgment.

      1.19   **Whitehead Representations.** Whitehead acknowledges that in entering into this Agreement, Okada has relied upon Whitehead's representation that he does not have any side agreements with the Buyers, Rockford or any other third party relating to the BH LLC Acquisition. This includes the representation that Whitehead is not receiving any undisclosed compensation from the Buyers or Rockford relating to the BH LLC Acquisition.

     2.   **General Release.** Except as to rights and obligations created by this Agreement, for value received, the receipt and adequacy of which is hereby acknowledged, the Parties hereby release each other, their respective parents, partners, subsidiaries, divisions, affiliates, and related entities or corporations, and their past and present owners, officers, directors, shareholders, employees, agents, partners, attorneys, heirs, successors, assigns, and insurers (collectively, the "Released Parties") from any and all claims or damages of any kind that are known which they now have against such Released Parties arising out of the Disputes.

     3.   **No Admission.** Notwithstanding anything stated otherwise in this Agreement, the Parties' execution of this Agreement is not an admission of any liability, fault or responsibility on the part of any released party. Any settlement made pursuant to this Agreement is regarded by the Parties hereto as payment to avoid the expense, inconvenience and uncertainty of litigation.

4.    **Cost of Dispute.**    Except as otherwise provided herein, each Party to this Agreement shall bear her/its own attorneys' fees and costs in all matters and proceedings settled and dismissed herein, or otherwise in connection with the Dispute.

5.    **No Reliance.**    The Parties represent and warrant that, in executing and entering into this Agreement, they are not relying and have not relied upon any representation, promise or statement made by anyone which is not recited, contained or embodied in this Agreement. Furthermore, each of the Parties to this Agreement has received independent legal advice, or has had the opportunity to receive independent legal advice, from such Party's respective attorneys with respect to the advisability of executing this Agreement. The Parties are entering into this Agreement wholly of their own free will and volition.

6.    **Default.**

6.1    **Event of Default.**    Occurrence of any of the following events shall be deemed default by Whitehead:

a. Failure to comply with or perform terms, obligations, covenant or conditions contained in any duly executed agreements between Okada and Whitehead;

b. Failure by Rockford or Whitehead to comply with or perform any term or obligation under any laws and regulations of Dominican Republic which may have any impact on Okada's interest in Lions Gate.

c. Any warranty, representation or statement made by Whitehead to Okada with respect to any of executed agreements between Whitehead and Okada is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter;

d. If collateralization of Lions Gate ceases to be in full force and effect at any time and for any reason;

e. Dissolution or termination of Rockford's existence, or the commencement of any bankruptcy or insolvency laws against Rockford or Whitehead;

f. Any proceedings against Rockford or Whitehead that may have any negative impact on Okada's interests in Lions Gate; and

g. Any acts or omission of acts by Rockford or Whitehead that may have any negative impact on Okada's interests in Lions Gate.

6.2. **Available Remedies.**    In an event of any of the aforementioned events of default, Okada shall be entitled to any and all remedies available under relevant laws of Dominican Republic, including but not limited to immediate payment of entire indebtedness secured by Lions Gate, foreclosure sale and an option to transfer legal and equitable title of Lions Gate to any party (i.e., *Pagare Notarial*).

7.    **Entire Agreement.**  This Agreement comprises and contains the entire agreement between the Parties respecting the matters set forth in this Agreement, and supersedes and replaces all prior negotiations, understandings, proposed agreements and agreements between the Parties, written or oral.  Neither Party has made any statement, representation or promise, other than as expressly set forth herein, to any other party in entering into this Agreement, which has been relied upon by any other party entering into this Agreement.

8.    **Confidentiality and Nondisclosure.**  This Agreement and the terms hereof shall be maintained in confidence and shall not be disclosed by either of the Parties to this Agreement to any other person, company or agency (governmental or private), unless required by judicial order.  Each of the Parties to this Agreement shall use the same level of care to prevent the full or partial disclosure of this Agreement that it uses to protect its own confidential information and shall, in any event, take all reasonable precautions to prevent the disclosure of the contents of this Agreement.  The Parties further agree that any unauthorized disclosure to third parties of confidential information provided hereunder, or a violation or threatened violation of this clause, would cause irreparable damage to the aggrieved party and, therefore, the aggrieved party would be entitled to an injunction prohibiting any such disclosure, or attempted disclosure.  The Parties' obligations under this paragraph shall continue indefinitely.  Nothing contained herein shall be construed to prohibit the Parties from disclosing the terms of this Agreement:  (i) in confidence to their spouse, attorneys, accountants, or other professionals; or (ii) to the Internal Revenue Service, the California Franchise Tax Board, or to the clerical personnel in the offices thereof.

9.    **Construction of this Agreement.**  The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any Party hereto. Both Parties have participated in drafting this Agreement. The Parties understand and expressly assume the risk that any fact not recited, contained or embodied herein may turn out hereafter to be other than, different from, or contrary to the facts now known to them or believed by them to be true. Nevertheless, the Parties intend by this Agreement, and with the advice of their own, independently selected counsel, to release finally, fully and forever, all matters released hereunder and agree that this Agreement shall be effective in all respects notwithstanding any such difference in facts, and shall not be subject to termination, modification or rescission by reason of any such difference in facts.

10.    **Authority of Signatories.**  Each of the Parties to this Agreement represents and warrants that it is authorized to enter into this Agreement and that any required consents, authorizations, or approvals have been obtained.

11.    **No Assignment.**  The Parties have not made or suffered any assignment, subrogation, hypothecation or other disposition of any claim, right, title, interest, demand or obligation it may possess relating to the matters set forth herein.

12.    **Successors, Assigns, Personal Representatives.**  This Agreement shall be to the benefit of, and binding upon, the successors, heirs, personal representatives, and assigns of each of the Parties to this Agreement.

13.    **Notice.**  Unless advised in writing of a different name and address, all notices, submissions and communications of any kind required or otherwise made under this Agreement shall be sent (as required) to the following:

If to:   Donald Okada

        Gaw | Poe, LLP
        100 Pine St., Suite 1250
        San Francisco, CA 94111
        Attn: Randolph Gaw, Esq.
        Fax No.: (415) 737-0642
        E-mail address: rgaw@gawpoe.com

If to:   Mark Whitehead

        The Cochran Firm California
        4929 Wilshire Blvd. Suite 1040
        Los Angeles, California 90010
        Attn: James A. Bryant II
        Fax No.: (310) 802-3829
        E-mail address: james.bryant@thecalawgroup.com

14.    **Further Assurances.**  Each Party agrees to take such further actions and to execute such further documents, instruments and agreements as may be reasonably requested by the other Party to further confirm and effect the consummation of the transactions contemplated by this Agreement.

15.    **Choice of Law/Venue.**  This Agreement is executed and delivered within the State of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with and governed by the laws of the State of California. In the event of any dispute in connection with this Agreement, the Parties hereto agree that the State or Federal Courts of Los Angeles County shall constitute the most appropriate venue for any such lawsuit or dispute due to the convenience of likely witnesses.

16.    **Waiver of Service.**  The Parties acknowledge that Whitehead may take residence outside the United States of California either on a temporary or permanent basis.  To effect the aims of this Agreement, the Parties agree, and hereby consent in advance, that service of process for any lawsuit or action related to this Agreement, including indemnification, may be effected by personal delivery to Randolph Gaw (on behalf of Donald Okada) or James A. Bryant II (on behalf of Mark Whitehead).

17.    **Specific Performance and Defense to Future Actions.**  The obligations and covenants set forth in this Agreement may be specifically enforced on or by any party entitled to the benefit hereof. This Agreement may, additionally, be pleaded as a full and complete defense to any and all claims and causes of action being released in accordance with this Agreement, and

the Parties hereto consent that it may be used as the basis for an injunction to halt any action suit or other proceeding based upon claims released by this Agreement.

18.    **Attorney's Fees and Costs.** The Parties agree that in any action or lawsuit relating to this Agreement, including indemnification or prosecution of a foreclosure or collection action upon the $950,000 Security Agreement, the prevailing party will be entitled to its reasonable attorney's fees and the costs of suit, including expert witness fees.

19.    **Modification and Amendment.**  This Agreement may not be modified or amended in any way, except by a writing signed by the party to be charged therewith.

20.    **Counterparts.**  This Agreement may be signed in counterparts, and each counterpart so signed shall constitute a part of one valid original document.

21.    **Facsimile or PDF Transmission.**  This document may be signed by facsimile or as a PDF document.  A photocopy of this Agreement may be used as the original.


[Signatures to Follow]

**PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN CLAIMS.**

EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

APPROVED AS TO FORM:

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____

9

**PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN CLAIMS.**

**EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.**

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____
James Bryant, Esq.

9

## **EXHIBIT A**
## ADMINISTRATOR INSTRUCTIONS

1.    **Power of Attorney**.  The Administrator shall receive Power of Attorney from SHR SOLAR 24, S.A., SHR SOLAR 134, S.A., SHR SOLAR 135, S.A., SHR SOLAR 136, S.A.. SHR SOLAR 137, S.A. (collectively the "DR Companies") as well as from their successor corporate identities, including but not limited to the possible conversion of the DR Companies from S.A. (Ltd.) to S.a.r.l. companies pursuant to Dominican Republic law, and Rockford Investment, Inc. a Belize corporation ("Rockford"), for purposes of

1.1    *Acto de Constitucion de Hipoteca*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against real property located at Seahorse Ranch, Puerto Plata, Dominican Republic, and currently held by the Dominican Republic entities called SHR SOLAR 24, S.A. (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), SHR SOLAR 134, S.A. (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata) (collectively, all of these real property assets are referred to as "Lions Gate", in favor of Donald Okada, an individual ("Okada");

1.2    *Pagare Notarial*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against Lions Gate, in favor of Okada; and

1.3    *Acuerdo de Dacion de Pago*, in the event of default by Mark Whitehead ("Whitehead"), in favor of Okada.

2.    **Escrow**.  Administrator shall hold in escrow 100% of all present and future outstanding shares of Rockford and its subsidiaries on behalf of Okada until the full performance of Whitehead of any and every executed agreements between and by Okada and Whitehead, and Okada notifies Administrator in writing of Okada's intent to release such Rockford shares from escrow.

3.    **Manager of the DR Companies**.

3.1    Appointment:  Okada and Whitehead will mutually agree upon the Manager of the DR Companies ("Manager").

3.2    Duties:  Manager of the DR Companies shall assume the duty of the Administrator once appointed.

4.    **Default**.

4.1     **Instructions in an Event of Default**.  In an event of default as agreed between Okada and Whitehead, and upon receipt by Administrator or Manager a notice of such default, Administrator or Manager shall perform the following duties on behalf of Okada:

(a)     Upon an event of default, among other remedies available under the agreements between Okada and Whitehead, Okada may declare the entire indebtedness secured by Lion's Gate immediately due and payable by delivery to Whitehead of written declaration of such default and of election to cause Lion's Gate to be sold.  If Okada so elects, Administrator or Manager shall, under the relevant laws of Dominican Republic, consider any and all necessary methods and execute to bring about such results.

(b)     Should Okada elects to claim the shares of Rockford and its subsidiaries in escrow, Administrator or Manager shall, under the relevant laws of Dominican Republic, promptly transfer every and all shares in escrow to Okada.  Further, Administrator or Manager shall consider any and all necessary methods and execute to bring about such results.

(c)     Should Okada elects to have a receiver appointed to take possession of all or any part of Lion's Gate, with the power to protect and preserve the Lion's Gate, to operate the Lion's Gate preceding foreclosure sale, and to collect rents or fees, if any, Administrator or Manager shall act as such Receiver.

(d)     Should Okada elects any other remedies as agreed between and by Okada and Whitehead, Administrator or Manager shall, within the confines of laws of Dominican Republic, perform all duties as requested by Okada.

4.2     **Notice to Okada of an Event of Default**.  In an event where any of the following occurs of which Administrator or Manager has actual or constructive notice or knowledge thereof, Administrator or Manager shall immediately notify Okada in writing of an event(s) where:

(a)     Rockford, DR Companies or Whitehead fails to comply with or to perform terms, obligations, covenant or condition contained in any agreements between Okada and Whitehead;

(b)     Rockford, DR Companies or Whitehead fails to comply with or perform any term or obligation under any laws and regulations of Dominican Republic which may have any impact on Okada's interest in Lion's Gate;

(c)     Any warranty, representation or statement made by Whitehead to Okada with respect to Lion's Gate or any other agreements is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter;

(d)     If collateralization of Lion's Gate ceases to be in full force and effect at any time and for any reason;

11

(e)    Dissolution or termination of Rockford's and/or DR Companies' existence, or the commencement of any bankruptcy or insolvency laws against Rockford, DR Companies or Whitehead;

(f)    Any proceedings against Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate; and

(g)    Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.    **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada under California and Dominican Republic law.

6.    **Administrative Expenses**.    All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead. The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada. The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.    **Change or Resignation of Administrator**. Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.    **Term of Administrator and Manager**. Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager. Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

# EXHIBIT 9

-------Original Message-------

**From:** jpm.fgn@mail.com
**Date:** 4/8/2014 11:53:11 PM
**To:** mark@markwhitehead.com
**Cc:** timo.lindberg;  Pasi Raitala
**Subject:** Re: due diligence

Hello Mark,

My replies below in **BOLD FONT:**

----- Original Message -----
From: mark@markwhitehead.com
Sent: 04/09/14 12:48 AM
To: jpm.fgn@mail.com
Subject: due diligence

Question on due diligence for the companies in Dominican republic and Belize.

1. Fresh certificate of good standing . You have that correct all with David Elbaz. Also the details of the Belize lilac.

**JPM: Yes, we have a fresh one for Rockford from March this year. Please find a scanned copy attached. The D.R. entities are all up to date. All taxes etc. paid and all five are sitting with the escrow lawyer, ready to be handed over to you.**
yes spoke with guido on that
Is there anything more on the company structures for lionsgate I need or you can send again.

**JPM: The legal description is complete in the draft of the trade contract and the escrow lawyer (Perdomo Law) holds everything in hand and is standing by waiting for instruction for the hand over to you.  yes**

You will have about 10k – 15k USD closing costs in total in the D.R. with him. Note: This will include "updating" all the 5 property companies according to the new law. This is a routine procedure and will take about 30 days. Does not affect title etc. in any way. ok
does that delay closing at all

You can communicate with Lic. Perdomo directly for any concerns and questions you or your in-house lawyer might have. ok will do

2. I assume you are forming new llc to buy Beverly hillbilly's correct or taking over hillbilly's. As suggested  a new llc and title certificate is total protection for you.

**JPM: The buying entity to take over the Beverly LLC shares is in place, but it is possible that there will be two entities doing the purchase 50/50. Will confirm this soon. ok**

3. Is there anything else you need now. I am trying to be pro active and get all I can in place to make it easy for legal to do what they need to do.

**JPM: Not really. We should be good to go. The easement / access issue is the one we are waiting for. ok**

As mentioned we should have the easement docs today the lawyer for the easement owner sent email yesterday to that effect.

2

EXHIBIT
9  dg
8-27-15
PENGAD 800-631-6989

DOC000142

**JPM: Sounds great! We'll keep our fingers crossed :)**

I have cc to my lawyer here on this issue as well.

**JPM: Good. I will do the same with Timo and his adviser.**

BR // J-P



;ed and may contain confidential and/or legally privileged material and information. Unauthorized disclosure, copying, distribution or us
ll as any copies made.

3

DOC000143

# EXHIBIT 10

James A. Bryant

**From:**       JP M-M <cdc@mail.com>
**Sent:**       Wednesday, April 9, 2014 10:44 AM
**To:**         mark@markwhitehead.com
**Subject:**    Re: due diligence

Hello Mark,

I am answering both your mails here.

The note should be done as far as we are concerned. No worries there.

About the closing in the D.R. The updating of the companies has no impact on closing or timing. It is just a new law there which requires companies under certain level of annual turn over (=all holding and non-trading property companies) to be converted from SAs to Sarl format. Nothing to do with ownership, titles etc. Perdomo will advise you further if needed. It is a routine process and he is standing by to carry it out for the new owner.

Any news on the easement ??

Best regards,

J-P

----- Original Message -----
From: mark@markwhitehead.com
Sent: 04/09/14 07:07 PM
To: jpm.fgn@mail.com
Subject: Re: due diligence



-------Original Message-------

**From:** jpm.fgn@mail.com
**Date:** 4/8/2014 11:53:11 PM
**To:** mark@markwhitehead.com
**Cc:** timo.lindberg; Pasi Raitala
**Subject:** Re: due diligence

Hello Mark,

My replies below in **BOLD FONT:**

----- Original Message -----
From: mark@markwhitehead.com
Sent: 04/09/14 12:48 AM
To: jpm.fgn@mail.com
Subject: due diligence



1

DOC000308

Question on due diligence for the companies in Dominican republic and Belize.

1. Fresh certificate of good standing . You have that correct all with David Elbaz. Also the details of the Belize lilac.

**JPM: Yes, we have a fresh one for Rockford from March this year. Please find a scanned copy attached. The D.R. entities are all up to date. All taxes etc. paid and all five are sitting with the escrow lawyer, ready to be handed over to you.**
yes spoke with guido on that
Is there anything more on the company structures for lionsgate I need or you can send again.

**JPM: The legal description is complete in the draft of the trade contract and the escrow lawyer (Perdomo Law) holds everything in hand and is standing by waiting for instruction for the hand over to you.** yes

**You will have about 10k – 15k USD closing costs in total in the D.R. with him. Note: This will include "updating" all the 5 property companies according to the new law. This is a routine procedure and will take about 30 days. Does not affect title etc. in any way.** ok does that delay closing at all

**You can communicate with Lic. Perdomo directly for any concerns and questions you or your in-house lawyer might have.** ok will do

2. I assume you are forming new llc to buy Beverly hillbilly's correct or taking over hillbilly's. As suggested  a new llc and title certificate is total protection for you.

## JPM: The buying entity to take over the Beverly LLC shares is in place, but it is possible that there will be two entities doing the purchase 50/50. Will confirm this soon. ok

3. Is there anything else you need now. I am trying to be pro active and get all I can in place to make it easy for legal to do what they need to do.

**JPM: Not really. We should be good to go. The easement / access issue is the one we are waiting for.** ok

As mentioned we should have the easement docs today the lawyer for the easement owner sent email yesterday to that effect.

**JPM: Sounds great! We'll keep our fingers crossed :)**

I have cc to my lawyer here on this issue as well.

**JPM: Good. I will do the same with Timo and his adviser.**

BR // J-P

DOC000309



**FREE Emoticons for your email - by
IncrediMail**

  

Cryotech Nordic Ltd

J-P E. Martins
COO, Business Development
Member of the board
www.cryotechnordic.com
www.ctnmedispa.fi
Direct phone +358 (0) 45 1361110

Please consider the environment before printing this email or attachment.

This electronic mail including attachments is intended only for the person(s) or entity to which it is addressed and may
contain confidential and/or legally privileged material and information. Unauthorized disclosure, copying, distribution
or use of this material and information may be unlawful and is prohibited. If you are not the intended recipient and ha
ve received this mail in error, please contact the sender and delete all contents of the e-
mail as well as any copies made.

DOC000310

# EXHIBIT 13

## James A. Bryant

| | |
|---|---|
| **From:** | Guido Perdomo <guidoperdomo@yahoo.com> |
| **Sent:** | Monday, May 19, 2014 1:31 PM |
| **To:** | mark |
| **Subject:** | Re: lionsgate mansion |

Correct but for that we need updated companies.

Guido


Enviado desde mi smartphone BlackBerry 10.

**De:** mark
**Enviado:** Monday, May 19, 2014 4:26 PM
**Para:** Guido Perdomo
**Asunto:** Re: lionsgate mansion

Just a lien on title or loan will do that correct. Like any other lien

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: Guido Perdomo
Date:05/19/2014 1:06 PM (GMT-08:00)
To: mark@markwhitehead.com
Subject: Re: lionsgate mansion


That can be done but companies must be updated, I mean transforming them to SRL.

You could also make a normal contract but no liens could be placed at titles office till this update is completed.

Regards

Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic
Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766
El Lunes, 19 de mayo, 2014 4:01 P.M., "mark@markwhitehead.com" <mark@markwhitehead.com> escribió:



guido

1



EXHIBIT
13 dg
8-27-15

DOC000268

Its mark whitehead I have settled a deal with a partner on the lions gate home which will be in my name and I need to have a lien or note on the home in favor of okada for $950,000  o interest rate . Can you arrange that and contact my lawyers here. On setting that up?

Can you contact James ASAP to work out such details

James A. Bryant II
Attorney at Law
4929 Wiltshire Blvd Suite 1010
Los Angeles, CA 90010
Ph. 310.860.6231 Cell 510.459.7846 Fax. 310.802.3829
james.bryant@thecalawgroup.com

-------*Original Message*-------

*From:* Guido Perdomo
*Date:* 4/3/2014 3:55:22 PM
*To:* mark@markwhitehead.com
*Subject:* Re: lionsgate mansion

No loans, it was only the lien which was affecting the property since long time. That lien was paid and the lawyer for Lionsgate was filing the documents to take it off.

I will confirm if it has been finnally taken off.

Guido P.

Enviado desde mi smartphone BlackBerry 10.

**De:** mark@markwhitehead.com
**Enviado:** Thursday, April 3, 2014 6:49 PM
**Para:** Guido Perdomo
**Asunto:** Re: lionsgate mansion

[x] 

so there are loans on the property. i did not know thanks

2

DOC000269

-------*Original Message*-------

***From:*** Guido Perdomo
***Date:*** 4/3/2014 3:43:16 PM
***To:*** mark@markwhitehead.com
***Subject:*** Re: lionsgate mansion

Ok. I will check if the release of the mortgage has already been completed.   Once I confirm I will let you know.

Regards

Guido

Enviado desde mi smartphone BlackBerry 10.

**De:** mark@markwhitehead.com
**Enviado:** Thursday, April 3, 2014 6:31 PM
**Para:** Guido Perdomo
**CC:** jpm.fgn@mail.com
**Asunto:** Re: lionsgate mansion



Guido .
 it's mark whitehead the potential buyer of the lionsgate mansion in Dominican republic.

I would be taking the shares in the companies that own the estate and also the Belize corporation.

Do you have any comment on that for me to consider at all.

 i understand you have all the docs for the property and the title is clean . Are there any issues we need to know about concerning title etc  of the property.
Once we are ready to close I will make a trip there to meet you and tour the home I hope to do that in the next couple of weeks.
Please advise

Mark Whitehead.

-------*Original Message*-------

***From:*** Guido Perdomo
***Date:*** 2/22/2014 12:20:40 AM
***To:*** mark@markwhitehead.com

3

DOC000270

**Subject:** Re: Mensaje recibido desde la web

25 percent of the capital gains.

Enviado desde mi smartphone BlackBerry 10.

**De:** mark@markwhitehead.com
**Enviado:** Friday, February 21, 2014 10:23 PM
**Para:** Guido Perdomo
**Asunto:** Re: Mensaje recibido desde la web



Guido

question  if we were to sell the home in dominant republic for $10m  us what tax liability would we have there on such a sale

-------Original Message-------

**From:** Guido Perdomo
**Date:** 1/12/2014 3:27:57 PM
**To:** mark@markwhitehead.com
**Subject:** Re: Mensaje recibido desde la web

We have the transfer taxes to move titles from the different companies to your name and them we have the legal fees.

Taxes should be around 2 percent and fees 0.5 percent.

Regards

Guido P

Enviado desde mi smartphone BlackBerry 10.

**De:** mark@markwhitehead.com
**Enviado:** domingo, 12 de enero de 2014 07:18 p.m.
**Para:** Guido Perdomo
**Asunto:** Re: Mensaje recibido desde la web

DOC000271



whats the breakdown of cost please so i understand ??

-------*Original Message*-------

**From:** Guido Perdomo
**Date:** 1/12/2014 3:16:34 PM
**To:** mark@markwhitehead.com
**Subject:** Re: Mensaje recibido desde la web

All costs will be around 2.5 percent and time frame to make due diligence will be around 30 days.

Regards

Guido

Enviado desde mi smartphone BlackBerry 10.

**De:** mark@markwhitehead.com
**Enviado:** domingo, 12 de enero de 2014 07:00 p.m.
**Para:** Guido Perdomo
**Asunto:** Re: Mensaje recibido desde la web



I assume you know the property i will be potentially buying for $10m
i need to understand all the cost with the purcahse to see if it feasable at all.

time frame for title searches etc

mark w

-------*Original Message*-------

**From:** Guido Perdomo
**Date:** 1/12/2014 2:44:50 PM
**To:** mark@markwhitehead.com
**Subject:** Re: Mensaje recibido desde la web

Dear sir.

5

DOC000272

Thanks for your message.

Yes, it will be a pleasure to assist you on this or any other Real Estate transaction you plan to make inthe North Coast of the Dominican Republic.

Sincerely

Guido Perdomo.

Enviado desde mi smartphone BlackBerry 10.

**De:** friskylabs@gmail.com
**Enviado:** domingo, 12 de enero de 2014 06:40 p.m.
**Para:** guidoperdomo@yahoo.com
**Responder a:** mark@markwhitehead.com
**Asunto:** Mensaje recibido desde la web

Recibido el 2014-01-12 a las 14:40

Detalles del mensaje.

Enviado por: mark whitehead

Domicilio: 9 ocean ridge dr newport coast ca 92657

Telefono: 9499034782

E-mail: mark@markwhitehead.com

Comentarios: i have been given your details by the owners of the lionsgate home in dominca republic im looking to purchase. is this something you can handle for me on your side as far as title making sure that i get at close clean verifiable title free of liens debt s etc

6

DOC000273



**FREE Animations** for your email - by IncrediMail

7

DOC000274

# EXHIBIT 14

## James A. Bryant

**From:** mark@markwhitehead.com
**Sent:** Tuesday, May 20, 2014 7:35 AM
**To:** jbryant@cochranfirm.com
**Subject:** skype with jp today



ok and time frame as well so we are all on same page
[5/19/2014 10:14:43 AM] mark whitehead: thanks mate
[5/19/2014 10:14:53 AM] mark whitehead: (y)(:l
[5/19/2014 10:18:50 AM] JP Martins: Sure. We should be able to move fast.
[5/19/2014 10:19:35 AM] JP Martins: Everything has been ready and
standing by for quite some time already. Just need to agree where and when
we will close it...
[5/19/2014 10:47:19 AM] mark whitehead: ok im fine with dominica in part
and here with okada part so we could close here then in dominican rep or
have guido do it there for me
[5/19/2014 10:47:37 AM] mark whitehead: let lawyers work that out i guess
[5/19/2014 10:48:37 AM] JP Martins: OK
[5/19/2014 10:49:00 AM] JP Martins: I will talk this through with Timo
tomorrow...
[5/19/2014 10:49:09 AM] mark whitehead: (cool)(y) ok
[5/19/2014 10:49:36 AM] JP Martins: Catch you later mate (handshake)
[5/19/2014 10:49:50 AM] mark whitehead: thanks you too (y)
[5/19/2014 3:37:14 PM] mark whitehead: i guess the companies have to be
updated according to guido does that make sense
[5/19/2014 11:10:47 PM] JP Martins: Yes sir. This was actually discussed
earlier on.
[5/19/2014 11:12:52 PM] JP Martins: There is a new system in place, and the
SAs under certain size of a turn over need to be converted into Sarl format.
No big deal, and Perdomo always said that would be wisest to do it when the
new owner takes over the ownership, so it does not affect / delay the closing.
The cost when Perdomo does it, is only about 2000 bucks per company.
[5/19/2014 11:14:06 PM] JP Martins: Another issue worth reminding you
off, is the 800m2 slice of land, which is in the back of the garden and on
LGM's side of the border fence but it belongs to the community.
[5/19/2014 11:15:03 PM] JP Martins: It is there due to a measuring error
back in the day and obviously no use to anyone. The only possible "buyer"
for the slice would be the owner of Lionsgate
[5/19/2014 11:16:39 PM] JP Martins: It could be bought for very little
money (around 40 -70k USD) which would increase the size of the property
and the value accordingly.
[5/19/2014 11:18:01 PM] JP Martins: The community cannot force anyone to
buy that slice, but at the same time would be a great deal m2 wise and
probably a clever "political" move from the new owner of the King Pin estate
inside the gates? Something worth thinking about...



**EXHIBIT**
14 dg
8-27-15

1

[5/19/2014 11:19:45 PM] JP Martins: We also double checked yesterday the local registries and spoke with the Rockford lawyer, Silverio and the property manager. Everything is 100% clear and ready to be handed over. The property is vacant and in great shape.

[5/19/2014 11:24:00 PM] JP Martins: The property manager reported about small issues like the large TV in the family kitchen having problems (not surprising, the TVs do not live for ever in that climate), the elevator needing an UPS (power back up) and that it also needed service and one new circuit board. If you read FGN's survey and maintenance report, you will see our recommendations and observations. If you want, we are in a position to plan, supervise and carry out all the needed maintenance work, source some additional patio and beach furniture etc.

[5/19/2014 11:28:21 PM] JP Martins: Question: Who will be in charge of drafting the slightly amended documents?

[5/19/2014 11:29:29 PM] JP Martins: I hope Okada is also fine with our agreement that the note will function as a counter collateral for the buyer of the BH LLC, in case there would be some unknown liabilities or surprises going forward?

[5/19/2014 11:29:50 PM] JP Martins: Question 2: How long you think it will take for you to get the title insurance?


[7:05:46 AM] mark whitehead: title insurance is ready i just need to pull the trigger and i assume the holder will be beverly hillbilys correct

[7:06:43 AM] mark whitehead: as far as amended docs i dont care is that elbars or my guy not sure whoever

[7:08:48 AM] mark whitehead: as far as unknown liabilities on beverly hills its clear also just about $5k for taxes due which title we pay at
close  with title in place it has to be clear as far as any other liabilites  there is none we owe a lawyer $30k and part of our deal okada and me is he gets paid from closing. all be it NOt in beverly hills name

[7:09:22 AM] mark whitehead: yes spoke with guido several times yesterday he quoted $10k us for his part i confirmed that was fine with him

[7:11:03 AM] mark whitehead: i remember the land piece and will deal with that once we are closed and maybe get you involved in sorting that out and the other issues with the home and moving forward plan



DOC000286

# EXHIBIT 15

## Lic. Guido Luis Perdomo Montalvo

Abogado - Notario Público

Calle Pedro Clisante No. 73, 2da Planta
Plaza Perdomo, El Batey, Sosúa, Rep. Dom.
Tel.: (809) 571-1950 y 571- 3274
Fax: (809) 571-2766
guidoperdomo@yahoo.com

U.S. Mailing Address
EPS – C 165
P.O. Box 02-5467
Miami, Florida, 33102

Sosua, Dominican Republic
May 23rd., 2014.-

Mr. Mark Whitehead
U.S.A.

Dear sir.

I hereby inform you that will be a pleasure to assist and represent you and the note holder Okada in the transaction related to the sale of the property known as "Lions Gate Mansion" located in Sea Horse Ranch, Sosua, Dominican Republic together with its associated companies.

Conditions of the transaction will be discussed later on.

You and Okada can be sure that all titles are with me and that will not be released till full payment has been completed. I remind you that all companies must be updated according to the new Corporate Law of the Dominican Republic.

Sincerely

Guido Perdomo
Lawyer and Notary Public





EXHIBIT
15 dg
8.27.15

# EXHIBIT 16

## Donald Okada

| | |
|---|---|
| **From:** | Enrique De Marchena <eedemarchena@dmklawyers.com> |
| **Sent:** | Tuesday, August 11, 2015 6:02 PM |
| **To:** | Donald Okada |
| **Cc:** | Nelson Ml. Jáquez Suárez |
| **Subject:** | RV: _Títulos__SHR |

Enviado desde mi smartphone BlackBerry 10.

**De:** Guido Perdomo <guidoperdomo@yahoo.com>
**Enviado:** martes, 11 de agosto de 2015 08:12 p.m.
**Para:** Enrique De Marchena
**Responder a:** Guido Perdomo
**Asunto:** Rv: _Títulos__SHR

Aqui mi respuesta

Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic
Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766

----- Mensaje reenviado -----
**De:** Guido Perdomo <guidoperdomo@yahoo.com>
**Para:** mark <mark@markwhitehead.com>
**Enviado:** Martes, 8 de julio, 2014 21:33:28
**Asunto:** Re: _Títulos__SHR

Companies must be updated according to the Corporate Law. I explained Chris Noblett about this

Guido

Enviado desde mi smartphone BlackBerry 10.
 Mensaje original
De: mark
Enviado: Tuesday, July 8, 2014 8:24 PM
Para: Guido Perdomo
Asunto: Re: _Títulos__SHR



Gaw said that the companies were not compliant can  you explain to his lawyer what's needs to
happen  and that it does not affect the ability to lien the  prpoerty and you will.make them.compliant
on close

1

Sent from my T-Mobile 4G LTE Device

-------- Original message -------- From: Guido Perdomo <guidoperdomo@yahoo.com>
Date:07/08/2014 6:11 PM (GMT-05:00) To: mark@markwhitehead.com
Cc: Subject: Re: _Títulos__SHR 

Yes. He has all these documents plus all the others he requested.

Guido

Enviado desde mi smartphone BlackBerry 10.
De: mark@markwhitehead.com
Enviado: Tuesday, July 8, 2014 4:56 PM
Para: Guido Perdomo
Asunto: RE: RV:_Títulos__SHR

did you send to the lawyer who represents okada your friend there at all
thanks guido

Does your tax suck

mark whitehead
949 350 9211
mark@markwhitehead.com

-------- Original Message --------
Subject: RV:_Títulos__SHR
From: Guido Perdomo <guidoperdomo@yahoo.com>
Date: Tue, July 08, 2014 1:27 pm
To: mark@markwhitehead.com

Here the titles and Registration for the Companies.

Regards

Guido P.

Enviado desde mi smartphone BlackBerry 10.

# EXHIBIT 17



| | |
|---|---|
| **From:** | mark@markwhitehead.com |
| **To:** | rqaw@qawpoe.com |
| **Subject:** | [FWD: RV:_Titulos__SHR] |
| **Date:** | Tuesday, July 08, 2014 2:03:31 PM |
| **Attachments:** | Titulos SHR.pdf |
| | SHR Solar.pdf |

# for your info .



Does your tax suck

mark whitehead
949 350 9211
mark@markwhitehead.com


-------- Original Message --------
Subject: RV:_Titulos__SHR
From: Guido Perdomo <guidoperdomo@yahoo.com>
Date: Tue, July 08, 2014 1:27 pm
To: mark@markwhitehead.com


Here the titles and Registration for the Companies.

Regards

Guido P.


Enviado desde mi smartphone BlackBerry 10.



**Cámara de Comercio y Producción de Puerto Plata, Inc.**
Calle Beller #17, Puerto Plata, República Dominicana / Tel. (809)586-2390 Fax (809)320-8407 / comercio.produc@codetel.net.do

**CERTIFICADO DE REGISTRO MERCANTIL**
SOCIEDADES DE COMERCIO

Registro No. 4805/2009

| Registro Nuevo X | | Modificación al Registro Original | | | | | | | Renovación Registro | |
|---|---|---|---|---|---|---|---|---|---|---|
| Razón Social | SHR SOLAR 135, S.A. | | | | | | | | | |
| Dirección de la empresa | Calle | Duarte | | No. | 02 | Sector | El Batey | Ciudad | Sosua, Puerto Plata, R. D. | |
| Teléfono 1 | (809) | | Teléfono 2 | | (809) | | | Fax | (809) | |
| Apartado Postal | | | E-mail: | | | | | Web Site | | |
| Nacional X Extranjera ☐ | | Fecha Emisión DIA 28 MES 01 AÑO 2009 | | | | | Fecha Vencimiento DIA 28 MES 01 AÑO 2011 | | | |
| Fecha de Asamblea Constitutiva | | | DIA 29 MES 01 AÑO 1998 | | | | RNC | | | |
| Actividades : | ☐ Importación | ☐ Mayorista | ☐ Industria X Servicio ☐ Exportación | | ☐ Detalista | | ☐ Comercio ☐ Otros (especifique) | | | |

| Actividad Descripción del Negocio | Principales Productos / Servicios | Sistema Armonizado (SA) |
|---|---|---|
| Adquirir por compra o por aporte en naturaleza un solar en la urb. Denominada "Sea Horse Ranch" (SHR) para crear, adquirir, alquilar, instalar y explotar todos los establecimientos, sucursales o agencias que se relacionen con una cualquiera de las actividades especificadas. | | |

| Nombre(s) Accionistas | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| ROCKFORD INVESTMENTS, INC. Rep. Por José A. Lantigua Balbuena | Belice | --------- | ------- | ----- | ------- |
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Milady del Rosario Luciano | Puerto Plata, R.D. | 037-0015960-5 | Dominicana | Soltera | Emp. privada |
| José Alejandro Henríquez Collado | Puerto Plata, R.D. | 037-0059260-7 | Dominicana | Soltero | Emp. privado |
| Paloma Gardén Pelegrin | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| Consejo de Administración | | | | | |
|---|---|---|---|---|---|
| Cargo | Nombre y Apellido | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
| Presidente | José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Vicepresidente | Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Tesorero | | | | | | |
| Secretario | Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Comisario | Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| Administradores y/o persona(s) Autorizada(s) a firmar en su nombre | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |

| Capital Autorizado RD$ | Capital Pagado RD$ | Bienes Raíces RD$ | Activos RD$ | Duración de la Sociedad |
|---|---|---|---|---|
| RD$ 700,000.00 | RD$ 662,800.00 | | | Indefinida |
| Fecha de Inicio de operaciones DIA MES AÑO | | Fecha última Asamblea DIA 16 MES 01 AÑO 2009 | | Duración de la directiva, hasta: 6 años |

| Referencias Comerciales | | | | | | Referencias Bancarias | |
|---|---|---|---|---|---|---|---|
| No. De Empleados | Masculinos | | Femeninos | | Total | Sucursales y Agencias/ Detalle | |
| Registros | | Descripción | | Registro Número | | | |
| Nombre Comercial | SHR SOLAR 135 | | | | | | |
| Marca de Fábrica | | | | | | | |
| Patente de Invención | | | | | | | |

_Auribel Tejada_
Directora Ejecutiva
Cámara de Comercio y Producción de Puerto Plata, Inc.

**Cámara de Comercio y Producción de Puerto Plata, Inc.**
Calle Beller #17, Puerto Plata, República Dominicana / Tel. (809)586-2390 Fax (809)320-8407 / comercio.produc@codetel.net.do

**CERTIFICADO DE REGISTRO MERCANTIL**
**SOCIEDADES DE COMERCIO**

Registro No. 4803/2009

| Registro Nuevo X | | Modificación al Registro Original | | | | | | | Renovación Registro | |
|---|---|---|---|---|---|---|---|---|---|---|
| Razón Social | SHR SOLAR 24, S.A. | | | | | | | | | |
| Dirección de la empresa | Calle | Duarte | | No. | 02 | Sector | El Batey | Ciudad | Sosua, Puerto Plata, R. D. | |
| Teléfono 1 | (809) | | Teléfono 2 | | (809) | | Fax | | (809) | |
| Apartado Postal | | E-mail: | | | | | Web Site | | | |
| Nacional X  Extranjera ☐ | | Fecha Emisión DIA 27 MES 01 AÑO 2009 | | | | Fecha Vencimiento DIA 27 MES 01 AÑO 2011 | | | | |
| Fecha de Asamblea Constitutiva | | DIA 03 MES 09 AÑO 1992 | | | | | RNC | | | |
| Actividades: ☐ Importación   ☐ Mayorista   ☐ Industria X Servicio ☐ Exportación   ☐ Detallista   ☐ Comercio ☐ Otros (especifique) | | | | | | | | | | |

| Actividad Descripción del Negocio | Principales Productos / Servicios | Sistema Armonizado (SA) |
|---|---|---|
| Promover y realizar el estudio, organización, gestión, administración y ejecución de todo genero de proyectos, negocios e inversiones, así como cualquier otra actividad o negocio de lícito comercio. | | |

| Nombre(s) Accionistas | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| ROCKFORD INVESTMENTS, INC. Rep. Por José A. Lantigua Balbuena | Belice | ------- | ------- | ------- | ------- |
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Milady del Rosario Luciano | Puerto Plata, R.D. | 037-0015960-5 | Dominicana | Soltera | Emp. privada |
| José Alejandro Henríquez Collado | Puerto Plata, R.D. | 037-0059280-7 | Dominicana | Soltero | Emp. privado |
| Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| | Consejo de Administración | | | | |
|---|---|---|---|---|---|
| Cargo | Nombre y Apellido | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
| Presidente | José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Vicepresidente | Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Tesorero | | | | | | |
| Secretario | Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Comisario | Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| Administradores y/o persona(s) Autorizada(s) a firmar en su nombre | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |

| Capital Autorizado RD$ | Capital Pagado RD$ | Bienes Raíces RD$ | Activos RD$ | Duración de la Sociedad |
|---|---|---|---|---|
| RD$ 1,572,700.00 | RD$ 1,568,400.00 | | | Indefinida |

| Fecha de inicio de operaciones DIA MES AÑO | Fecha última Asamblea DIA 15 MES 01 AÑO 2009 | Duración de la directiva: hasta 6 años |
|---|---|---|

| | Referencias Comerciales | | | | Referencias Bancarias | |
|---|---|---|---|---|---|---|
| No. De Empleados | Masculinos | | Femeninos | Total | Sucursales y Agencias/ Detalle | |

| Registros | Descripción | Registro Número |
|---|---|---|
| Nombre Comercial | SHR SOLAR 24 | |
| Marca de Fábrica | | |
| Patente de Invención | | |

*Auribel Tejada*
Directora Ejecutiva
Cámara de Comercio y Producción de Puerto Plata, Inc.

# Cámara de Comercio y Producción de Puerto Plata, Inc.

Calle Beller #17, Puerto Plata, República Dominicana / Tel. (809)586-2390 Fax (809)320-8407 / comercio.produc@codetel.net.do

## CERTIFICADO DE REGISTRO MERCANTIL

### SOCIEDADES DE COMERCIO

**Registro No. 4806/2009**

| Registro Nuevo X | Modificación al Registro Original | | | | | | | Renovación Registro |
|---|---|---|---|---|---|---|---|---|
| Razón Social | SHR SOLAR 136, S.A. | | | | | | | |
| Dirección de la empresa | Calle | Duarte | | No. | 02 | Sector | El Batey | Ciudad | Sosua, Puerto Plata, R. D. |
| Teléfono 1 | (809) | | Teléfono 2 | | (809) | | Fax | (809) |
| Apartado Postal | | E-mail: | | | | | Web Site | |
| Nacional X  Extranjera ☐ | Fecha Emisión DIA 28 MES 01 AÑO 2009 | | | | Fecha Vencimiento DIA 28 MES 01 AÑO 2011 | | | |
| Fecha de Asamblea Constitutiva | DÍA 29 MES 01 AÑO 1998 | | | | | RNC | | |

Actividades: ☐ Importación  ☐ Mayorista  ☐ Industria  X Servicio  ☐ Exportación  ☐ Detallista  ☐ Comercio  ☐ Otros (especifique)

| Actividad Descripción del Negocio | Principales Productos / Servicios | Sistema Armonizado (SA) |
|---|---|---|
| Adquirir por compra o por aporte en naturaleza un solar en la urb. Denominada "Sea Horse Ranch" (SHR) para crear, adquirir, alquilar, instalar y explotar todos los establecimientos, sucursales o agencias que se relacionen con una cualquiera de las actividades especificadas. | | |

| Nombre(s) Accionistas | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| ROCKFORD INVESTMENTS, INC. Rep. Por José A. Lantigua Balbuena | Belice | -------- | -------- | -------- | -------- |
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Milady del Rosario Luciano | Puerto Plata, R.D. | 037-0015960-5 | Dominicana | Soltera | Emp. privada |
| José Alejandro Henríquez Collado | Puerto Plata, R.D. | 037-0069260-7 | Dominicana | Soltero | Emp. privado |
| Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

**Consejo de Administración**

| Cargo | Nombre y Apellido | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|---|
| Presidente | José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Vicepresidente | Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Tesorero | | | | | | |
| Secretario | Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Comisario | Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| Administradores y/o persona(s) Autorizada(s) a firmar en su nombre | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |

| Capital Autorizado RD$ | Capital Pagado RD$ | Bienes Raíces RD$ | Activos RD$ | Duración de la Sociedad |
|---|---|---|---|---|
| RD$ 900,000.00 | RD$ 829,800.00 | | | Indefinida |

| Fecha de Inicio de operaciones DIA MES AÑO | Fecha última Asamblea DIA 15 MES 01 AÑO 2009 | Duración de la directiva, hasta: 6 años |
|---|---|---|

| Referencias Comerciales | | | | | Referencias Bancarias |
|---|---|---|---|---|---|
| No. De Empleados | Masculinos | | Femeninos | Total | Sucursales y Agencias/ Detalle |
| Registros | | Descripción | | Registro Número | |
| Nombre Comercial | SHR SOLAR 136 | | | | |
| Marca de Fábrica | | | | | |
| Patente de Invención | | | | | |

Auribel Tejada
Directora Ejecutiva
Cámara de Comercio y Producción de Puerto Plata, Inc.

**Cámara de Comercio y Producción de Puerto Plata, Inc.**
Calle Beller #17, Puerto Plata, República Dominicana / Tel. (809)586-2300 Fax (809)320-8407 / comercio.produc@codetel.net.do

## CERTIFICADO DE REGISTRO MERCANTIL
### SOCIEDADES DE COMERCIO

Registro No. 4807/2009

| Registro Nuevo X | | Modificación al Registro Original | | | | | Renovación Registro | |
|---|---|---|---|---|---|---|---|---|
| Razón Social | SHR SOLAR 137, S.A. | | | | | | | |
| Dirección de la empresa | Calle | Duarte | No. | 02 | Sector | El Batey | Ciudad | Sosua, Puerto Plata, R.D. |
| Teléfono 1 | (809) | | Teléfono 2 | | (809) | | Fax | (809) |
| Apartado Postal | | E-mail: | | | | Web Site: | | |
| Nacional X  Extranjera ☐ | | Fecha Emisión DIA 28 MES 01 AÑO 2009 | | | | Fecha Vencimiento DIA 28 MES 01 AÑO 2011 | | |
| Fecha de Asamblea Constitutiva | | DIA 29 MES 01 AÑO 1998 | | | | RNC | | |
| Actividades : ☐ Importación ☐ Mayorista ☐ Industria X Servicio ☐ Exportación ☐ Detallista ☐ Comercio ☐ Otros (especifique) | | | | | | | | |

| Actividad Descripción del Negocio | Principales Productos / Servicios | Sistema Armonizado (SA) |
|---|---|---|
| Adquirir por compra o por aporte en naturaleza un solar en la urb. Denominada "Sea Horse Ranch" (SHR) para crear, adquirir, alquilar, instalar y explotar todos los establecimientos, sucursales o agencias que se relacionen con una cualquiera de las actividades especificadas. | | |

| Nombre(s) Accionistas | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| ROCKFORD INVESTMENTS, INC. Rep. Por José A. Lantigua Balbuena | Belice | — | ——— | ——— | — |
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Milady del Rosario Luciano | Puerto Plata, R.D. | 037-0016960-5 | Dominicana | Soltera | Emp. privada |
| José Alejandro Henríquez Collado | Puerto Plata, R.D. | 037-0059260-7 | Dominicana | Soltero | Emp. privado |
| Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

Consejo de Administración

| Cargo | Nombre y Apellido | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|---|
| Presidente | José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Vicepresidente | Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresaria |
| Tesorero | | | | | | |
| Secretario | Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Comisario | Paloma Gardén Pelegrín | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| Administradores y/o persona(s) Autorizada(s) a firmar en su nombre | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |

| Capital Autorizado RD$ | Capital Pagado RD$ | Bienes Raíces RD$ | Activos RD$ | Duración de la Sociedad |
|---|---|---|---|---|
| RD$ 700,000.00 | RD$ 644,800.00 | | | Indefinida |

| Fecha de Inicio de operaciones DIA MES AÑO | Fecha última Asamblea DIA 16 MES 01 AÑO 2009 | Duración de la directiva, hasta: 6 años |
|---|---|---|

| | Referencias Comerciales | | | | Referencias Bancarias | |
|---|---|---|---|---|---|---|
| No. De Empleados | Masculinos | | Femeninos | Total | Sucursales y Agencias/ Detalle | |
| Registros | | Descripción | | Registro Número | | |
| Nombre Comercial | SHR SOLAR 137 | | | | | |
| Marca de Fábrica | | | | | | |
| Patente de Invención | | | | | | |

Auribel Tejada
Directora Ejecutiva
Cámara de Comercio y Producción de Puerto Plata, Inc.



**Cámara de Comercio y Producción de Puerto Plata, Inc.**
Calle Beller #17, Puerto Plata, República Dominicana / Tel. (809)586-2390 Fax (809)320-8407 / comercio.produc@codetel.net.do

### CERTIFICADO DE REGISTRO MERCANTIL
#### SOCIEDADES DE COMERCIO

Registro No. 4804/2009

| Registro Nuevo X | | | Modificación al Registro Original | | | | | Renovación Registro | |
|---|---|---|---|---|---|---|---|---|---|
| Razón Social | | SHR SOLAR 134, S.A. | | | | | | | |
| Dirección de la empresa | Calle | Duarte | | No. | 02 | Sector | El Batey | Ciudad | Sosua, Puerto Plata, R.D. |
| Teléfono 1 | (809) | | Teléfono 2 | | (809) | | | Fax | (809) |
| Apartado Postal | | | E-mail: | | | | | Web Site | |

| Nacional X  Extranjera ☐ | Fecha Emisión DIA 28 MES 01 AÑO 2009 | Fecha Vencimiento DIA 28 MES 01 AÑO 2011 |
|---|---|---|
| Fecha de Asamblea Constitutiva | DIA 29 MES 01 AÑO 1998 | RNC | 1-05-05450-7 |

Actividades: ☐ Importación ☐ Mayorista ☐ Industria X Servicio ☐ Exportación ☐ Detallista ☐ Comercio ☐ Otros (especifique)

| Actividad Descripción del Negocio | Principales Productos / Servicios | Sistema Armonizado (SA) |
|---|---|---|
| Adquirir por compra o por aporte en naturaleza un solar en la urb. Denominada "Sea Horse Ranch (SHR) para crear, adquirir, alquilar, instalar y explotar todos los establecimientos, sucursales o agencias que se relacionen con una cualquiera de las actividades especificadas. | | |

| Nombre(s) Accionistas | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| ROCKFORD INVESTMENTS, INC. Rep. Por José A. Lantigua Balbuena | Belico | ——— | ——— | ——— | ——— |
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Milady del Rosario Luciano | Puerto Plata, R.D. | 037-0015960-5 | Dominicana | Soltera | Emp. privada |
| José Alejandro Henríquez Collado | Puerto Plata, R.D. | 037-0059260-7 | Dominicana | Soltero | Emp. privado |
| Paloma Gardén Pelegrin | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

**Consejo de Administración**

| Cargo | Nombre y Apellido | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|---|
| Presidente | José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |
| Vicepresidente | Cristóbal Hernández Peniche | Puerto Plata, R.D. | 037-0101752-1 | Dominicana | Soltero | Empresario |
| Tesorero | | | | | | |
| Secretario | Ángel Rafael Silverio Chevalier | Puerto Plata, R.D. | 037-0093115-1 | Dominicana | Soltero | Empresario |
| Comisario | Paloma Gardén Pelegrin | Puerto Plata, R.D. | 037-0109246-6 | Dominicana | Soltera | Emp. privada |

| Administradores y/o persona(s) Autorizada(s) a firmar en su nombre | Dirección | Cédula / Pasaporte | Nacionalidad | Estado Civil | Profesión |
|---|---|---|---|---|---|
| José Apolinar Lantigua Balbuena | Sosúa, Pto. Pta., R.D. | 097-0005057-9 | Dominicana | Soltero | Empresario |

| Capital Autorizado RD$ | Capital Pagado RD$ | Bienes Raíces RD$ | Activos RD$ | Duración de la Sociedad |
|---|---|---|---|---|
| RD$ 1,087,700.00 | RD$ 1,016,500.00 | | | Indefinida |

| Fecha de Inicio de operaciones DIA  MES AÑO | Fecha última Asamblea DIA 16 MES 01 AÑO 2009 | Duración de la directiva, hasta: 6 años |
|---|---|---|

| Referencias Comerciales | | | | Referencias Bancarias |
|---|---|---|---|---|
| No. De Empleados | Masculinos | Femeninos | Total | Sucursales y Agencias/ Detalle |
| Registros | Descripción | | Registro Número | |
| Nombre Comercial | SHR SOLAR 134 | | | |
| Marca de Fábrica | | | | |
| Patente de Invención | | | | |

Auribel Tejada
Directora Ejecutiva
Cámara de Comercio y Producción de Puerto Plata, Inc.

Libro No. _____ 111 _____ PROVINCIA ó DISTRITO _____ PUERTO PLATA _____ CIUDAD ó MUNICIPIO _____ PUERTO PLATA _____ Folio No. _____ 188 _____

REGISTRADO PRIMERAMENTE
EN CUMPLIMIENTO DEL
DECRETO U ORDEN

No. ......1162......DEL TRIBUNAL.
SUP DE TIERRAS, EN EL LIBRO
REGISTRO VOL....... FOLIO......
BAJO EL No...3....EL DIA......22....
DE...Diciembre DE........1931.

TRANSFERENCIA DEL
CERTIFICADO
No........41.....LIBRO No...188.....
FOLIO......................
106
TRANSFERIDO AL
CERTIFICADO
No............LIBRO No............
FOLIO......................

(ciento ochenta y ocho)
004434
SERIE PJ

## REPUBLICA DOMINICANA



SOLAR No. ......................
MANZ. No ...... PORCION No. ......
PARCELA No..Ref.-6-Reform-D- 2..
DIST. CAT No .....2.....
DE .......PUERTO PLATA.......

AREA:
0    30    61.01
.....H.......A........M.......D

**REGISTRO DE TITULOS**
**PUERTO PLATA**
**EN NOMBRE DE LA REPUBLICA**

## Certificado de Título Num. 81.-

PROPIETARIO(S):    SHR SOLAR 137, S.A.-

MUNICIPIO:    PUERTO PLATA

DESCRIPCION:    De acuerdo con la Primera Resolución de la Segunda Junta General Constitutiva, de fecha 6 de febrero del año 1998, inscrita el día 3 del mes de junio del año 1998, a las 1.10.00 la tarde, bajo el No.893, folio 224, del Libro de Inscripciones No. 25.- COCONUTS, C, POR A; sociedad comercial organizada y existente en virtud de las leyes de la República Dominicana, con su domicilio y asiento social en el Municipio de Sosúa, Provincia de Puerto Plata, debidamente representada por su Presidente Administrador, INCO INTERNACIONAL LTD, sociedad comercial constituida y existente de acuerdo con las leyes de las Bahamas, con su domicilio social en Cumberland Street P/O, Box No. 529, Nassau, Las Bahamas, sociedad comercial a su vez representada por William Greer Kirkman, estadounidense, mayor de edad, soltero, empresario, portador de la cédula de identidad No. 001-12572987, domiciliado y residente en la ciudad y Municipio de Sosúa, Provincia de Puerto Plata, República Dominicana, y provisionalmente en esta ciudad; y William Allen Kirkman, dominicano, mayor de edad, casado, empleado privado, portador de la cédula de identidad y electoral No.037-0088435-4, domiciliado y residente en la ciudad y Municipio de Sosúa, Provincia de Puerto Plata, República Dominicana, y provisionalmente en esta ciudad, quienes actúan en virtud de resolución de fecha trece (13) del mes de septiembre del año 1996, HA APORTADO A LA SOCIEDAD COMERCIAL "SHR SOLAR 137, S.A." sociedad comercial organizada y existente en virtud de las leyes de la República Dominicana, con su domicilio y asiento social en la calle Duarte No. 2, (tercer piso), El Batey, de la ciudad y Municipio de Sosúa, Provincia de Puerto Plata, República Dominicana, TODOS SUS DERECHOS en la Parcela No. 1-Ref-6-Reform-D-2 (uno-Reformada-seis-Reformada-D-dos), del Distrito Catastral No. 2 ( dos), del Municipio y Provincia de Puerto Plata, Sección Lugar Colonia de la Dorsa, la Cual tiene una extensión superficial de: 0 (cero) HECTAREA, 30 (treina) AREAS, 61.01 (sesenta y uno punto cero uno) CENTIAREAS, Limitada: Al NORTE: P. No. 1-Ref-6-Reform.-D-3, y P. No. 1-Ref-6-Reform.-Resto.- Al ESTE: P. No. 1-Ref-6-Reform.-D-2, y Calle. - AL SUR: Calle y P. No. 1-Ref-6-Reform.-D-1.- Al OESTE: P. No. 1-Ref-6-Reform.-D-1, P. No. 1-Ref-6-Reform.-A-24, P. No. 1-Ref-6-Reform.-Resto.- De acuerdo con la Certificación del Director General de Mensuras Catastral.- Por tanto Se DECLARA SHR SOLAR 137, S.A.- investida con el Derecho de Propiedad de esta Parcela.- Haciéndose constar que dicho aporte ha sido estipulado por la suma de: SEISCIENTOS CUARENTA Y CUATRO MIL PESOS DOMINICANOS (R.D.$ 644,000.00).- Puerto Plata a los 19 (diecinueve) días del mes de junio del año 1998.- El Registrador de Títulos.- LIC. ALEXANDRA E. RAPOSO SANTOS.-

LIC. ALEXANDRA E. RAPOSO SANTOS.
Registrador de Títulos



VERIFICAR LA PRESENCIA DE LA MARCA DE AGUA EN FORMA DE LOGO SOSTENIENDO EL DOCUMENTO A CONTRALUZ

# REGISTRO DE TÍTULOS

## JURISDICCIÓN INMOBILIARIA
### PODER JUDICIAL REPÚBLICA DOMINICANA

| | |
|---|---|
| MATRÍCULA | 1500002331 |
| FECHA Y HORA DE INSCRIPCIÓN | 3/jun/1998, |
| VIENE DE | L111, F180, V0, H134 |
| MUNICIPIO | Puerto Plata |
| PROVINCIA | |

**OFICINA**
REGISTRO DE TÍTULOS DE PUERTO PLATA

SUPERFICIE EN METROS CUADRADOS
2,982.24 m²

**DESIGNACIÓN CATASTRAL**
Parcela 1-REF-6-REFORM-D-5, DC 02

**PROPIETARIO**
SHR SOLAR 134, S.A.

En virtud de la Ley y en nombre de la República se declara TITULAR DEL DERECHO DE PROPIEDAD a: SHR SOLAR 134, S.A., sobre el inmueble identificado como Parcela 1-REF-6-REFORM-D-5, del Distrito Catastral No.02, que tiene una superficie de 2,982.24 metros cuadrados, matrícula No.1500002331, ubicado en Puerto Plata. El derecho fue adquirido a COCONUTS, C. POR A.. El derecho tiene su origen en APORTE, según consta en el documento de fecha 6 de febrero del 1998, ACTA DE ASAMBLEA, , inscrita en el libro día 3 de junio del 1998 a las 2:10PM. Nota: EL PRESENTE ORIGINAL SUSTITUYE AL DEL LIBRO 111, F180 V0 VOLUMEN 0 HOJA1134, EN VIRTUD DE LO ESTABLECIDO EN LA RESOLUCIÓN NO. 622-2007, DEL 29 DE MARZO DEL 2007, DE LA SUPREMA CORTE DE JUSTICIA, QUE APRUEBA LOS NUEVOS FORMATOS DE LA JURISDICCIÓN INMOBILIARIA.- Emitido el 30 de junio del 2008.

Lic. Evelyn Rivera de Finke
Registradora de Títulos de Puerto Plata

2700801828

00005807

DOCUMENTO OFICIAL, SU ALTERACIÓN ESTA PENALIZADA POR LEY

0185   **CONSTANCIA**   164

VERIFICAR LA PRESENCIA DE LA MARCA DE AGUA EN FORMA DE LOGO SOSTENIENDO EL DOCUMENTO A CONTRALUZ

**REGISTRO DE TÍTULOS**

**JURISDICCIÓN INMOBILIARIA**
PODER JUDICIAL REPÚBLICA DOMINICANA

| MATRÍCULA | |
| --- | --- |
| | 1500002330 |
| FECHA Y HORA DE INSCRIPCIÓN | 20/nov/2002. |
| VER DE | L134, F248, V0, H204 |
| MUNICIPIO | Puerto Plata |
| PROVINCIA | |

OFICINA
REGISTRO DE TÍTULOS DE PUERTO PLATA

SUPERFICIE EN METROS CUADRADOS
747.00 m²

DESIGNACIÓN CATASTRAL:
Parcela 1-REF-6-REF, DC 02

PROPIETARIO
SHR SOLAR 134, S.A.

En virtud de la Ley y en nombre de la República se declara TITULAR DE LOS DERECHOS DE PROPIEDAD a: SHR SOLAR 134, S.A., sobre una porción de terreno con una superficie de 747.00 metros cuadrados, identificada con la matrícula No.1500002330, dentro del inmueble: Parcela 1-REF-6-REF, del Distrito Catastral No.02, ubicado en Puerto Plata. El derecho fue adquirido a COCONUTS & CORP., del derecho tiene su origen en APORTE, según consta en el documento de fecha 16 de abril del 2002, _____ inscrita en el libro diario el 20 de noviembre del 2002 a las 11:36AM. Nota: EL PRESENTE ORIGINAL SUSTITUYE AL DEL LIBRO 134, FOLIO 248, VOLUMEN 0, HOJA 204, EN VIRTUD DE LO ESTABLECIDO EN LA RESOLUCIÓN NO. 622-2007, DEL 29 DE MARZO DEL 2007, DE LA SUPREMA CORTE DE JUSTICIA, QUE APRUEBA LOS NUEVOS FORMATOS DE LA JURISDICCIÓN INMOBILIARIA.-. Emitido el 30 de junio del 2008.

Lic. Evelyn Olvera de Finke
Registradora de Títulos de Puerto Plata

NULO   NULO   NULO   NULO   NULO   NULO   NULO

2700801828

NULO

00050500

7965 + 8504 + 8504
1.4.2
LEER AL DORSO

**DOCUMENTO OFICIAL, SU ALTERACIÓN ESTÁ PENALIZADA POR LEY**

ESTE DOCUMENTO NO ES VÁLIDO SI TIENE ALTERACIONES, BORRADURAS O TACHADURAS

CERTIFICADO

VERIFICAR LA PRESENCIA DE LA MARCA DE AGUA EN FORMA DE LOGO SOSTENIENDO EL DOCUMENTO A CONTRALUZ

**REGISTRO DE TÍTULOS**

**JURISDICCIÓN INMOBILIARIA**
PODER JUDICIAL REPÚBLICA DOMINICANA

| | |
|---|---|
| MATRÍCULA | 1500002329 |
| FECHA Y HORA DE INSCRIPCIÓN | 3/jun/1998, |
| VÉASE DE. | L111, F164, V0, H138 |
| MUNICIPIO | Puerto Plata |
| PROVINCIA | |

OFICINA
REGISTRO DE TÍTULOS DE PUERTO PLATA

SUPERFICIE EN METROS CUADRADOS
**3,143.62 m²**

DESIGNACIÓN CATASTRAL
Parcela 1-REF-6-REFORM-D-4, DC 02

PROPIETARIO
SHR SOLAR 135, S.A.

En virtud de la Ley en nombre de la República se declara TITULAR DEL DERECHO DE PROPIEDAD a: SHR SOLAR 135, S.A., sobre el inmueble identificado como Parcela 1-REF-6-REFORM-D-4, del Distrito Catastral No.02, que tiene una superficie de 3,143.62 metros cuadrados, matrícula No.1500002329, ubicado en Puerto Plata. El derecho fue adquirido a COCONUTS, C. POR A. El derecho tiene su origen en APORTE, según consta en el documento de fecha 6 de febrero del 1998, ACTA DE ASAMBLEA, , inscrita en fecha 13 de junio del 1998 a las 11:50AM. Nota: EL PRESENTE ORIGINAL SUSTITUYE AL DEL LIBRO 111, FOLIO 164, VOLUMEN 0, HOJA138, EN VIRTUD DE LO ESTABLECIDO EN LA RESOLUCIÓN NO. 622-2007, DEL 29 DE MARZO DEL 2007, DE LA SUPREMA CORTE DE JUSTICIA, QUE APRUEBA LOS NUEVOS FORMATOS DE LA JURISDICCIÓN INMOBILIRIA.-. Emitido el 30 de junio del 2008.

Lic. Evelyn Rivera de Finke
Registradora de Títulos de Puerto Plata

NULO

2700801828

00005805

DOCUMENTO OFICIAL, SU ALTERACIÓN ESTA PENALIZADA POR LEY

Libro No. 86    PROVINCIA ó DISTRITO PUERTO PLATA   MUNICIPIO PUERTO PLATA   Folio No. 15 (quince)

**REPUBLICA DOMINICANA**

0032366
SERIE PJ

REGISTRADO PRIMERAMENTE
EN CUMPLIMIENTO DEL
DECRETO U ORDEN

No. 1162...........DEL TRIBUNAL.
SUP DE TIERRAS, EN EL LIBRO
REGISTRO VOL....1... FOLIO....5...
BAJO EL No....5.... EL DIA....22.
DE...Diciembre DE....1931....

TRANSFERENCIA DEL
CERTIFICADO

No...46.... LIBRO No...12.......
FOLIO .......62....................

TRANSFERIDO AL
CERTIFICADO

No............. LIBRO No...........
FOLIO ...................

SOLAR No .......................
MANZ. No ...... PORCION No ......
PARCELA No .... 1-Ref-6-Ref
DIST. CAT No ...... 2 .............
DE PUERTO PLATA ...............

AREA:

104...H...58...A.64...M.......0

REGISTRO DE TITULOS
PUERTO PLATA
EN NOMBRE DE LA REPUBLICA

## Certificado de Título Num. 119.-(Anotación No.16)

(CONSTANCIA EXPEDIDA DE ACUERDO CON EL ARTICULO 195 DE LA LEY DE REGISTRO DE TIERRAS).-

PROPIETARIO(S): SHR SOLAR 24, S. A.-

MUNICIPIO PUERTO PLATA

DESCRIPCION

del 2002, inscrita el día 20 de Noviembre del 2002, a las 11:38 de la mañana, bajo el No.1236, folio 309 del Libro de Inscripciones No.33 COCONUTS, C. POR; A; Sociedad comercial organizada de acuerdo con las leyes dominicanas, con domicilio social en este Municipio de Sosúa, República Dominicana, debidamente representada por su presidente-administrador y STAR INSURANCE COMPANY (CAYMAN) LIMITED y este a su vez representada por los Señores WILLIAM GREER KIRKMAN, Cédula No. 001-0057298-7 y WILLIAM ATREEN KIRKMAN, Cédula No.037-0068435-4, HA APORTADO A SHR SOLAR 24, S. A., Sociedad comercial previamente y conforme de conformidad con las leyes

Sosúa, Provincia de Puerto Plata, República Dominicana, debidamente representada por su Presidente LAM INVESTMENTS, S. A., y este a su vez representado por el Señor PAULO R. MARTINS, DE SUS DERECHOS en esta Parcela, una porción que mide: 2,619.83 (dos mil seiscientos diecinueve punto ochenta y tres) METROS CUADRADOS.-Por Tanto SE DECLARA: A SHR SOLAR 24, S. A., INVESTIDA con el derecho de propiedad de la porción indicada.-Haciendose constar que dicho aporte a Sido estimado a la suma de UN MILLON TRESCIENTOS SESENTA Y SIETE MIL SEISCIENTOS PESOS (RD$1,367,700.00).-Puerto Plata, R. D., a los veintisiete (27) Días del mes de Enero del año dos mil tres (2003).-El Registrador de Títulos.-LIC. EVELYN RIVERA DE PARRA.-

LIC. EVELYN RIVERA DE PARRA
Registrador de Títulos

CERTIFICADO DE TÍTULO

VERIFICAR LA PRESENCIA DE LA MARCA DE AGUA EN FORMA DE LOGO SOSTENIENDO EL DOCUMENTO A CONTRALUZ



**REGISTRO DE TÍTULOS**

**JURISDICCIÓN INMOBILIARIA**
PODER JUDICIAL REPÚBLICA DOMINICANA

OFICINA
REGISTRO DE TÍTULOS DE PUERTO PLATA

| MATRÍCULA | 1500001788 |
| FECHA Y HORA DE INSCRIPCIÓN | 9/oct/1992, |
| VÉASE EN: | L76, F67, V0, H0065 |
| MUNICIPIO | Puerto Plata |
| PROVINCIA | |
| SUPERFICIE UN METROS CUADRADOS | 2,943.00 m² |

DESIGNACIÓN CATASTRAL
Parcela 1-REFORM-8-REFORM-A-24, DC 02

PROPIETARIO
SHR SOLAR 24, S. A.

En virtud de la Ley y en nombre de la República se declara TITULAR DEL DERECHO DE PROPIEDAD a: SHR SOLAR 24, S. A., sobre el Inmueble identificado como Parcela 1-REFORM-8-REFORM-A-24, del Distrito Catastral No.02, que tiene una superficie de 2,943.00 metros cuadrados, matrícula No.1500001788, ubicado en Puerto Plata. El derecho fue adquirido a SEA HORSE RANCH, S. A. El derecho tiene su origen en APORTE, según consta en el documento de fecha 11 de septiembre del 1992, ACTA DE ASAMBLEA, inscrito en el Libro Diario el 6 de octubre del 1992 a las 11:45:00AM. El presente duplicado por pérdida remplaza y cancela el anterior duplicado. Emitido el 18 de noviembre del 2008.

Lic. Evelyn Rivera de Pinke
Registradora de Títulos de Puerto Plata

2700804297

00049763

3521 > 11313 > 13104
1.4.2
LEER AL DORSO

DOCUMENTO OFICIAL, SU ALTERACIÓN ESTÁ PENALIZADA POR LEY

Libro No. .....111.....

PROVINCIA ó DISTRITO .....PUERTO PLATA.....  CIUDAD ó MUNICIPIO .....PUERTO PLATA.....  Folio No. .....155.....

(ciento cincuenta y cinco)

003284
SERIE PJ

**REPUBLICA DOMINICANA**

REGISTRADO PRIMERAMENTE EN CUMPLIMIENTO DEL DECRETO U ORDEN
No. ...1162... DEL TRIBUNAL SUP DE TIERRAS, EN EL LIBRO REGISTRO VOS. ..... FOLIO 2.. BAJO EL No. ........ EL DIA. ...5... DE ...Diciembre... DE ....1931...

TRANSFERENCIA DEL
CERTIFICADO
42        108
No. ........ LIBRO No. ...... FOLIO ............ 197
TRANSFERIDO AL CERTIFICADO
No. ........ LIBRO No. ...... FOLIO ........ No. ...........

SOLAR No. ....................
MANZ. No ...... PORCION No ......
PARCELA No. 1-Ref-6-Reform-D-3
                         2
DIST. CAT. No. PUERTO PLATA
DE ........................

AREA:
0    39   40.79
.....H..... A.....M.....D

**REGISTRO DE TITULOS**
**PUERTO PLATA**
**EN NOMBRE DE LA REPUBLICA**

## Certificado de Título Num. 48.-

**PROPIETARIO(S):**    SHR SOLAR 136, S.A.-

**MUNICIPIO:**    (0) PUERTO PLATA (0) NULO N[ULO]
NULO NULO NULO

**DESCRIPCION:** De acuerdo con la Primera Resolución de la Segunda Junta General Constitutiva, de fecha 6 de febrero del año 1998, inscrita el día a del mes de junio del año 1998, a ... de la tarde, bajo el No. 905, folio 227 del Libro de Inscripciones No. 25.- COCONUTS, C. POR A., sociedad comercial organizada y existente en virtud de las leyes de la República Dominicana, con su domicilio y asiento social en el Municipio de Sosúa, Provincia de Puerto Plata, debidamente representada por su Presidente Administrador CINCO INTERNACIONAL LTD, sociedad comercial constituida y existente de acuerdo con las leyes de las Bahamas, con su domicilio social en Cumberland Street, P.O. Box No. 529, Nassau Las Bahamas sociedad comercial a su vez representada por William Greer Kirkman, estadunidense, mayor de edad,

de Sosúa, Provincia de Puerto Plata, República Dominicana, y provisionalmente en esta ciudad; y William Allen Kirkman, dominicano, mayor de edad, casado, empleado privado, portador de la cédula de identidad y electoral No.037-0068435-4, domiciliado y residente en la ciudad y Municipio de Sosúa, Provincia de Puerto Plata, República Dominicana, y provisionalmente en esta ciudad, quienes actúan en virtud de resolución de fecha trece (13) del mes de septiembre del año 1996, HA APORTADO A LA SOCIEDAD COMERCIAL SHR SOLAR136, S.A., sociedad comercial organizada y existente en virtud de las leyes de la República Dominicana, con su domicilio y asiento social en la calle Duarte No. 2, (tercer piso), El Batey, de la ciudad y Municipio de Sosúa, Provincia de Puerto Plata, República Dominicana, TODOS SUS DERECHOS en la Parcela No. 1-Ref-6-Reform-D-3 (uno-Reformada-seis-Reformada-D-tres) del Distrito Catastral No. 2 ( dos), del Municipio y Provincia de Puerto Plata, Sección Sosúa, Lugar Colonia de la Bolsa, la Cual tiene una extensión superficial de: 0 (cero) HECTAREA, 39 (treinta y nueve) AREAS 40/79, (cuarenta punto setenta y nueve) CENTIAREAS, Limitada: Al NORTE: P. No. 1-Ref-6-Reform- D-4 y P. No. 1-Ref-6-Reform- (Resto).- Al ESTE: P. No 1-Ref-6-Reform-D-4 y Calle.- Al SUR: Calle y P. No. 1-Ref-6-Reform-D-2.- Al OESTE: P. No. 1-Ref-6-Reform-D-2 y P. No. 1-Ref-6-Reform-Resto.- De acuerdo con la Certificación del Director General de Mensuras Catastral.- Por tanto Se DECLARA, SHR SOLAR 136, S.A.- investida con el Derecho de Propiedad de esta Parcela.- Haciéndose constar que dicho aporte ha sido estipulado por la suma de:OCHOCIENTOS VEINTINUEVE, MIL PESOS DOMINICANOS (RD$ ....... Puerto Plata a los 19 (diecinueve) días del mes de junio del año 1998.- El Registrador de Títulos, LIC. ALEXANDRA E. RAPOSO SANTOS.-



(0) NULO NULO L[...]
NULO NULO NU[...]
(0) NULO NULO [...]
NULO NULO NULO

LIC. ALEXANDRA E. RAPOSO SANTOS.-
Registrador de Títulos-

# EXHIBIT 18

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO
AND MAIL TAX STATEMENTS TO

NAME          Mark Whitehead

ADDRESS       9 Ocean Ridge

CITY          Newport Beach
STATE & ZIP   California 92657

## GRANT DEED

TITLE ORDER NO.              ESCROW NO.              APN NO. 052 013 09

THE UNDERSIGNED GRANTOR(s) DECLARE(s)    Conveyed from LLC where Both Grantees are only members
DOCUMENTARY TRANSFER TAX is $____No Consideration_____ CITY TAX $_____
☐ computed on full value of property conveyed, or ☐ computed on full value less value of liens or encumbrances remaining at time of sale,
☐ Unincorporated area: ☐ City of _____, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

DONALD OKADA, a single man as his sole and separate property,

hereby GRANT(s) its full interest evenly divided to;

MARK WHITEHEAD AND ANNETTE WHITEHEAD, Husband and Wife, an undivided fifty percent (50%) interest

the following described real property in the City of Newport Beach, County of Orange, State of California:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE PART OF
Also known as: 9 Ocean Ridge, Newport Beach, California 92657

Dated_____8/15/14_____          _____
                                             Donald Okada

**EXHIBIT**

_18 dg_

_8-27-15_

STATE OF CALIFORNIA    }
COUNTY OF ORANGE       } ss.

On _AUGUST 15, 2014_ _____ before me, _Kimberly LAM RANDALL_ _____.

personally appeared _DONALD AKIO OKADA_ _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

WITNESS my hand and official seal.

Signature _____

KIMBERLY LAM RANDALL
Commission # 2055394
Notary Public - California
Orange County
My Comm. Expires Jan 17, 2018

Exhibit "A"

Parcel 1:

Parcel 5, as shown on Exhibit "8" attached to lot line adjustment LL 90-100, recorded April 17, 1991 as instrument no.91-179005 of Official Records of Orange County, California.

Except therefrom all oil, gas, minerals and other hydrocarbons, below a depth of 500 feet, without the right of surface entry, as reserved in deeds of record.

Parcel2:

Non-exclusive easement for access, ingress, egress, drainage, maintenance and repairs, all as described in the Declaration of Covenants, Conditions and Restrictions for Newport Coast Community Association recorded May 24, 1991 as instrument no. 91-257521, as amended by amendment no. 1 to the Declaration of Covenants, Conditions and Restrictions for Newport Coast Community Association recorded December 6, 1991 as instrument no. 91-672706, both of Official Records of Orange County, California (collectively, the "Master Declaration") and in the Supplementary Declaration of Covenants, Conditions and Restrictions for Newport Coast Community Association (Ocean Ridge - Phase 3) recorded September 25,1997 as instrument no. 473968 of said Official Records, the special Declaration of Covenants, Conditions and Restrictions governing landscaping, community entry and general maintenance (Newport Coast Project), recorded May 23, 1991 as instrument no. 91-255875, as amended by document recorded December 6,1991, as instrument no. 91-671963 (collectively, the "Special Declaration"), both of said Official Records, as imposed by that certain Supplementary Special Declaration of Covenant, Conditions and Restrictions Governing landscaping, community entry and general maintenance (Newport Coast-Ocean Ridge) recorded December 21,1994 as instrument no. 94-727646 of said Official Records, the Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Bramalea Homes at Newport Coast recorded May 29,1991- as instrument no. 91-265970, as amended by that certain First amendment to Declaration of Covenants, Conditions and Restrictions and Reservation of easement for Bramalea Homes at Newport Coast recorded April 15, 1992 as instrument no. 92-246647, both of Official Records of Orange County, California (collectively the "Declaration"), and in that certain Notice of Addition of Territory, designation of phase and Supplemental Declaration of Covenants, Conditions and Restrictions for Phase 3 of the signature collection at Ocean Ridge (the "Notice") recorded September 25,1997 as instrument no. 97-473969 of said Official Records.

# EXHIBIT 24

## ADMINISTRATOR INSTRUCTIONS

1.    **Power of Attorney.** The Administrator shall receive Power of Attorney from SHR SOLAR 24, S.A., SHR SOLAR 134, S.A., SHR SOLAR 135, S.A., SHR SOLAR 136, S.A.. SHR SOLAR 137, S.A. (collectively the "DR Companies") as well as from their successor corporate identities, including but not limited to the possible conversion of the DR Companies from S.A. (Ltd.) to S.a.r.l. companies pursuant to Dominican Republic law, and Rockford Investment, Inc. a Belize corporation ("Rockford"), for purposes of

1.1    *Acto de Constitucion de Hipoteca*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against real property located at Seahorse Ranch, Puerto Plata, Dominican Republic, and currently held by the Dominican Republic entities called SHR SOLAR 24, S.A. (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), SHR SOLAR 134, S.A. (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata) (collectively, all of these real property assets are referred to as "Lions Gate"), in favor of Donald Okada, an individual ("Okada");

1.2    *Pagare Notarial*, in the amount of Nine Hundred and Fifty Thousand USD ($950,000) for a term of eighteen (18) months, bearing a rate of two percent (2%) simple interest per annum, to be secured as a first priority lien against Lions Gate, in favor of Okada; and

1.3    *Acuerdo de Dacion de Pago*, in the event of default by Mark Whitehead ("Whitehead"), in favor of Okada.

2.    **Escrow.** Administrator shall hold in escrow 100% of all present and future outstanding shares of Rockford and its subsidiaries on behalf of Okada and Whitehead until the full performance of Whitehead of any and every executed agreements between and by Okada and Whitehead, and Okada notifies Administrator in writing of Okada's intent to release such Rockford shares, held for his benefit, from escrow.

3.    **Manager of the DR Companies.**

3.1    Appointment: Okada and Whitehead will mutually agree upon the Manager of the DR Companies ("Manager").

3.2    Duties: Manager of the DR Companies shall assume the duty of the Administrator once appointed.

4.    **Default.**

4.1    **Instructions in an Event of Default.** In an event of default as agreed between Okada and Whitehead, and upon receipt by Administrator or Manager a notice of such default, Administrator or Manager shall perform the following duties on behalf of Okada:

1



EXHIBIT
2 Ydy
8·27·15

DOC000105

(a)    Upon an event of default, among other remedies available under the agreements between Okada and Whitehead, Okada may declare the entire indebtedness secured by Lion's Gate immediately due and payable by delivery to Whitehead of written declaration of such default and of election to cause Lion's Gate to be sold. If Okada so elects, Administrator or Manager shall, under the relevant laws of Dominican Republic, consider any and all necessary methods and execute to bring about such results.

(b)    Should Okada elects to claim the shares of Rockford and its subsidiaries in escrow, Administrator or Manager shall, under the relevant laws of Dominican Republic, promptly transfer every and all shares in escrow to Okada. Further, Administrator or Manager shall consider any and all necessary methods and execute to bring about such results.

(c)    Should Okada elects to have a receiver appointed to take possession of all or any part of Lion's Gate, with the power to protect and preserve the Lion's Gate, to operate the Lion's Gate preceding foreclosure sale, and to collect rents or fees, if any, Administrator or Manager shall act as such Receiver.

(d)    Should Okada elects any other remedies as agreed between and by Okada and Whitehead, Administrator or Manager shall, within the confines of laws of Dominican Republic, perform all duties as requested by Okada.

4.2    **Notice to Okada of an Event of Default.** In an event where any of the following occurs of which Administrator or Manager has actual or constructive notice or knowledge thereof, Administrator or Manager shall immediately notify Okada in writing of an event(s) where:

(a)    Rockford, DR Companies or Whitehead fails to comply with or to perform terms, obligations, covenant or condition contained in any agreements between Okada and Whitehead;

(b)    Rockford, DR Companies or Whitehead fails to comply with or perform any term or obligation under any laws and regulations of Dominican Republic which may have any impact on Okada's interest in Lion's Gate;

(c)    Any warranty, representation or statement made by Whitehead to Okada with respect to Lion's Gate or any other agreements is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter;

(d)    If collateralization of Lion's Gate ceases to be in full force and effect at any time and for any reason;

(e)    Dissolution or termination of Rockford's and/or DR Companies' existence, or the commencement of any bankruptcy or insolvency laws against Rockford, DR Companies or Whitehead;

(f)    Any proceedings against Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate; and

2

DOC000106

(g)    Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.    **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's and Whitehead's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada and Whitehead under California and Dominican Republic law.

6.    **Administrative Expenses**. All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead. The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada. The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.    **Change or Resignation of Administrator**. Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.    **Term of Administrator and Manager**. Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager. Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

Executed this 14th day of August, 2014.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

I accept the appointment of Manager of the DR Companies and Administrator of Rockford and consent to the responsibilities of the same as stated in these Administrator Instructions.

PERDOMO LAW

By:_____

3

DOC000107

(g)    Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.    **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's and Whitehead's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada and Whitehead under California and Dominican Republic law.

6.    **Administrative Expenses**.  All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead. The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada. The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.    **Change or Resignation of Administrator**.  Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.    **Term of Administrator and Manager**.  Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager. Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

Executed this 14th day of August, 2014.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

I accept the appointment of Manager of the DR Companies and Administrator of Rockford and consent to the responsibilities of the same as stated in these Administrator Instructions.

PERDOMO LAW

By:_____

3

(g)    Any acts or omission of acts by Rockford, DR Companies or Whitehead that may have any negative impact on Okada's interests in Lion's Gate.

5.    **Miscellaneous Duties**. Administrator or Manager shall perform any other duties that may reasonably necessary to protect Okada's and Whitehead's interests in Lion's Gate. Administrator or Manager shall be deemed a fiduciary of Okada and Whitehead under California and Dominican Republic law.

6.    **Administrative Expenses**.  All expenses incurred as a result of operation of Rockford, other than Administrator fee, shall be paid for by Whitehead. The Administrator fee and the Manager's salary shall be split 50-50 by Whitehead and Okada. The Administrator fee shall be $2,000 USD for the first six months and then $1,000 USD for every month thereafter.

7.    **Change or Resignation of Administrator**.  Administrator shall not resign or otherwise be changed without prior written consent of Okada and Whitehead.

8.    **Term of Administrator and Manager**.  Administrator shall be relieved from all duties hereunder upon the earlier occurrence of satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein or the appointment of Manager.  Manager, once appointed, shall be relieved from all duties hereunder upon satisfactory payment in the amount of Nine Hundred and Fifty Thousand USD ($950,000) and any accrued interest therein.

Executed this 14th day of August, 2014.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

I accept the appointment of Manager of the DR Companies and Administrator of Rockford and consent to the responsibilities of the same as stated in these Administrator Instructions.

PERDOMO LAW

By:_____

3

DOC000109

EXHIBIT 25

## FIRST AMENDMENT TO SETTLEMENT AGREEMENT

This First Amendment to Settlement Agreement is made as of August 13, 2014 (the "Effective Date"), by and between Donald Okada ("Okada"), on the one hand, and Mark Whitehead ("Whitehead"), on the other hand, with respect to the following the facts and circumstances set forth below. Okada and Whitehead are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on or around July 31, 2014, Whitehead and Okada entered into a Settlement Agreement (the "Agreement") to resolve a number of claims relating to their joint ventures, and to effect the transfer of certain partnership property to Timo Lindberg, on behalf of Premium Invest Ltd. and Kamprad Venture Capital LP (collectively the "Buyers").

WHEREAS the Agreement specified that upon closing of the transaction between the Parties and Buyers, Okada would receive a non-voting ownership interest in Rockford Investment, Inc., a Belize corporation ("Rockford") in the amount of Nine Hundred and Fifty Thousand USD ($950,000) subject to the various other terms and conditions of the Agreement.

WHEREAS Buyers have represented that a conveyance of Okada's ownership interest in Rockford would delay closing of the transaction between the Buyers and the Parties.

WHEREAS, the Parties wish to memorialize a compromise between themselves to allow the transaction to proceed without delay by amending the Agreement, doing so freely and voluntarily, after having received the benefit of independent counsel and with full knowledge of the binding and conclusive nature thereof.

NOW THEREFORE, for good and valuable consideration (i.e., each party agreeing that such amendment will permit the transaction between Parties and Buyers to proceed), the receipt and sufficiency of which is hereby acknowledged, including the mutual promises contained in this Agreement, IT IS AGREED BETWEEN OKADA and WHITEHEAD that:

## TERMS AND CONDITIONS

1.    **Amendment.** In the event Okada cannot receive his ownership interest in Rockford upon closing, as required under section 1.6 of the Agreement, then upon closing, the entire ownership interest in Rockford, including legal title, will be conveyed directly to Perdomo Law instead of to Okada and Whitehead. Perdomo Law shall hold those ownership interests in trust for Okada and Whitehead in accordance with Section 2 of the Administrator Instructions.

2.    **No Reliance.** The Parties represent and warrant that, in executing and entering into this Amendment, they are not relying and have not relied upon any representation, promise or statement made by anyone which is not recited, contained or embodied in this Amendment. Furthermore, each of the Parties to this Amendment has received independent legal advice, or has had the opportunity to receive independent legal advice, from such Party's respective attorneys with respect to the advisability of executing this Amendment. The Parties are entering into this Amendment wholly of their own free will and volition.

1

EXHIBIT

25 dg

8·27·15

3.      **No Other Amendment.** The Parties agree that there are no other amendments to the Agreement.

4.      **Successors, Assigns, Personal Representatives.** This Amendment shall be to the benefit of, and binding upon, the successors, heirs, personal representatives, and assigns of each of the Parties to the Agreement.

5.      **Choice of Law/Venue.** This Amendment is executed and delivered within the State of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with and governed by the laws of the State of California. In the event of any dispute in connection with this Agreement, the Parties hereto agree that the State or Federal Courts of Los Angeles County shall constitute the most appropriate venue for any such lawsuit or dispute due to the convenience of likely witnesses.

6.      **Waiver of Service.** The Parties acknowledge that Whitehead may take residence outside the United States of California either on a temporary or permanent basis. To effect the aims of this Amendment, the Parties agree, and hereby consent in advance, that service of process for any lawsuit or action related to this Amendment may be effected by personal delivery to Randolph Gaw (on behalf of Donald Okada) or James A. Bryant II (on behalf of Mark Whitehead).

7.      **Specific Performance and Defense to Future Actions.** The obligations and covenants set forth in this Amendment may be specifically enforced on or by any party entitled to the benefit hereof.

8.      **Attorney's Fees and Costs.** The Parties agree that in any action or lawsuit relating to this Amendment, the prevailing party will be entitled to its reasonable attorney's fees and the costs of suit, including expert witness fees.

9.      **Modification and Amendment.** This Amendment may not be modified or amended in any way, except by a writing signed by the party to be charged therewith.

10.     **Counterparts.** This Agreement may be signed in counterparts, and each counterpart so signed shall constitute a part of one valid original document.

11.     **Facsimile or PDF Transmission.** This document may be signed by facsimile or as a PDF document. A photocopy of this Agreement may be used as the original.

[Signatures to Follow]

2

EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____

3

EXECUTED THE DAY AND YEAR FIRST ABOVE WRITTEN.

DONALD OKADA

By:_____

MARK WHITEHEAD

By:_____

**APPROVED AS TO FORM:**

GAW | POE LLP

By:_____

THE COCHRAN FIRM CALIFORNIA

By:_____

3

# EXHIBIT 27

| | |
|---|---|
| **From:** | mark@markwhitehead.com |
| **To:** | Guido Perdomo |
| **Cc:** | James Bryant |
| **Subject:** | companies |
| **Date:** | Monday, October 06, 2014 11:59:46 AM |

Guido please advise the steps to properly update
the various companies to conform with dom law.
the process please and cost  and timeframe.

mark whitehead



Does your tax suck

mark whitehead
949 903 4782
mark@markwhitehead.com



# EXHIBIT 28

| | |
|---|---|
| **From:** | Guido Perdomo |
| **To:** | mark@markwhitehead.com; Donald Okada; rgaw@gawpoe.com; james.bryant@thecalawgroup.com |
| **Subject:** | Re: Administrator Instructions |
| **Date:** | Monday, October 06, 2014 10:14:44 AM |

Dear sirs.

As escrow agent for the transaction you have done about Lions Gate Property, Sea Horse Ranch, Dominican Republic, I hereby inform you that the administrator for this property has been fired by Mr, Whitehead and he is entitle to a severance payment of around US$20,000.-. I am in touch with him and he has given till the 10th of this month to receive his payment otherwise he would take legal action that could conduct that a lien will be put to the property.

I really would like to resolve this before he could take legal action as this could complicate matters and increase the costs.

Please let me know.

Sincerely

Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic
Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766



# EXHIBIT 29

| | |
|---|---|
| **From:** | jpm.fgn@mail.com |
| **To:** | mark@markwhitehead.com |
| **Cc:** | Guido Perdomo; Donald Okada; rgaw@gawpoe.com; james.bryant@thecalawgroup.com |
| **Subject:** | Re: RE: Administrator Instructions |
| **Date:** | Monday, October 06, 2014 11:17:26 AM |

Gentlemen,

Firstly, I have not employed anyone to work for "me" in the Dom. Rep. I have been advising the company Rockford and its owners for several years with the management of the property and Hito has indeed been working as the property manager and he has also been in charge of staff management, payroll and day to day admin of the companies and the asset. He is the only person who has has signing rights to the property company's bank accounts etc.

As I have already explained to Mark, there has been no need to liquidate any of the local employees after this deal, since the structure (=the local employer) has not changed. However, this means at the same time that the companies have been handed over with the staff in place as old employees and in a case of replacing a staff member a liquidation payment might be due. Note: I am not an expert on these matters, and would not like to give advise for that reason.

I will communicate with Hito and try to reason with him, but I cannot guarantee the result since this is not under my control in any way whatsoever. As always, I repeat what I have already said to Mark; it is always better to negotiate and find an amicable solution when dealing with staff in the Dom. Rep. Litigation is not a good solution.

Hito has been in his management position for 6 years, so it is quite possible that he is entitled to a liquidation payment. Guido knows better than I do what would be the right amount due and how it is calculated.

Best regards,

J-P

**Sent:** Monday, October 06, 2014 at 8:53 PM
**From:** mark@markwhitehead.com
**To:** "Guido Perdomo" <guidoperdomo@yahoo.com>, "Donald Okada"
<encore7@sbcglobal.net>, "rgaw@gawpoe.com" <rgaw@gawpoe.com>,
"james.bryant@thecalawgroup.com" <james.bryant@thecalawgroup.com>
**Cc:** jpm.fgn@mail.com
**Subject:** RE: Administrator Instructions

guido
 jp who employed hito is dealing direct with
hito on this hito was not the  adminstrator for
the property he was the manager employed by
jp
if he is now claiming to be the administrator
then he needs to show his contract with us.
 he was only employed by mark whitehead for



one month to access is work and previous
work and as such failed that assessment with
us. miserably

mark whitehead



Does your tax suck

mark whitehead
949 903 4782
mark@markwhitehead.com

-------- Original Message --------
Subject: Re: Administrator Instructions
From: Guido Perdomo
<guidoperdomo@yahoo.com>
Date: Mon, October 06, 2014 10:14 am
To: "mark@markwhitehead.com"
<mark@markwhitehead.com>, Donald
Okada
<encore7@sbcglobal.net>,
"rgaw@gawpoe.com"
<rgaw@gawpoe.com>,
"james.bryant@thecalawgroup.com"
<james.bryant@thecalawgroup.com>

Dear sirs.

As escrow agent for the transaction you have done about Lions Gate Property, Sea Horse Ranch, Dominican Republic, I hereby inform you that the administrator for this property has been fired by Mr, Whitehead and he is entitle to a severance payment of around US$20,000.-. I am in touch with him and he has given till the 10th of this month to receive his payment otherwise he would take legal action that could conduct that a lien will be put to the property.

I really would like to resolve this before he could take legal action as this could complicate matters and increase the costs.

Please let me know.

Sincerely


Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic
Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766

# EXHIBIT 30

From:        mark@markwhitehead.com
To:          jprn.fgn@mail.com
Cc:          Guido Perdomo; Donald Okada; rgaw@gawpoe.com; james.bryant@thecalawgroup.com
Subject:     RE: RE: Administrator Instructions
Date:        Monday, October 06, 2014 11:37:00 AM

no under dominican law he is not entitled to
liquidation  he has no contract as such certainly
with us. dominican law states they must work for
you full time  min 40 hours per week. hito
worked in the month here average of 20 hours
per week if lucky then he just sat on his phone
while others did work including yours truly.' the
accounting methods he used consisted of here is
a piece of unsigned paper with and amount on it
you owe  me for ??
i asked if he could do quick books he said his
wife maybe able to do that.
during the time prior to close it became clear
when we arrived that know one was doing their
job place was a mess. we now know hito was
hardly here and staff maybe slept a lot . had no
direction at all. hito clearly did not manage
anything.
we have had peggy the new manager who
managers multiple homes like this consult with
the liquidation lawyer she uses and  we believe
stated he is not entitled to it.
on top of that he was a terrible manager for us
and we have a lot of information of what was
going on  from multiple neighbors.
he is of course welcome to file a law suit and we
are welcome to defend it if needed.
As you all know  law suits dont scare me.  hito
runs a cock fighting club on weekends and loan



sharks money to locals  he has multiple business. further to vacate the liquidation law and he made it very very clear when we took over that he is not entitled to liquidation and if we chose to sack him then so be it . We said we are assessing all staff and will decide within the 3 mths required by law  for new owners. it took 30 days to reach that conclusion on hito and two others.

hope this explains our position.

we remain firm on it.

this information  is for the above only and not for any other party.

mark whitehead



Does your tax suck

mark whitehead
949 903 4782
mark@markwhitehead.com

-------- Original Message --------
Subject: Re: RE: Administrator Instructions
From: jpm.fgn@mail.com

Date: Mon, October 06, 2014 11:17 am
To: mark@markwhitehead.com
Cc: "Guido Perdomo" <guidoperdomo@yahoo.com>, "Donald Okada"
<encore7@sbcglobal.net>, "rgaw@gawpoe.com" <rgaw@gawpoe.com>,
"james.bryant@thecalawgroup.com" <james.bryant@thecalawgroup.com>

Gentlemen,

Firstly, I have not employed anyone to work for "me" in the Dom. Rep. I have been
advising the company Rockford and its owners for several years with the management of
the property and Hito has indeed been working as the property manager and he has also
been in charge of staff management, payroll and day to day admin of the companies and
the asset. He is the only person who has has signing rights to the property company's
bank accounts etc.

As I have already explained to Mark, there has been no need to liquidate any of the local
employees after this deal, since the structure (=the local employer) has not changed.
However, this means at the same time that the companies have been handed over with
the staff in place as old employees and in a case of replacing a staff member a liquidation
payment might be due. Note: I am not an expert on these matters, and would not like to
give advise for that reason.

I will communicate with Hito and try to reason with him, but I cannot guarantee the result
since this is not under my control in any way whatsoever. As always, I repeat what I
have already said to Mark; it is always better to negotiate and find an amicable solution
when dealing with staff in the Dom. Rep. Litigation is not a good solution.

Hito has been in his management position for 6 years, so it is quite possible that he is
entitled to a liquidation payment. Guido knows better than I do what would be the right
amount due and how it is calculated.

Best regards,

J-P

Sent: Monday, October 06, 2014 at 8:53 PM
From: mark@markwhitehead.com
To: "Guido Perdomo" <guidoperdomo@yahoo.com>, "Donald Okada"
<encore7@sbcglobal.net>, "rgaw@gawpoe.com" <rgaw@gawpoe.com>,
"james.bryant@thecalawgroup.com" <james.bryant@thecalawgroup.com>
Cc: jpm.fgn@mail.com
Subject: RE: Administrator Instructions

guido
 jp who employed hito is dealing direct
with hito on this hito was not the
adminstrator for the property he was the
manager employed by jp
if he is now claiming to be the
administrator then he needs to show his
contract with us.

he was only employed by mark whitehead
for one month to access is work and
previous work and as such failed that
assessment with us. miserably

mark whitehead



Does your tax suck

mark whitehead
949 903 4782
mark@markwhitehead.com

-------- Original Message --------
Subject: Re: Administrator
Instructions
From: Guido Perdomo
<guidoperdomo@yahoo.com>
Date: Mon, October 06, 2014 10:14
am
To: "mark@markwhitehead.com"
<mark@markwhitehead.com>,
Donald Okada
<encore7@sbcglobal.net>,
"rgaw@gawpoe.com"
<rgaw@gawpoe.com>,
"james.bryant@thecalawgroup.com"

<james.bryant@thecalawgroup.com>

Dear sirs.

As escrow agent for the transaction you have done about Lions Gate Property, Sea Horse Ranch, Dominican Republic, I hereby inform you that the administrator for this property has been fired by Mr, Whitehead and he is entitle to a severance payment of around US$20,000.-. I am in touch with him and he has given till the 10th of this month to receive his payment otherwise he would take legal action that could conduct that a lien will be put to the property.

I really would like to resolve this before he could take legal action as this could complicate matters and increase the costs.

Please let me know.

Sincerely

Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic

Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766

# EXHIBIT 31

| From: | mark@markwhitehead.com |
|---|---|
| To: | Guido Perdomo |
| Cc: | James Bryant |
| Subject: | lionsgate company fees confirmation of wire |
| Date: | Wednesday, October 08, 2014 12:21:14 PM |
| Attachments: | IMG_20141008_0005.pdf |

please find confirmation of wire to bank of america for guido pedramo to get the dominican companies in order or updated.

Had i have known it was critical to registering the liens for okada i would have done it sooner. had i known that ito the manager of record for the companies i would have dealt with that differently as well. im really not very good at reading minds. i trust that jp will sort the ito issue out quickly.

the success of the property is having it run properly and to be presentable to all parties interested which is what we have been striving for the last 6 weeks here. the way it was run previously is just plain insulting.

mark whitehead

mark whitehead





Does your tax suck

mark whitehead
949 903 4782
mark@markwhitehead.com

EXHIBIT 32

## Donald Okada

| | |
|---|---|
| **From:** | Enrique De Marchena <eedemarchena@dmklawyers.com> |
| **Sent:** | Tuesday, August 11, 2015 6:03 PM |
| **To:** | Donald Okada |
| **Cc:** | Nelson Ml. Jáquez Suárez |
| **Subject:** | RV: lionsgate |

Enviado desde mi smartphone BlackBerry 10.

**De:** Guido Perdomo <guidoperdomo@yahoo.com>
**Enviado:** martes, 11 de agosto de 2015 08:15 p.m.
**Para:** Enrique De Marchena
**Responder a:** Guido Perdomo
**Asunto:** Rv: lionsgate

Aqui el otro email, como ves ya estaba cogiendo cuerda.

Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic
Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766

----- Mensaje reenviado -----
**De:** Guido Perdomo <guidoperdomo@yahoo.com>
**Para:** mark@markwhitehead.com
**Enviado:** Miércoles, 8 de octubre, 2014 10:37:33
**Asunto:** Re: lionsgate

Dear sir.

To update the companies Mr. Jose Lantigua needs to sign his resignation and he will not do that till his severance payment is done.

I am not in Sosua today, please come by tomorrow or if you prefer you can leave the check with the Secretary.

It is strange you did not know that to file the liens companies had to be updated, I am almost sure that information is written in one of several emails we shared.

Sincerely

Guido P.

1


EXHIBIT
32 dg
8-27-15

Enviado desde mi smartphone BlackBerry 10.

---

**De:** mark@markwhitehead.com
**Enviado:** Wednesday, October 8, 2014 10:26 AM
**Para:** Guido Perdomo
**Asunto:** lionsgate

Guido
i was not aware that the liens could not be put on the property by okada until the companies were compliant. when we first went to your office you said all is in order but at some stage we need to get the companies compliant so i was aware of it but not that its was neccessary.
i will drop in check today for that issues so the process can be started.

jp said he was going to speak with jose not sure what transpired there but clearly its jp issue as you said i hope jp has that sorted.
i sent jp email now to find out that status.
is there anything i need to sign for the companies stuff

mark



Does your tax suck

mark whitehead
949 903 4782
mark@markwhitehead.com

2

# EXHIBIT 34



**GAW | POE LLP**

4 Embarcadero Ctr., Suite 1400
San Francisco, CA 94111
Tel: 415.766.7451
Fax: 415.737.0642

October 8, 2014

**VIA E-MAIL**

Guido Perdomo
Oficina de Abogados Lic. Guido Luis Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic

        **Re:   Notice of Default of Mark Whitehead**

Dear Mr. Perdomo,

        Under Section 4.1 of the Administrator Instructions dated August 14, 2014 and Section 6.1 of the Settlement Agreement dated July 31, 2014[1], my client Donald Okada hereby declares that Mark Whitehead is in default and that this letter shall serve as notice thereof. Pursuant to Section 4.1(b) of the Administrator Instructions, Mr. Okada hereby requests that you, under the laws of the Dominican Republic, transfer all shares of Rockford Investment Inc., a Belize company, to him.

*Failure to Inscribe Liens*

        Mr. Whitehead is in default for breach of Section 4.2(a) of the Administrator Instructions and Section 6.1(a) of the Settlement Agreement because he has failed to comply with his obligation under Section 1.5 of the Settlement Agreement to issue a first priority lien against the property known as Lions Gate within 24 hours after closing of the transaction transferring ownership of Lions Gate to Perdomo Law to hold in trust for Messrs. Okada and Whitehead. That closing took place on August 15, 2014. Yet on October 7, 2014, nearly two months later, this lien has not yet been inscribed. Enclosed with this letter are the most recent Certifications of Legal Status of Property for the five Dominican Republic companies holding title to the parcels of land that make up Lion's Gate showing that no lien has been recorded on them.[2]

        During our conference call on September 15, 2014 in which Mr. Whitehead's attorney James Bryant was present, you explained that in order for Mr. Whitehead to properly register the liens on Lion's Gate, he must first reinstate the five Dominican Republic companies. You said it would cost $10,000 and also said during the call that you had informed Mr. Whitehead about this

---

[1] A copy of the Administrator Instructions and the Settlement Agreement.

[2] SHR SOLAR 24 (Parcels 1-Ref-6-Ref of Cadastral District (C.D.) No. 2, Puerto Plata and 1-Reform-6-Reform-A-24, C.D. No.02), S.A., SHR SOLAR 134 (Parcel 1-Ref-6-Ref, C.D. No. 2, Puerto Plata), S.A., SHR SOLAR 135, S.A. (1-Ref-6-Reform-D-4, C.D. No. 2, Puerto Plata), SHR SOLAR 137, S.A. (Parcel 1-Ref-6-Reform-D-2, C.D.No.2, Puerto Plata) and SHR SOLAR 136, S.A. (Parcel 1-Ref-6-Reform-D-3, C.D.No.2, Puerto Plata)

EXHIBIT

34 dg

8-27-15

issue a month or two earlier. You also explained it would take 30 days for the Dominican authorities to reinstate the holding companies and transform them into S.a.r.l. entities so that a lien can be placed upon them.

At the conclusion of that call, Mr. Bryant informed everyone that he would have his client begin the process of reinstating the Dominican Republic companies. It is our understanding that as of today, Mr. Whitehead still has not remitted you the funds needed for this to happen, three weeks after that conference call. In fact, I was apparently copied on an e-mail to you from Mr. Whitehead on October 6, 2014 where he asked you to explain the process, yet again, about how to transform the Dominican Republic companies. He clearly had no interest in causing a lien to be issued on Lions Gate as soon as possible, let alone within the 24 hours required under Section 1.5 of the Settlement Agreement.

According to Mr. Okada's attorneys in the Dominican Republic, it also appears that it will likely take 1-2 months even after the companies are reinstated and transformed to inscribe any liens. Mr. Whitehead has to pay off all taxes owed by those companies and possibly do a land survey as well. Therefore, Mr. Whitehead is in default because there is no possibility of Mr. Okada receiving his lien any time in the near future even if he acts with all possible speed, and the events since August 15 demonstrate he has no interest in acting quickly to fulfill his obligation to Mr. Okada.

### *Misrepresentations by Mr. Whitehead*

Mr. Okada also declares a default pursuant to Section 4.2(c) of the Administrator Instructions and Section 6.1(c) of the Settlement Agreement because of false representations made by Mr. Whitehead to Mr. Okada regarding Lions Gate. On July 29, 2014, Mr. Whitehead sent Mr. Okada numerous text messages stating that there were no impediments to his ability to lien the property.

On that date, I had questioned J-P Martins about whether the fact that the Dominican Republic companies had not been registered as S.a.r.l. entities would impede their transfer from Rockford to Messrs. Whitehead and Okada. In response to our inquiries, Mr. Whitehead furiously texted Mr. Okada asking why were we asking such questions and that the status of these corporations "has no bearing on [the] note or ability to lien property." He also threatened to sue Mr. Okada if we asked further questions that resulted in the buyer walking away from the BH LLC transaction.

It is now clear that Mr. Whitehead was lying in those text messages, as he knew the fact that the properties had not been transformed into S.a.r.l. entities meant that no liens could be inscribed upon Lions Gate soon after the closing of the transaction, let alone within 24 hours after closing. He apparently made those statements reassuring Mr. Okada that liens would be placed on Lions Gate without any problems solely to convince Mr. Okada to agree to the transaction. He made those statements without any intention to honor his obligations to Mr. Okada. We will make those text messages available to you upon request.

**Termination of Jose Lantigua**

Mr. Okada also declares a default pursuant to Section 4.2(b) of the Administrator Instructions and Section 6.1(b) of the Settlement Agreement. As you know, Mr. Whitehead recently (and without consulting anyone) terminated the services of Jose Lantigua, thereby entitling Mr. Lantigua to a severance payment of approximately $20,000 USD due in several days. Mr. Whitehead did this action against the recommendation of J-P Martins, the prior administrator for Rockford. Mr. Whitehead is also refusing to give Mr. Lantigua his severance payment.

Mr. Whitehead declared in his e-mail on October 6, 2014 to you and me that "he is of course welcome to file a law suit and we are welcome to defend it if needed. As you all know law suits dont scare me." While lawsuits may not scare him, both you and Mr. Okada's attorneys in the Dominican Republic have confirmed that Mr. Whitehead is obliged under Dominican Republic law to provide this severance payment. Mr. Whitehead has therefore caused Rockford to fail to comply with Dominican Republic law and has jeopardized Mr. Okada's interest in Lions Gate in violations of Sections 4.2(b) and 6.1(b), as Mr. Lantigua is entitled to place a lien upon the property.

Mr. Okada's attorneys in the Dominican Republic also inform him that under Dominican Republic law, Mr. Lantigua's lien would be given priority over any liens belonging to Mr. Okada. Furthermore, Mr. Lantigua would be entitled to many times more money than $20,000 USD in damages against Rockford.

Similarly, the termination of Jose Lantigua constitutes a default under Section 4.2(f) of the Administrator Instructions and Section 6.1(f) of the Settlement Agreement. A lawsuit and lien by Mr. Lantigua against Rockford certainly qualify as proceedings that would have a negative impact on Mr. Okada's interests in Lions Gate.

Finally, the termination of Jose Lantigua constitutes a default under Section 4.2(g) of the Administrator Instructions and Section 6.1(g) of the Settlement Agreement. Mr. Whitehead's refusal to pay Mr. Lantigua the severance payment mandated under Dominican Republic law is an act or omission that has a negative impact on Mr. Okada's interests in Lions Gate, as Mr. Whitehead's actions entitle Mr. Lantigua to place a senior lien on the property.

Enclosed is a share transfer agreement that we request you execute after you have confirmed that Mr. Whitehead is in default under the applicable agreements. Please feel free to contact me with any questions you might have.

Sincerely,

Randolph Gaw

cc:   James Bryant, Esq.
      Donald Okada
      Mark Whitehead

3

# EXHIBIT 35

## Randolph Gaw

| | |
|---|---|
| **From:** | Guido Perdomo |
| **Sent:** | Monday, October 13, 2014 9:07 AM |
| **To:** | mark@markwhitehead.com; james.bryant@thecalawgroup.com; Donald Okada; rgaw@gawpoe.com |
| **Subject:** | Rv: Okada - Nueva Traducción |
| **Attachments:** | Okada - Repeated Summons - Notificaciu00F3n del Default - eng -.doc |

Dear sirs.

In compliance with my fiduciary duties and at the request of Mr Donald Okada, via bailiff act received this morning at my offices, courtesy translation attached herewith, I proceed to sign the transfer of shares in favor of Mr. Donald Okada.

Due to the fact that I have not been able to obtain the signature of Mr Jose Lantigua (he has not received the amount agreed for his liquidation), president of the DR Corporations, therefore I have not been able to start the process of updating the dominican companies, I will proceed to transfer back the US$10,000.- received from Mr Mark Whitehead for such purposes. PLease provide wire transfer instructions.

I just want to confirm that besides said funds I have not received any other funds for any other purpose, including but not limited registration of liens. I confirm having received US$2,000.- for my fees as fiduciary agent.

It has been a pleasure to serve you.

Sincerely

Lic. Guido Perdomo
Calle Pedro Clisante No. 73
Sosua, Puerto Plata
Dominican Republic
Tel. (809)571-1950 - 571-3274
Fax. (809)571-2766


EXHIBIT
35dg
8.27-15

1

# EXHIBIT 36

## James A. Bryant

| | |
|---|---|
| **From:** | Gabriel Tribaldos <gabriel.tribaldos@morimor.com> |
| **Sent:** | Friday, November 21, 2014 8:59 AM |
| **To:** | 'mark' |
| **Cc:** | 'James Bryant'; archivocaribe@morimor.com |
| **Subject:** | I0000094712 – Rockford Investments Inc. |

Dear Mark,

Your instructions has been noted.

Best

MORGAN & MORGAN
ABOGADOS - ATTORNEYS AT LAW

**Gabriel Tribaldos** / pt
Senior Associate
**MORGAN & MORGAN**
MMG Tower | Avenida Paseo del Mar | Costa del Este
Panama | Rep. of Panama
(T) 507.265.7777 (ext. 7655)
(F) 507.265.7700
(E) gabriel.tribaldos@morimor.com
(W) morimor.com

regards,

Morgan & Morgan is the first Panamanian law firm signatory of the
*Pro Bono Declaration for the Americas,* an initiative adopted by regional leading law firms.
*Think about the environment! Don't print this e-mail unless it's really necessary. Disclaimer*

Les informamos que con motivo de la celebración de Fiestas Nacionales durante el mes de diciembre, estaremos cerrados los días 1 y 8 de diciembre.

Favor tomar nota que todas las oficinas públicas permanecerán cerradas los días 1 y 8 de diciembre.

nuestros directores no estarán disponibles para firmar documentos.

Kindly take note that due to National Holidays on December, our office will be closed on December 1st and 8th.

We also inform that all government offices will be closed on December 1st and 8th.

Please be advised that our directors will not be signing documents on those dates.

**De:** mark [mailto:mark@markwhitehead.com]
**Enviado el:** viernes, 21 de noviembre de 2014 11:30 a.m.
**Para:** Gabriel Tribaldos
**CC:** James Bryant
**Asunto:** Lionsgate



Hi Gabriel
It's mark whitehead the owner if lionsgate we have a dispute with okada a small interest owner according to settlement agreement any dispute has to be dealt with in Los Angeles court we are filing proceedings as we

1

speak p m ease do not make any un authorised transfer of Rockford with proper approval from me  my lawyer james bryant

Mark whitehead

Sent from my T-Mobile 4G LTE Device

DOC000302

# EXHIBIT 37

## James A. Bryant

| | |
|---|---|
| **From:** | jpm.fgn@mail.com |
| **Sent:** | Friday, November 28, 2014 8:03 PM |
| **To:** | mark@markwhitehead.com |
| **Subject:** | Re: who was rockford lawyer in dom i though guido |

Hello,

The escrow lawyer could not be seller's lawyer for obvious reasons. Guigo was selected by a previous buyer from the UK and the seller gladly accepted him and this resulted Guido holding all original docs and titles in escrow since 2013.

Rockford's lawyer is Aris Silverio but the firm is owned by Hito's cousin so not sure how well that would work for you...

I will talk to Guido because all this is starting to sound too unbelievable. I do not understand why Guido would do anything against given instructions. We have known him for over a decade and consider him an honest and trustworthy lawyer.

Best regards,

JP

-----Original message-----
Sent: lauantai, 29 marraskuu 2014 at 03:55:31
From: mark@markwhitehead.com
To: jpm.fgn@mail.com
Subject: who was rockford lawyer in dom i though guido


[http://www.facebook.com/pages/Taxsuxnet/324728154223369] [http://twitter.com/#!/marktaxsux]
[http://twitter.com/#!/marktaxsux]


 Does your tax suck

mark whitehead
949 903 4782


mark@markwhitehead.com[mailto:mark@markwhitehead.com]



i

DOC000283